# EXHIBIT B



# SPRINGFIELD POLICE DEPARTMENT

## Paul F. Williams, Chief of Police

**STATEMENT OF:** *Agent John Stuart*

**MADE:** *November 12, 2020*

**PRESENCE OF:** *Detective Kelly Patton*

---

*Q:* **Detective Patton**
*A:* **Agent Stuart**
*T:* **Attorney Tom Allen**

(Sound of door opening and closing)

Q: You can just have a seat there. All right. So, hey, I appreciate you comin' down here and givin' me a statement. This obviously is about the…the shooting incident that happened there at 1827 South Maryland.

A: Yes.

Q: And that was on the second of November, is that correct?

A: Yes.

Q: Okay. Before we get started, I know your attorney…well, actually, you've elected to have an attorney present with you or have…be in communication with an attorney while…

A: Yeah, he's gonna be on the phone. He's out of New York, so he's…

Q: Okay, so why don't you go ahead, and before we even get started, we'll just go ahead and let you get that phone call made and get him on.

(Sound of ringing phone)

T: Thomas Allen.

A: Hey, Tom, this is John Stuart. I'm here in the interview room with Detective Patton and kinda gettin' started, so I was just gonna put you here on speaker and make sure you can hear everything. Are you there?

T: All right. Now are you back?

A: Yeah, Thomas, can you hear me?

T: Yeah.

A: Okay, yeah. So, we're…so, we're here in the interview room. I'm here with Detective Patton and I'm just gonna put you on…I've got you on speaker here and I'm assumin' you can hear okay?

T:     Yeah.

A:     Okay.

Q:     Sir, this is Detective Patton. Can you hear me as well?

T:     Yeah, I can hear you.

Q:     Okay. So basically, we're gonna get started here with the…with the interview with…with the agent here, so I'll just…I'll get right into it if that's okay with you. Do you have any questions before I get started, sir?

T:     I don't have any questions, no.

Q:     Okay. So, I'm gonna start with some just general information, okay, just so I can make sure to have everything for my report. Basically, what's your…can you just tell me your first and last name?

A:     John Stuart.

Q:     Is it J-O-H-N?

A:     Yeah, J-O-H-N S-T-U-A-R-T.

Q:     Okay, and (unintelligible) what's your middle initial?

A:     A.

Q:     And what's your date of birth?

A:     12-12-80.

Q:     Okay, so since this investigation involves a shooting, basically what I'm gonna do is—I know you have your attorney present here—but before I ask you any kind of questions I'm gonna just make sure you understand the Miranda Warning and I'm gonna read that to you. Is that okay?

A:     Yes.

Q:     Okay. So, basically this is a Statement of Rights Form here, and it says, you have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer before making any statement or answering any questions, and you may have him present during questioning. You cannot afford an attorney…oh, sorry…if you cannot afford an attorney, one will be appointed to represent you before any questioning if you wish. You can decide at any time to exercise these rights and not answer any questions or make any statements. Do you understand those rights?

A:     Yes.

Q:     Okay. And basically this…I'll have you sign this, and this says, "I have had the above statement of my rights read to me and I fully understand each of them." And if that's the case, I'll have you sign right there and date it. And eleven-twelve; I've got eight-oh-nine.

T:     And…and just for…for clarity purposes, he's not in custody right now? He's free to leave as he wishes.

Q:     That is correct. Is it okay if I call you John?

A:     Yes.

Q:     Okay, John, absolutely. That's one thing I was gonna make sure you understood is that you are not under arrest, you're not in custody, and if you want to end this interview at any time, you can get up and walk out that door, okay?

A:     I understand.

Q:     Okay. Okay, so just…just general kind of stuff here. So, you're obviously employed by the federal government, but can you explain that to me? Who are you actually employed by?

A:     Drug Enforcement Administration.

Q:     Drug Enforcement. And how long have you been with the DEA?

A:     About nine years.

Q:     Nine years? Do you have any other law enforcement experience before that?

A:     Yes, nine years with the Springfield Police Department.

Q:     Okay, so what…can you kinda describe what your current assignment is with the DEA?

A:     Yeah, I'm a criminal investigator assigned to the Springfield, Missouri resident office, so basically, I'm charged with investigating federal violations of federal drug law.

Q:     Okay, and have you…have you done that for the full nine years?

A:     Yes.

Q:     And where…where all have you been?

A:     I was initially assigned to the St. Louis field division, so I worked in the St. Louis Metropolitan area and transferred back to Springfield in June of 2017.

Q:     June of 2017. And then, so you've been here since 2017?

A:     Yes.

Q:     Okay. And you said you were also a Springfield Police Department…Police Department officer?

A:     Yes.

Q:     What years did you…

A:     I got hired in December of 2002, and I resigned from the Police Department to take the job with the DEA in October of 2011.

Q:     Okay. All right. So, basically, what I want to do now is just ask you a little bit—and we may come back to look at this later on—but I just want to ask you a little bit about what happened on November 11th, but I want to go back before this incident happened, okay? So, I kinda want to get a little bit of an idea about what you're doin', like what your day was and all that, so can you kinda just start with the beginning of that day, I think it was a Monday?

A:     Yeah, November second, you mean?

Q:     Yeah.

A:     Yeah. Yeah, so, it was just kind of a…first part of the day was kind of a general day, I was just kinda doin' some…some paperwork and some stuff in the office. Nothin' really to report there until about two-twenty in the afternoon; one of the Task Force Officers named Mittag asked for some assistance on surveillance.

Q:     Okay.

A:     And so, when he asked for that assistance, I left the office to go out and help him try to…try to follow a…a suspect.

Q:     Did he have somebody in mind?

A:     Yeah, he was doin' a…he's…he was workin' a longer-term case and he had seen one of his suspects and he just was askin' for help followin' that person.

Q:     Okay.
A:     So, I left the office to go assist with that.

Q:     Okay, so you say when you left the office…what…what did you leave in?
A:     My…my government vehicle.

Q:     Okay, and can you describe that to me?
A:     It's a Dodge Caravan.

Q:     And color?
A:     Black.

Q:     Black, okay. And so, then you left in your…in your Dodge Caravan, and where'd you go to?
A:     I was tryin' to catch up to the surveillance that he was already doin'…he was by himself, I think, so he was tryin' to do…tryin' to do one-man surveillance through town, which is pretty difficult, but I was tryin' to catch up so I went…I was goin' north on Campbell from the Outfield. I got to about Broadmoor and he said that he had last seen the vehicle going north on Campbell from Sunshine, but he was kinda losin' sight of it because of traffic lights—I think he had missed one—so I continued north just to see if I could catch up. And he had given a description, which was a black SUV, I think maybe an Oldsmobile is what he said. He said he lost it about there, so I continued through Sunshine and Campbell, went northbound and was just tryin' to see if I could find the vehicle somewhere in a parking lot or somethin'. Based on my time workin'…workin' cases here in Springfield, I knew that the Wal-Mart right there at Campbell and Grand is a pretty…pretty high-crime drug area. We find a lot of…we do a lot of surveillance that leads us there, we see a lot of drug activity there on…while we're doin' different investigations, so I basically had that in mind, I wanted to go to that parkin' lot and see if I saw this car.

Q:     Okay.
A:     So, I got there in that parkin' lot and I'm drivin' through the lot and I saw a similar-looking black SUV. I called it out on the radio and then another agent, Tony Gasperoni, was also out there helpin', and he got in the parking lot first and said, "No, this one that you're lookin' at, that you saw from a distance, is actually like a Chevy or somethin' different." So, it wasn't the one we were lookin' for, but by that time I'm already in the Wal-Mart parking lot, on-scene there, and so we…Nick Mittag, the TFO, called that surveillance and said, "Oh, we don't know where it went so we're done with that."

Q:     Okay.
A:     And this was probably about two-thirty at this time.

Q:     Okay, so is that a separate investigation…
A:     Yes.

Q:     …than what transpired later on?
A:     But that's what led me out there.

Q:     Okay.
A:     And so, while I'm there in the Wal-Mart parking lot, kinda lookin' for this one car, I look across the lot and to the south there's a couple of apartment complexes and I noticed there was a red Pontiac G6 that, while I was drivin' through the parking lot of the Wal-Mart, it—there's a little side road right there to the south of Grand—I don't know what it's called, but…well, I guess it's Normal, 'cause…yeah, I think Normal Street, because…

Q:     It runs east and west?
A:     It runs east and west, just south of Grand…

Q:     Okay.
A:     …from…and it goes west off of Campbell. And so, as I was driving through the lot, I noticed this red Pontiac G6 drivin' down Normal and it pulled into a parking space at the apartments at like 428 West Normal. And it parked in a…kind of an odd spot. Most of the parking spaces of that building are kind of…if you park there, the building kinda runs north and south, you'd kinda be parked facing the building, most of the spots, and there's a couple, there's an area of the lot that's kinda to the east of…of the building a little bit, in that same complex, and there's some spots that are more or less kinda like parallel parking spaces, or there's…there's an area there, anyway, and that's where this G6 parked, facing south. And just based on the area, you know, the…the drug activity and the…and the crime that goes on in that area, it just kinda caught my eye the way this car parked away from the other cars, and I noticed there was a…there was a white male driver in it. I don't know who he was, but I noticed that he stayed in the car when he pulled up. And, you know, after years and years of doin' drug investigations, when I see that it just catches my eye, because, you know, you're not goin' there to visit…you know, you're not goin' there to your apartment or somethin' like that, you're just sittin' there maybe, it…it catches my eye so I just sat and watched it for a…for a minute or two.

Q:     Okay.
A:     And so, as I'm watchin' that car, I notice a white male with a white hat and black shirt and pants—I think kinda black pants, I think—he came walking from the area of the apartment complex to the east, which would be 410 West Normal. And he walked up to the driver's door of this red G6…

Q:     Okay.
A:     …and he starts a conversation with the driver. And they talk for a…for a short time, and then he kinda kneels down or squats down next to the driver's door as he's talkin' to the driver, and then I see the guy that had walked up on foot and the driver do a hand-to-hand exchange. And, you know, based on my training and experience, to me, the way this guy had acted, it just…it rose my suspicion, I think, "oh, this looks like a…this looks like a drug transaction."

Q:     Okay.
A:     He hasn't done any other business, this guy walks up, clearly from an area nearby, they have a short conversation, they do a hand-to-hand exchange, guy in the white hat walks away.

Q:     So, did you actually see some…one of the two men hand something to the other one, or did they actually reach out and…
A:     Yeah, I saw…I saw what it looked like, they, you know, their hands met like they're gonna exchange an item. I couldn't see what the item was from…from the distance I was at, and, you know, a lot of times, you know, smaller amounts of drugs are hard…hard to see anyway. I couldn't see what it was, just a hand-to-hand exchange based on everything that I was…that I was watchin', rose my suspicion of…

Q:     Okay.
A:     …you know, this is a drug deal. And the guy immediately—that had walked up—immediately walks away after that exchange.

Q:     After the exchange?
A:     Yeah, and he goes back to 410 West Normal, Apartment number three.

Q:     And you said he was a white male wearing a white hat.
A:     Yeah, the white hat, it…the top of it was white, the bill might've been a darker color…

Q:     Okay.
A:     …but a black shirt, and then he had long pants on. They…they were dark-colored.

Q:     And he came out of 410?
A:     I didn't see…the first time when I saw him walkin' up, he was walkin' through the yard…kinda the yard of the apartment lot of four…of four-ten towards the G6, which was parked at four-twenty-eight.

Q:     Okay, and then you see this hand-to-hand and then he walks away from the car and goes…
A:     Yeah.

Q:     …into somewhere there at 410.
A:     Yeah, he walked into apartment number three. I saw that when he went back inside.

Q:     Okay, go ahead.
A:     So, I…after seeing that, myself and another agent—Gasperoni—you know, we were in the area watchin' it, and I…and I called out the radio, I was like, "Hey, I'm watchin' another deal right now, let's follow this red Pontiac."

Q:     Okay.
A:     Just to kinda see what's goin' on, try to con…

Q:     And that's communication just between you and him, or can everybody else…'cause you said you're talking on the radio; can everybody else hear this?
A:     Well, you say everybody…I mean, we have our own channels…

Q:     Right.
A:     …on our…on our…on our law enforcement radio, but at this time the only people I really know that's out there is me and Gasperoni—Agent Gasperoni—and TFO Mittag had been out so I assume he might've still been on the radio somewhere, but he had kind of called what he was doin' and he had another, you know, project in mind, he was gonna go…he was gonna go look at somethin' else or do somethin' else, and so as far as I know, the only person that really were on there, communicating, was just me and Agent Gasperoni. And Mitt…and TFO Mittag may have…may have been listening, I don't really know.

Q:     Okay, so once you see this, you talk…you get on the radio, you…you…you call out to Agent Gasperoni?
A:     Yes.

Q:     And then you say, "Let's kinda focus our attention on that," is that…
A:     Yeah, just we wanted to follow…I wanted to follow this red Pontiac and kinda see…

Q:     Okay.
A:     …what it did after doin' this, you know, hand-to-hand transaction.

Q:     Okay, then what happened?
A:     So, it left, I mean, like I said, pretty soon after that hand-to-hand transaction, and starts movin'. We follow it and it travels through town without makin' any other stops or anything. We followed it to 1605 East Central here in Springfield.

Q:      1605 East Central?
A:      Yes.

Q:      Okay.
A:      Agent Gasperoni actually saw it make the last turn—we were doin' covert surveillance, so you know, we're not really makin' every turn—we were kinda tradin' off who's…

Q:      Mm hmm.
A:      …who's makin' the turns with it. He sees it pull in, he described the second house east of Delaware, I think, on the north side of Central, and he lets it go and I circle the block, and as I come back around, I see that that red Pontiac's in the driveway; there's nobody in it anymore, there's nobody outside, so it just kind of appears like the driver of that car, you know, went back to…to a place he's gonna be for a while or…or whatever. May be home, may be whatever.

Q:      So, it's sittin' in the drive, no one's in it, okay.
A:      Yep.

Q:      Go ahead.
A:      So, at that time, you know, I talked…told Agent Gasperoni on the radio, I said, "Hey, let's…I want to…I want to go back to that other apartment down there on Normal and just see," because, you know, I had been watchin' it for…or really, just watchin' this car just for a couple of minutes and saw that, so I was like, "I'm gonna go back down there and just kinda see what else happens from that apartment."

Q:      Okay.
A:      So, I went directly back, he and I both; Agent Gasperoni and I both went directly back to that area of the…of 410 West Normal, and we established surveillance of that apartment. I actually parked in the parking lot of 428 Normal, in my vehicle where…where I could kinda see one side of the complex and Agent Gasperoni parked where he had an actual physical eye on apartment number three.

Q:      Okay. Go ahead.
A:      So…so, this is just a couple minutes after three p.m.; we sat there for maybe…I would estimate maybe two minutes, and we see a U-Haul pickup truck, like a rental that you rent, you know, by the hour or whatever, pull into that apartment complex at 410 West Normal and park near door number three.

Q:      Okay, you said U-Haul truck. So, in my experience here, I've had several different investigations; what kind of truck was it? 'Cause I know that they rent several different kinds. Like, was it a box truck?
A:      It was…oh, no, it was a pickup truck; I just don't remember if it was a Ford or a Chevy or a…

Q:      Okay, well…and that's all…that's…that's what I'm just tryin' to get at, was it a…
A:      Right.

Q:      …a box truck or a pickup truck…
A:      No, it was like a pickup that you can, you know, based on…based on what I know, it's like an hourly rental sometimes, or whatever, that you can rent these pickup trucks for…

Q:      Okay.
A:      …and you know, had…had Arizona plates on it, I think. And, you know, he described the driver as a…as a white male, mid-twenties, brown hair, and he…

Q:      And you said he described that…

A:     Agent Gasperoni.

Q:     …so Gasperoni gave you the…kinda the description…
A:     Yeah, that guy drivin' it. It was occupied one time, just by that guy. And just based on…you know, based on my training and experience in doing these investigations, again, when I see rental cars start showing up at places I think are involved in drugs, it just kinda…it heightens my….my suspicion of what's goin' on because, you know, a lot of people involved in criminal activity think that these rental vehicles…I mean, it does…it…it affords them a level of anonymity…

Q:     Mm hmm.
A:     …because you can't run it, you don't get their name off the plate, and…and again, the plates are typically good, so it's not like they're, you know, runnin' someone else's plates and gettin', you know, possibly stopped for some kind of registration violation, so I just…and I…and I've specifically seen U-Haul vehicles in Springfield, doin' investigations, you know, showin' up to places and doin'…bein' involved in…in drug activity in…in past, you know, instances. So, you know, showin' up to this place that we were watchin', we were there just a couple of minutes and this truck shows up, and he sees—Agent Gasperoni—sees the driver get out and go knock on the door of number three. Didn't get an answer, and then goes right back to the truck.

Q:     Okay.
A:     And he goes right back to the truck for just a…just a few seconds and then he's back at the door, bein' let inside.

Q:     Okay.
A:     It's about 3:05 p.m. when he goes inside.

Q:     Makes a phone call and then he…and then he goes back to it?
A:     Well, I don't know if he made a phone call; I just know that he went back to the truck.

Q:     Okay.
A:     He knocked on the door…knocked on the door, didn't get an answer, went back to the truck. Although it's within a few seconds of goin' back to the truck, he's right back at the door bein' let inside.

Q:     Gotcha.
A:     And that's, like I say, he went inside about 3:05.

Q:     Okay.
A:     So, we…you know, we continued watchin' about…I think it was about three…three-fourteen, three-fifteen, he walks back out to the U-Haul truck. And so, he's been in there just a few minutes, goes back to the truck, turns right around and goes back to the door, and I don't…I don't know if he went all the way inside, but he goes back to the door for just a…just a few seconds and he's back to the truck again. And he gets in the truck and, you know, like he's…like he's gettin' ready to take off, and then I think, you know, the door's shut and all that, and so we're kinda preparing for what's gonna happen, you know, he's leavin'. And so, me and Agent Gasperoni are…are talkin' on the radio again and I tell him, "Hey, I want to follow this truck," because, you know, we've watched this apartment a total of just a few minutes and we've seen, you know, two—you know, based on the first hand-to-hand, and then I see another guy showin' up with just a few minutes and leavin'—and I'm thinkin', "Okay, this is drug deal number two, you know. He's just…him and U-Haul truck driver have been involved in…in what I think's…you know, another one, so I say, "Hey, let's…let's follow this car."

Q:  Okay.

A:  And so, about, you know, three, I think it was about three-sixteen, the truck actually starts movin' out of that parking lot and goes to…it comes out the west—kinda southwest—exit of that parkin'…parkin' lot, which is kinda right where I'm parked at. Comes out towards me, and then goes back towards Campbell and then we start mobile surveillance on it.

Q:  Okay. Go ahead.

A:  So, we follow…you know, myself and Agent Gasperoni are followin' it away from there. It goes down Campbell to Sunshine, goes east on Sunshine, and we're, you know, both of us are kinda in the area. Agent Gasperoni is actually in…in front of me at some point because the turn…the car…the U-Haul truck turns south on Maryland.

Q:  Okay.

A:  And when it did that, you know, as…as part of the covert surveillance, you know, Agent Gasperoni doesn't turn with it right away because he'd been right behind it, so he…he continues past and then I turn south on Maryland.

Q:  Okay.

A:  And I…I make that turn with it, and just a few houses down, on the west side of the street, I see the truck had kinda pulled…pulled to the side of the curb and—facin' south right there—and…and I'm sorry, you said the address earlier, but…

Q:  1827.

A:  1827, yeah. Couldn't remember if it was 27 or 47. But it pulls…it pulls to the curb south on Maryland, right in front…kind of front of…front of that address or just a little bit north of it maybe, but…but right there. And when it…when it stops at the curb, I make the decision—based on what we'd seen at this house, you know—that I wanted to talk to this guy and…and basically start tryin' to, you know, get some more answers to this…

Q:  Okay.

A:  …suspected drug activity that I've just been watching. And so, I tell Agent Gasperoni on the radio I'm gonna…I'm gonna contact the driver of this U-Haul 'cause it stopped, and I pretty much put that out on the radio to him real quick and I'm gettin' out of the…gettin' out of my car at that time.

Q:  Okay. So, did you…is this kinda like considered a…a traffic stop, or is it just a…just a stop-and-talk?

A:  Nah, I mean, I just…it's more or less that he, because of the driver stopped there, that I feel like I've got the opportunity to just kind of walk up and talk to him.

Q:  Okay.

A:  I mean, I didn't activate any type of emergency lights or anything; I just literally kinda parked…kinda stopped where I was at and…and got out to go approach him.

Q:  Okay, and was he still in this truck…the truck whenever you got out of your car?

A:  Yeah, so I asked him…so, again, I…I told the other agent that, "Hey, I'm gonna go talk to the guy," knowing that he under…he understands that means, "I want you to come back around," 'cause he had gone past…

Q:  Right.

A:  …to…to come help me, because, you know, got one guy there, I want to…I want to have him come help and I want to talk to this guy, based on what we'd seen, based on these…the suspected drug transactions.

So, I…I put on my vest—you know, we have…we have soft-body armor that's more or less kind of what, like, a patrol officer would wear that's kind of easier to get on quickly, and then we have some really big, bulky, heavy stuff, but I put on my soft…more or less the soft-body armor. It's tan, I've got black placards on it, on the front and back, that say "Police" in white letters.

Q:     Okay.
A:     There's one in the front, one in the back, if I didn't say that.

Q:     Okay.
A:     So, I put that on and then I got out of my car.

Q:     So, you…and I'll just kinda stop you there so we'll just…I want to get a little bit more into detail…
A:     Okay.

Q:     …at some point in time about, you know, about, you know, kinda what you were wearing, your clothing…
A:     Mm hmm.

Q:     …and want to make sure I've got this correct. You said you had a…a tan vest on. So, is that…is that kinda like one you can put on like a jacket?
A:     No, it's…

Q:     Or is more over your head?
A:     …it's more just…yeah, over your head. It's basically just like a…like a patrol officer would wear under their uniform…

Q:     Okay.
A:     …but it's just…it's got Velcro to put patches on the outside because, you know…

Q:     So, what a typical patrol officer's is, you put…you put two panels over your head. One covers your chest, one covers your back, and then you pull it…
A:     Pull it, yeah.

Q:     …and basically, it's got the Velcro…
A:     You know, it's got the elastic right here on the sides.

Q:     Okay. And then on…on that, you said there is a panel front and back that…that says "Police."
A:     Yeah.

Q:     And that…that the panel's black with white letters, is that correct?
A:     Mm hmm.

Q:     Okay, what else were you wearing?
A:     Tee shirt, jeans, and tennis shoes.

Q:     Okay, is that typical for you to…is that typical attire that you wear…
A:     I mean, yeah.

Q:     …on these…on these things?

A:    Yes, typically it's…on…on somethin' like this especially, when somethin's kind of fluid and…and happening quickly, I mean, yeah, I keep that vest right there behind the seat or whatever, so I can throw it on and make sure that everybody knows who I am.

Q:    Okay.
A:    If I'm goin' to contact somebody, you know, it's very obvious, says "Police" on it.

Q:    So, what about a sidearm? 'Cause, I mean, you're…you're obviously a federal agent. Were you armed?
A:    Yes.

Q:    Okay, where is that sidearm? Where…where do you typically carry it in this capacity?
A:    Yeah, when…when…you know, initially this was kind of a covert surveillance so I'm still kind in that, you know, so the way I carry it during that and I carry an appendix carry. I had a Glock 26 appendix carry…

Q:    Okay.
A:    …and I'm right-handed so it's kind of on my right front, you know, I guess in maybe the one o'clock-position or something, right there.

Q:    Okay.
A:    And then I have a spare mag on my left side.

Q:    Okay.
A:    But again, that's not really visible, it's…

Q:    Kinda covered up?
A:    Yeah, it's…it's under my tee shirt, you can't…you can't really see it, but I mean, the vest…the vest was right there on it.

Q:    I want to make sure he's still there. I mean, I…
A:    Yeah, Thomas, you still there?
T:    Yeah, I'm here.

Q:    Okay, I just want to make sure you still can hear us okay. So, you get out of the truck, you throw this vest on…
A:    Well, I put…I put it on before I got out of my car.

Q:    Okay.
A:    I'm sittin' in the driver's seat and I…and I realize I'm gonna make some contact with somebody, so I'm like reachin', grabbin' it, throwin' it on…

Q:    Okay.
A:    …like before I step out.

Q:    All right. So, let's…let's kinda get back into this contact here where you get out of the car—your van— and just kinda start from there and tell me what…what happened.
A:    So…so, I got out and I'm…like I say, I'm parked be…behind this U-Haul truck but a little bit offset, you know, where it's a little bit to the…if I'm lookin' south, it's a little bit to the front, to the right of me. And as I get out of the car, I start, you know, just makin' that initial approach to this guy. He's still sittin' in the driver's seat and I see him basically notice me walkin' up. I mean, he kinda looks…looks over, notices

me, and when I…when he…he turns away from me and I see his, you know, what I can see, 'cause that truck sits up, you know, a little higher, but it's where I can see through the driver's window and rear glass. He notices me and he…his shoulders kinda dip down, move, and…and to me it looks like he's reachin' in the floorboard.

Q:     Okay.

A:     And when I see that, I mean, my concern is, you know—based on my training and experience—people involved in drugs, you know, keep weapons…I think he's either, you know, hidin' somethin' or retrieving, you know, maybe a weapon or…or somethin' from the floorboard as I'm approachin'.

Q:     Okay.

A:     So, when I see that, obviously, now…now I'm, you know, concerned. I'm still by myself at this point; Agent Gasperoni's still not there, so I walk up to that door and I…and I just say the words, "Police" to people; that's typically what I say because DEA sometimes, people get con…you know, I don't want there to be any confusion, I usually just say "Police." It's clear and everybody knows what that means.

Q:     Right.

A:     So, as I'm walkin' up and I'm, "Hey, Police, put your hands on the steering wheel," and the doors, you know, he's still closed and I'm sayin' that; that window's down a little bit. And so, he does, you know, he puts his hands up there, and I open the driver's door so I can kinda see what he's doin' and I can communicate with him better 'cause the window…it was down a little bit but it's still…I want to kind of…I want to get where I can see his whole…as much of him as I can, based on that furtive movement that he made.

Q:     Right, okay. And furtive movement is basically…kinda describe that…

A:     Yeah, that was…that was just when I saw him reachin', you know, reach into that floorboard of the truck when he notices me, and so, basically it's, you know, what I think—based…based on these kind of investigations—they see the police and they're either, you know, hiding somethin' or retrieving somethin'…

Q:     Okay.

A:     …and, you know, weapons, drugs, whatever, I might be, you know, concerned at that point for my safety. I want to make sure I can see him, see what he's doin' so I can keep an eye on…on him and not, you know, if he's just got a weapon or…or ditched one or retrieved one, I don't know.

Q:     Right.

A:     But I want to be able to see him better, so I opened up the driver's door.

Q:     Okay, so you open the driver's door and then what happens?

A:     So, we had just a…just a real quick…as I'm…as I'm watchin', him, you know, I told him to put his hands on the steering wheel, I'm havin' just a real quick, couple, few-sentence conversation as far as, like, "Hey, man," you know, "where you…where you headin' to?" That, you know, "what are you doin' here, where you headin' to?" that kind of thing. And he told me…he…he indicated to me verbally that he's here to see some…some friends or buddies—I don't remember the word he used—but some acquaintance. He…he indicates he's here to see some people he knows.

Q:     Did he recognize you as a police officer? Did you guys…

A:     Yeah. I…I said, "Police" when I walked up; he never questioned that. He…he…our interaction was, you know, common to, like, law enforcement, you know, suspect or whatever you want to use, the word…

Q:	Right.
A:	…I mean, he's not questionin' who I am or anything.

Q:	That…and that's what I'm askin', is he…
A:	Right.

Q:	…you know, sayin', "Who are you? What's goin' on?"
A:	No.

Q:	Okay.
A:	No, he…he…he didn't question any of that when I'm askin' kind of common first-interaction questions with him, he's answerin' 'em. Like, he…he's not…

Q:	Okay.
A:	…doesn't appear to have any issues with…with identity of me or anything, and, you know, I do…I do this kind of thing frequently and…and I've not had anybody question that when I'm dressed like that and when I'm makin' contacts with people.

Q:	Okay. So, he tells you he's there to see friends?
A:	Yeah. The word he used, I…I mean, I got the im…you know, "I'm here to see some people," I got the…that impression; I don't remember what word he said, friends, buddies, I can't remember, but…and when he says that, he…he either kinda looks up or nods his head, or he does somethin' with his body language that caused me to look in front of where he had parked. Because there was a car parked right in front of that address, and it was facing north but it was parked on the west side of the street, so more or less facin' the wrong way on the wrong side of the street.

Q:	Okay.
A:	But he's kinda parked front bumper to front bumper with this other little passenger car.

Q:	Okay.
A:	And when I walked up…be…because, you know, he's makin' these movements concerning me for my safety and what's goin' on, I didn't notice anybody in that car. The way it's sittin', it's a tree-lined street, it's kind of, you know, shady, it's…the windshield angle and everything, I just didn't notice really much about it, and I didn't really notice anybody in it at that time as I'm approaching. But when he says this to me, it draws my attention to glance that way and look at this car, and when I do, I notice there's two people sittin' in this car that's parked in front of him.

Q:	Okay. Go ahead.
A:	And so, I…I kinda confirmed with him, "You're here to see these guys?" or some…somethin', you know; I'm kinda tryin' to confirm if he's talkin' about, you know, the people that's sittin' in this car or whatever, and he…and he…he more or less acknowledges, "yeah, I'm here," you know, "I'm here to see these people," or whatever. So now, you know, I've got…I've got these drug transactions comin' from four-ten and I've got this guy that was just at this address for a little bit, now he's showin' up on the side of the street and there's people waitin' on him in a car, and, you know, based on these kind of investi…drug investigations, and now I'm thinkin' this is drug deal number two gettin' ready to happen, I've just stepped in the middle…middle of it, 'cause I got, you know…we do…we do a lot of surveillances that go from, you know, we'll…we'll follow somebody for, you know, however long, and it may be they go pick up drugs somewhere and it may be three, four, five deals that we, you know, they're goin' from one place to the next…

Q:	Okay.

A:	…just continuin' on that pattern. And a lot of 'em happen, you know, a lot of 'em happen in parking lots, but we also have a lot of people that will just pull to the side of the streets and make it a little bit more, you know, not noticed by people, because, you know, you pull to the side of the street, you can see if someone's followin' you, that kind of thing, so they'll just do it right there. And he tells me he's here to see some friends, but yet there's these guys waitin' in a car out front.

Q:	Okay.

A:	And so, you know, it's just kind of…fits that pattern of…of when we're…when we're watchin, we're doin' surveillances, when we're doin' investigations, you know, we do controlled buys, we send people to do…that we're controlling, this is the way, you know, they often go this way where somebody's waitin' outside, waitin' on people. So, when he says that, I notice these people sittin' in the…sittin' in the car, and…and immediately I'm…I'm thinkin', "oh man, I just…now I've got three people on the scene and me, and he's gettin' ready to meet these guys and…and do another drug transaction." So, now I'm kind thinkin', "okay, now I'm needin'…I'm needin' to really control the situation a little better," and I'm still there by myself.

Q:	Okay.

A:	So, so this kinda all…so, now I'm kinda dealin' with him—the driver of the U-Haul truck—and now I've noticed these other guys and…and as I'm kind of lookin' that way, I notice that the…the doors are open on this other passenger car and…I can't describe it, I don't remember what kind of car it is. It's just a little passenger car, it's like gold or tan, I think.

Q:	Okay.

A:	But I notice that the front seat passenger has opened the door and stepped, like he's standing at that open passenger door of that car.

Q:	Okay, so the front passenger, not the driver?

A:	Right, front passenger. And that car's facing me, so he's more-or-less, closer to me than the driver is because of the way it's parked. And I notice that guy's out of the car and I notice…I think the…the driver, I can see him, but I just don't remember if he had stepped out a little bit or kinda swung his legs out but was still…he's…he's…I notice him too, but the…the front passenger is really who I'm…I'm noticin' more because the…you know, the guy's tellin' me, "I'm here to see these guys," and now he's stepped out of the car, he's watchin'. Like, I notice he's pretty…pretty intently watchin'…like, it's not like he's just gettin' out of the car and mindin' his own business type of thing, and, you know, the driver of the U-Haul has already told me he's here to see these folks, and so I'm…and I'm tellin'…I'm tellin' driver and passenger, I'm like, "Sit back in the car," you know, because just the way he stood up out of the car, it kinda seemed like he was gonna…I…I just saw it and I thought, "Man, this guy's gonna come right to me." It…it was somethin' about the way he was, you know, steppin' out and lookin', like, I was kinda thinkin' he was just gonna come right to me and then I'm gonna be…you know, just outnumbered, really, at that point. It's still me and I've got all these guys out here. Nobody…nobody's under control yet, I still haven't got the driver of the U-Haul truck patted down or detained, and now I got this guy steppin' out and it's…it's…you know, it's kinda gettin' in the situation where it's…it's not good, and the…

Q:	And it's still just you?

A:	Still just me.

Q:	And then you said you gave him…you…you verbally told him to get back in the car…

A:	Yes.

Q:     …or did you give him…what did you tell 'em to do?

A:     I…I told him and the driver both, "Sit back in the car."

Q:     Okay.

A:     And I…and I think I said it two or three times; I said it more than once, because didn't look like he really cared what I was sayin'…

Q:     Okay.

A:     …at that…at that point, you know. I said it more than once, you know, and…I was talking, you know. Not…not yell, but I was talking pretty loudly because, you know, we're outside, there's some ambient noise and all that, so…

Q:     Okay.

A:     …so, I told them that and…and he…and he doesn't really…he doesn't really do it, but he doesn't approach me, but at the same time as I'm…as I'm kinda dealin' with that, I also have to deal with the driver of this U-Haul truck, and so it's kinda all goin' on at once and the next…the next thing, you know, I'm…I'm havin' the driver of this…of this U-Haul truck step out of the truck.

Q:     Okay.

A:     And as he's gettin' out, you know, I know I'm gettin' ready to pat him down for weapons and things, and I…and I'm askin' him, "Hey, do you have anything on you that's gonna poke me, cut me, hurt me, any guns, drugs, knives?" Standard questions for it, 'cause I don't want to get, you know, stuck or…or…or injured by somethin' he's got on his person. So, I'm askin' him that as I'm gettin' him out, and when I say that to him—the driver of the U-Haul truck—he responds with, "I don't use needles."

Q:     Okay.

A:     And it…as soon as he said that, I…I realized, "Well, that's…that's…that's a statement that you come across a lot by people that are involved in…in drugs," because he's…he's not…he's more or less acknowledging to—in my training and experience—he's saying, "Well, I don't use needles, I…I use drugs another way." Like, you know, "I smoke it, snort it, whatever," but the fact that he says, "I don't use needles," it's not…it's not denial of any involvement in drug activity…

Q:     Right.

A:     …it's sayin', "Well, I don't use needles, so I don't have any needles on me that's gonna poke you," but it…it's just another indicator to me that, yeah, I'm right on here, he's…he's involved, he knows what I'm talkin' about, he…he's just sayin', "I don't use needles," as his…"I don't…that's not my preferred way to use drugs." So, it caught my attention again, and again we were just goin' down this path of, like, yeah, I know it's…you know, I'm…I'm right in the middle of this thing, this drug deal. And so, he says that and he…and he says…and he also verbally consents to a search of his person. So, I've got him out, we're standin' basic…basically right behind the driver's door and I'm kinda doin' a quick…quick pat-down of him and was startin' to kind of search him so I can make sure that, you know, after these movements he'd made, I was making sure he doesn't have a weapon or anything else, and I'm just…I'm just startin' that process of kinda gettin'…

Q:     Okay, so I just want to make sure I understand; you pull him out and you're dealing with this other gentleman that got out of the car, but you still have enough time, you're…to say, "Hey, do you care if I search you and make sure you don't have anything on you illegal?"

A:     Yeah, it was kinda all goin' on at once, but…but, you know, I'm…I'm still concerned about U-Haul driver because, you know, he made that movement and I still haven't got him controlled. So, I'm kinda…I'm

kinda startin' to want to get the point out, like I'm tryin' to get at least somebody under control here, you know.

Q:    Right.

A:    I want somebody in a position where at least I'm not havin' to worry about them while doin' this.

Q:    Okay.

A:    I think about the time I'm…I'm tryin'…er, I'm asking him to get out—the driver of the U-Haul truck—I can look down the road and I can see Agent Gasperoni startin' to approach, but he's…I don't know what block he made, but, I mean, he's approachin' but he's not there quite yet, you know.

Q:    Mm hmm.

A:    Like, he's comin' towards me in his car.

Q:    And…and is he coming from the south or…

A:    Coming from the south…

Q:    Okay.

A:    …'cause he basically circled the block around, you know, took some side road—I don't know what street—but, you know, he came…he was comin' from the south but he was still a ways down the road. And I can see him comin' so I know I've got somebody else comin' with me and I'm tryin' to just get control of…you know, I want to get control of at least one person that I know…

Q:    Okay.

A:    …I don't have to worry about. So, it's kind of…it's kind of all happening at the same time. I threw some handcuffs on the driver of the U-Haul truck to detain him.

Q:    So, when you're throwin'…when…when you're placing the driver in handcuffs, where are the other two individuals?

A:    You know, I don't know right there. I mean, I'm dealin' with him. There's a little bit of a gap there where I'm kinda dealin' with him, and then, you know, gettin' him handcuffed and everything, and…and while I'm handcuffing him, you know, I'm also still kind of just real quickly gettin' some, you know, askin' him some questions, and so I was askin' him, you know, "Where you…where you comin' from right now?" And he tells me Campbell and Grand, I think, and I'm like, that's an intersection, that's not a place, you know? It's not, you know, so I…I followed up and was like, "Where at?" and he says, "Wal-Mart." So, again, you know…he didn't go to the Wal-Mart, I was…I was watchin'. He wasn't at Wal-Mart, so he's again lyin' about where he's been, so it kinda confirmed this whole…this whole thing that's goin' on, this whole drug transaction. So, he says that. I kinda get him in…in cuffs, and then my…my…you know, then I can kinda focus back on the whole…the whole scene, and Agent Gasperoni, about that time, is…is pullin' up fully on-scene with me, and he's parked facin' north, maybe a little…just slightly south of being kind of parked next to this other little passenger car that was in front of the truck.

Q:    Okay.

A:    So, just a little south of it, but still, you know, his driver door is…like, if you would step out of his driver door, you'd be facing that house on Maryland, the 1827.

Q:    Okay.

A:    So, he gets out and…and I…I told him when he gets out of the car, and so that's when I kinda noticed that the front passenger of this other, this little car, he was now standing on the driver's side of that passenger car that he had been riding in, and he's in between…he's a few steps from that car towards that house.

Q:	This is the driver?

A:	This is the passenger, the front passenger.

Q:	Oh, the passenger, okay.

A:	Yeah, the driver, I think…I don't…I don't know where he was at still. I think…it still kinda seems like he was around the driver's door, maybe even still sittin' in the car, but the…but the passenger's out, you know, in…you know, a few steps from that car, kind of in the, like, on the, I don't know, sidewalk or driveway of that house.

Q:	Okay, go ahead.

A:	And…and based on…based on what's goin' on at this point, you know, I think all three of these guys are involved in a drug transaction, and based on his behavior when…when he got out of that car the first time—the front passenger—based on the way he stood up and…and…and I had to tell him to sit in the car a couple of times and he didn't do it, his…his behavior's got me concerned. And so, I tell Agent Gasperoni, when he gets there, I verbally communicate with him, "Hey," you know, "watch that guy," or…I…I'm tellin' him to pay attention to him based on his behavior, I don't like it, somethin's not right.

Q:	Okay.

A:	I don't remember the words I used…you know, Agent Gasperoni and I work together a lot, so we have kind of the…the shorthand communication, we know what, you know; he knows what I mean…

Q:	Right.

A:	…I know he understands what I'm sayin'. This guy's not actin' right, keep an eye out. And so, he had stepped out of the car, Agent Gasperoni had stepped out of his car, and I told him that and then I saw him reach back into his car and put on his Police vest. He initially just stepped out in his street clothes…

Q:	You're talkin' about Agent Gasperoni?

A:	…yeah, because he had…I think he was workin' pretty, you know, he was tryin' to get back to me 'cause he knew I jumped out, and when he got there he just, you know, I guess didn't have it on yet, but I saw him reach back in his car and put it on 'cause…based on what I told him.

Q:	Okay.

A:	And so, he's there, and so now I've got him to help me watch, you know, kinda what's goin' on with everybody, and I think at that time I'm, you know, I'm still kinda…I'm still kinda talkin' with and detainin' and searchin' the driver of the U-Haul truck.

Q:	Okay.

A:	So, I kinda let…I kinda let him…

Q:	So, where are you standing at?

A:	I was still standing by the U-Haul truck.

Q:	Still standing by the truck?

A:	Yeah.

Q:	Okay.

A:	And I…you know, I don't…I'm…I'm dealin' with…I'm dealin' with the driver of the U-Haul truck so I don't, you know, I don't really hear exactly what's goin' on with Agent Gasperoni and the other guy, but the next thing I know, Agent Gasperoni is yellin' for me. He…he's just yellin', he's just, "Hey John," you

know, gettin' my attention, and I hear…he says it once and I'm…and I'm kinda finishing up what I'm doin', makin' sure the…the first guy doesn't have any…any weapons or dope on him—he's consented to a search—and I hear him say it again. "Hey John!" and so now, I'm like, "okay, somethin's…somethin's up over here, let me get to…let me get over there." So, I look…I look over there and he's—Agent Gasperoni—is standing face-to-face with this, the guy that had been the front passenger, and he's got ahold of the guy's hands, like more-or-less they're standing, facin' each other and he's…he's got the guy's hands…

Q:   Okay.

A:   …in front of him. And I just recognize that as, you know, somethin's not right and he's tryin' to control this guy's hands. Like, he's, you know, in my mind he's done somethin' that's made him concerned and he's—Agent Gasperoni—is thinkin', you know, "I've gotta control his hands for what…for whatever's goin' on." So, I immediately take the driver of the U-Haul truck, who I…who was in handcuffs, and I walk him around the front of the U-Haul truck and I kinda sit him down, more-or-less in the same front yard there as where we're parked in front of. That way, I can kind of, more or less tryin' to get everybody where I can see everybody, you know, all the…all the people involved, and I sat him there. And I'm startin' to walk over to Agent Gasperoni and this…and this other guy, and as I'm walkin' up, Agent Gasperoni is tellin' me, "He's got a gun."

Q:   Okay.

A:   So, he's tellin'…you know, so he makes that statement to me and…and so I'm…so now, you know, I'm sittin' there thinkin', "We've…we've interrupted this drug deal; now we've got a guy that's showin' up to a drug deal with a gun." You know, that's…that's another federal violation right there. I mean, you know…

Q:   Right.

A:   …you can't…can't have guns on drug deals. So, I'm walkin' up and I…and I'm just thinkin', "Okay, we've gotta get this," 'cause I know, based on the way…the way that Agent Gasperoni is interactin' with this guy, he's gotta control his hands, that somethin', you know, somethin' has made that occur and usually that's somethin' that this guy's not doin' what he's asked him to do, he's concerned about his behavior so he's tryin' to…he's tryin' to get me over there to help him and concerned about this guy's actions.

Q:   Okay.

A:   So, I walk up and…and I'm just gonna, you know, I don't know…I don't know where the gun's at, but I know that people, you know, commonly carry 'em in their waistband somewhere, so I don't know if it's in front, back, you know…could…could've been anywhere—I don't know where it's at—but I want to get the guy in cuffs until we figure out what's goin' on, for our safety. And…and I mean, clearly somethin's not been goin' right or it wouldn't…this interaction wouldn't be him sittin' there grabbin' the guy's hands.

Q:   Okay.

A:   So, I…I walk up, kind of…and…and so, Agent Gasperoni is kinda facing the house—so kinda facing west—and the other guy is facing east, more or less, and I walk up kinda to the…kinda behind…you know, behind the guy that he's talkin' to, kinda from his left side, and I just, you know, I'm…I'm grabbin'…gonna grab ahold of him to put him in some handcuffs, so just go with that motion, grabbin' one of his arms and gonna put cuffs on him. And as soon as I do that, the guy pulls away.

Q:   Okay, did…does he pull away from you, or does he pull away from the other agent, or does he pull away from both of you?

A:   Yeah, he…he broke free from both of us at that point.

Q:      Do you remember…you said you were comin' up on his left side?
A:      Kind of from the back but from the left…

Q:      Okay.
A:      …so more from like the rear quarter kind of, from the…I mean, I was just kinda walkin' up from that way anyway, but, I mean, I was behind him but I had approached from his left side.

Q:      Okay. Go ahead.
A:      So, it's like as soon…soon as I…soon as I kinda tried to grab his arm to…to put him in some handcuffs, he…he pulls away from both of us, and then, you know, it's kind of a…it's a real quick scramble. I'm tryin' to control his arms…you know, his hands, because, you know, Agent Gasperoni has already told me he's got a gun, you know, and I know at this point, you know, we…we got drug activity and guns and people not complyin'.

Q:      Right.
A:      So, obviously it's…it's bad.

Q:      So, do you…what do you do then? Are you tryin' to re-engage with him?
A:      Yeah, because again…

Q:      (Unintelligible)
A:      …it's not…I mean, he pulled away but it wasn't…it wasn't like he pulled away and immediately took off and…and tried to get away, like run away from us; it's…I'm tryin' to grab his arms to control him 'cause I don't, you know, I don't know where his gun's at but I don't want him grabbin' it, so I'm tryin' to…tryin' to grab his arms and we're havin' a…it's just really quick. The whole…the whole fight, basically, is like, I don't know, three or five seconds; I mean, it's not long. Because we're scramblin'…I mean, this guy is bigger than both of us by far, you know. I mean, I'm tryin' to control his hands. During this…during the struggle we end up kind of basically doing a complete turnaround where now I'm facing west and the…and the suspect's facing east.

Q:      Okay.
A:      And I've kinda got ahold of him, I'm tryin' to…tryin' to control his hands, I'm tryin' to get him down, at least tryin' to get some control of him. So, at one point, you know, he's kind of bent over and I'm kinda tryin' to…tryin' to get him down on the ground, and he, you know, kinda…kinda shoves me, kinda raises his arms, you know, it's really quick. But alls I know is, I end up on my back and he's standin'…and he's, you know, he's facin' east, I'm facin'—or laying—west, basically, and as I do that, as I'm on the ground I try to kind of grab ahold of him and pull him, you know, keep control of him and kind of pull him down, but, you know, that lasts for just a short time and then next thing I know he's…he's broke free from that and he…he stood up. I mean, he's got hips above his feet, you know. I don't know if, from my perspective, I don't really know if both feet were on the ground yet, but, I mean, hips are above the feet; I think he's standin' or about, you know, regained his position, you know, where he's…where he's got control of himself, you know, and I'm layin' on the ground.

Q:      So, you're on your back and you say you're tryin' to get control of him and you're pullin'…kinda pullin'…
A:      I tried…when he…when he kinda shoved me down or…or shoved off and I tried to kinda keep him, okay, keep him with me, just kinda more instinct during the fight 'cause you're tryin' to control the guy.

Q:      And does he physically…he pushes himself away from you or does he break free?
A:      Yeah, he broke free; I don't know how…

Q:      Okay.

A:      …I don't really know how, but it…it didn't work, and like I say, the guy is much bigger than me, so he…

Q:      So, this is the second time he's broke free from wherever you're tryin' to hold on?

A:      Right.

Q:      …of what kind of control you're takin' him…

A:      Yeah.

Q:      …er, tryin' to get…

A:      Yeah, I'm tryin' to get control of a hand again. He's…he's…he's broke free, and I mean, he's…like I say, he's…he's a guy bigger…bigger than me, so he breaks free; however, I don't…I don't really know how, but I know that, you know, I notice he's more or less standin' up or…or…or, you know, like I say, gettin' in that position, and just real quick. Our feet are still, like, you know, he's basically standin' over the top of me, our feet are still tangled, so just as he's standin' up, I'm just tryin' to do anything to get him, you know, where he's not in such a…in such a position of, you know, I mean, he's in a way advantageous position of me. So, our feet…I kinda just noticed that, you know, his…my feet and his legs are kinda still touchin' so I just…I remember just tryin' to kinda put one of my feet kinda behind his ankle and kinda put, maybe I can kinda trip him or something, get him off balance, and that's, you know, that's kind of…just kind of a real quick thing that happened because I noticed, you know, I can feel that that's happen…that we're touching, you know, legs. So, I…I try that and, you know, it doesn't work; he's still standin', you know, at this time, so he's kinda, like I say, he's standin' up or…or, you know, almost fully standing, but his…his upper body was still kinda leaned over a little bit, like, so he's…he's basically over the top of me, just standing over the top of me and I'm on my back.

Q:      Okay.

A:      So, that's…that's…and that's the…that's the time, that's the moment he gets control of himself, he's standin' over me, and that's when I see his right hand go to his right hip. And it was a very distinct, you know, motion to…that I've seen, you know, I've been in law enforcement, you know, a long time; I've seen…I've seen people draw guns a ton of times in training, you know, we do simulation exercises where you deal with people, and I knew when I saw that, that was a hostile move to his right waist, you know. My partner's already said he's got a gun, you know, so when I saw that movement, I mean, I'm…I'm sure he's drawin' a gun; he's goin' for the…for that gun that, you know, I've already been told he has. So, he makes that motion, and when I say he makes the motion to his right hip, I mean, I saw the motion to his right hip, but I also saw his hand stop there for, like, it made it, and in my mind, it…it's the…he's got ahold of it, he's establishing a grip, you know, because it wasn't just…it wasn't just right hand goin' towards the right hip, it's right hand to right hip and it's there.

Q:      Okay.

A:      So, at that moment…I mean, I'm…now, you know, I'm in this position down on the ground underneath him and I'm, you know, immediate threat that this guy is gonna shoot and kill me and my partner.

Q:      Okay.

A:      So, I…so, I know that we…we need to take, you know…I mean, I…I want to take immediate action and stop this, 'cause I know, you know, it's…it's gettin' ready to go…go all bad, you know.

Q:      Okay.

A:      So, I'm…I'm still on the ground. I'm not, you know, not in a great position. I've got, you know, like my gun's not in the best, you know, 'cause I'm down and I've got this vest on, you know, it's still more or

less…it…it's still holstered on me and this guys' already…already got hand on gun, you know, in my mind, you know.

Q:      Okay.
A:      So, that's…you know, I'm…I'm layin' on the ground, I see that, and then I hear shots.

Q:      Did you know where those shots came from?
A:      You know, I…during this fight I don't really know where Agent Gasperoni ended up, but I…you know, he wasn't in my peripheral vision, or at least I wasn't pickin' him up then, you know…I'm…you know, I just…I assumed it was him. I mean…

Q:      Okay, did you know at the time if it was the gentleman that you were fighting with or if it was the agent?
A:      No, but I believed it was…it was Agent Gasperoni.

Q:      Okay.
A:      Because when that happened, I mean…because I was…next thing I was expectin' to see was his gun come out and it's, you know, from…from suspect, and so, I hear the shots and then that doesn't happen, so, you know, realizing that, you know, Agent Gasperoni is, I'm gonna assume, in a better position than me. I mean, I'm on the ground underneath this guy, so…

Q:      Was he still standing, you think, or did you know, or could you tell?
A:      I…you know, I…I couldn't see him.

Q:      Okay.
A:      I mean, he was…during this…during this kind of little short, you know, this fight that happened, you know, we kinda did a complete turnaround,; I'm facin' a different direction, the suspect's facin' a different direction and I don't…I don't know where Agent Gasperoni is, but I know he's there tryin' to help. I mean, he's my partner.

Q:      Right.
A:      So, you know…

Q:      So, you hear gunshots.
A:      …I can't see him, but yeah, I hear…

Q:      Okay.
A:      …I hear some shots.

Q:      So then, what happens right after that?
A:      You know, they…they have an effect on the guy where he's not able to get his gun out, and as I…as I hear those, you know, I'm tryin' to get up, get off the ground, and so I'm, you know, I'm kinda gettin' back…gettin' back to my feet and the suspect, you know, falls over.

Q:      Okay. So then, you're able to get back to your feet.
A:      Yep.

Q:      And at this point in time, the suspect is on the ground.
A:      Yep.

Q:      So then, what happened after that?

A:     So, he…he…so, you know, I get back up, suspect is on the ground. I tell Agent Gasperoni, I was like, "Get…get some cuffs," you know, I…I want to cuff this guy up 'cause I still don't know, you know, still don't know exactly what…I mean, this is just…it all happened so quick, you know, still just tryin' to…tryin' to get everything under control, so I tell him, "Get some cuffs," and then we…we put handcuffs on him, on the suspect, and I don't even know if I did it or Agent Gasperoni did it.

Q:     Okay.
A:     But we do that, and…and I think, at minimum I was standin' there, like, and maybe helped him. I…I know I was standin' there with…with the suspect, you know, when he's just like right there, and we put…get the cuffs on him and he's layin' kinda head facin' northwest…

Q:     Okay.
A:     …kinda on his front a little bit, more on his left side a little bit, and at his right hip is a pistol, so…

Q:     Okay. You say he's laying kinda northwest, and is he on his back or his belly?
A:     More...more on his belly, but, you know, kind of left…left side face on the ground, a little bit more left shoulder, left side of his body, more down a little bit, you know.

Q:     Okay.
A:     Not…not…not a hundred percent just face-down.

Q:     Gotcha. And so then…so, you guys get him in custody, basically with the handcuffs…
A:     Yeah.

Q:     …and how do you…how…are you searching him to see if there was a gun, or…or how…how do you guys…how do you…
A:     I…I just remember we get him in cuffs and then, okay, now, you know, now I can take the next step and actually look, and…and I just see this, the…the handle of a…it's either…it's either like a tan or olive; it's not a black pistol but it's got, like, the other color, you know, polymer frame. It looks like a…like a…I don't know, like a Springfield Armory or somethin' like that, but like, kinda large-frame semi-auto handgun and it's right there in his right waistband, right where he reached.

Q:     Okay, was it inside his waistband…
A:     Yes.

Q:     …outside his waistband, or…
A:     It was inside.

Q:     Okay. So, then what…what…what did you guys do after that?
A:     I…I took that gun out of his waistband myself, and I took it to my government vehicle, and I laid it on the front seat. I didn't manipulate it; I just laid it on the front seat. I retrieved my…my phone and I locked my car. That gun laid on the front seat and I went back right…you know, my car was just a few feet away, but I went right back over there and…I mean, it was…you know, I…I saw Agent Gasperoni and I checked the pulse, you know. I mean, based on the injuries I could see, you know, my first responder training, there was really nothing I could do to help this guy.

Q:     Okay. So, he has injuries that were pretty evident at that point in time, that you could see?
A:     Yeah, he…he clearly had a gunshot wound to the head.

Q:     Okay.

A:     I just…like I said, nothin'…nothin' that I have with me or no training I have can really help that at the moment.

Q:     Right.
A:     So, I get on the phone and call 911.

Q:     And it's just straight up 911?
A:     Yep.

Q:     You first call our dispatchers to…
A:     I just called 911.

Q:     Okay.
A:     Yeah.

Q:     And what…what did you tell 'em?
A:     I just explained that we…and I was…who I was, and I gave 'em my…my badge number, tryin' to make sure, 'cause, I mean, it's not somethin' that…I don't think they come across a whole lot…

Q:     Right.
A:     …so I'm tryin' to make sure they understand who I am. You know, I say I'm DEA, I got two agents here, and we just…we've just been involved in an incident. We got a big…we got somebody with gunshot wounds, and I need EMS and some police response.

Q:     Okay, so what about the other two individuals, the U-Haul driver and then the other…other person in…maybe in the driver's seat of that car; where…where did they end up at?
A:     So, the U-Haul driver is still sittin' there in cuffs, he didn't move. He's still just sittin' there where I…where I sat him down before the fight.

Q:     How far away between…what's the distance in between you and him, roughly, between him, where he's sitting, and…and the scuffle that you guys got into, you began to, you know, you got into?
A:     I mean, it's not far. I mean, it's a small front yard, so I would think like twelve-fifteen feet or somethin'.

Q:     Okay. And then, what about the driver of the other car?
A:     He's closer, you know, he's…

Q:     Closer to you?
A:     Yeah, because as far as…far as I know—of course, I'm not watching him this whole time because I'm involved in this fight—but as far as I know, he was still kinda right there at the driver's door, either…either sitting there with his feet hangin' out or sitting right there. Alls I…alls I know is that he was still not detained or still not been talked to, really; I hadn't said a word to him other than, you know, "Both of you guys stay in the car." But when I look up after, you know, after the initial thing—I think it's after I'm gettin' my phone—he's still standin' there…still sittin' there. He's actually sitting on the ground right at the driver's door with the door open, and he's, you know, kind of experiencing some shock or somethin'.

Q:     Mm hmm.
A:     And he's still not detained, 'cause I know he's still, like…he's…he's tryin' to get a…a phone out to like…he says, "I'm tryin' to call…" and I was like, "I'm callin' 911, stop…stop movin' around, stop doin' what you're doin'." Because I still don't know what he's doin', you know, as far as…

Q:  So, the driver of the…of the little car was trying to make a phone call?

A:  He's…yeah, he's got it…

Q:  Or was doing something with his phone.

A:  Yeah, it looks like he's tryin' to do…and I'm like…we're both—Agent Gasperoni—we're both tellin' him to stop what you're doin' and just lay…just, you know, stop. 'Cause we want to get him detained too, 'cause we still don't know what's in his car, we still don't know anything about what's goin' on with him.

Q:  Okay.

A:  And so, he's still doin' that but I, you know…at some point I…I think he may have ended up with cuffs on him, I don't remember, but I know that…so, I'm…I'm sittin' there dialin' 911, and so the guy from the U-Haul is still right there, driver of the car is still right there, I mean…

Q:  Okay, so you were able to call 911. After you called 911, did anything else really happen? I mean, were you able to get the scene secure enough to where things settled down, or what happened between the time you called 911 and officers got on-scene?

A:  I mean, I think we were just kinda still dealin' with this driver, like tryin' to get him to stop reachin' around, doin' stuff, and I don't know…I…you know, I don't know.

Q:  The driver of the green car?

A:  Yeah, that little car that was in front of the U-Haul.

Q:  Because the other…because the U-Haul driver's in cuffs, is that…

A:  He's in cuffs sittin' there, and the other guy is on the ground in cuffs, clearly, at this point, you know, he's not a threat for us, and I've secured the gun and everything. And then the other guy's still there and I think…I don't know, I didn't cuff him up, so I don't really know…

Q:  Okay.

A:  …if he…I don't know. I mean, really, the next…the next thing is gonna be…it's not long. I don't know…you know, I don't know how long it was. I mean, I called…I called my supervisor, you know…

Q:  In between…

A:  After I called 911.

Q:  Okay.

A:  Just, you know, just following DEA procedure, so, you know, call him and let him know there's an incident and he needs to get out there.

Q:  Okay.

A:  And, you know, I don't know how long it was 'til the first police showed up, and him; that…that timeframe is kinda hard to…

Q:  Okay.

A:  …hard to articulate, you know. I mean, it wasn't long, but it seemed long.

Q:  So, was that everybody that was involved? You've got the U-Haul driver, the gentleman that got out of the passenger seat that you guys detained, and then the driver of the green car. Was there anybody else that was involved at…at…at that house, that you knew of?

A:  No.

Q:	Okay, so once officers got on-scene and they secured it, what did you do after that?

A:	So, you know, some…some uniform guys show up. I think Sergeant Nuccio was the first person I remember talkin' to or seein', and I was tellin' him, like, I…I wanted to get these other two, you know, the driver of the U-Haul and the driver that was still…the guy that was still out there, I was like, "We need to get them, make sure they're detained and…and safe," and, you know, get them kinda…make sure they're secure. And just kinda briefly…like, EMS is gettin' there too, so they're…so…so, really, at this time, like, SPD guys are takin'…they're kinda securin' things even more. I mean, (unintelligible) help, you know…

Q:	Mm hmm.

A:	…so…so, I told Agent Gasperoni, to sit in his car 'cause he's a little bit worked up; he's…he's kinda havin' a reaction, so I was like, "Just sit in your car and…and stay calm," you know. So, I set him in the car and I'm kinda dealin' with kinda tryin' to get the basic facts of what's goin' on to SPD guys, so they know what…what's safe or not.

Q:	Okay.

A:	So, somebody there was askin' me, "What about this house? Is it secured, or is there anybody in there?" I said, "I don't know anything about this house," you know. "This house wasn't really the focus of what we were doing, it was the people," so now we're in front of this house and they're concerned, you know, what…do we know if there could be a problem in this house? I said, "I don't know." So, they were kinda makin' those decisions on what they want to do.

Q:	Okay.

A:	I told 'em, you know, where the gun was at.

Q:	Where the gun…?

A:	The gun that I secured from the suspect.

Q:	Okay.

A:	I told 'em where it was at, told 'em I hadn't messed with it, 'cause…'cause at the time, you know, they have an officer there, takin' pictures and…

Q:	Right.

A:	…doin' all that, and I want him…I want…you know, I'm just thinkin' I want them to be the ones that, you know…

Q:	Right.

A:	…clear this weapon and take pictures and make sure to, you know, do that part of it.

Q:	So, a couple of questions that I would have just to ask is, just to kinda clarify why you took the gun from…from the individual…from…and then put it in your car. Was…was there any particular…what was your thought process for removing it, or movin' it from there to there?

A:	Well, like I said, I mean, 'cause, I mean, I don't know who's still runnin' around out here, you know; for all I know, there might be five people that come out of the house and I've gotta deal with that, so, I mean, I've gotta get this thing secured so I know where it's at and so I know that nobody else can access it, that we're worried about, so…

Q:	Okay.

A:	…I put it there because—and locked my car— 'cause, I mean, I know where it's at.

Q:    And so, just so I'm one hundred percent clear, you…you did not discharge your firearm, is that correct?

A:    No.

Q:    Okay, and Agent Gasperoni did discharge his…his weapon, is that correct?

A:    Yes.

Q:    Okay, and then the other gentleman, Mr. Slay, did not discharge his weapon but he…you saw him reach for what you believe was a weapon, and then you recovered this weapon from him?

A:    Right, and when you say I saw him reachin' for it, I…I believe that he had ahold of it, I mean…

Q:    Right, okay. I understand that. So, after this shooting—being a federal agency you kinda do things a…just a little bit different than the way we normally do 'em—you…you…did you leave the scene once it was kinda secured?

A:    Yeah, once…once my supervisor got there and once there was enough, you know, felt like, you know, it was at least under control enough that I…I wasn't gonna be helpful at that point as far as the….I don't know how many SPD guys were there and all that, but obviously they…they…they're handling it. And that…that's typical of here, I mean, they're gonna handle the scene, so…

Q:    Right, right.

A:    …yeah, I mean, I…I got out of there. I don't know what time it was; I mean, it had been some…some…some time, I mean, some minutes had passed, I mean. But yeah, I left.

Q:    And where did you go to?

A:    Another agent transported me to the off…to our office, our DEA office, and, you know, my car was left there secured…

Q:    Okay.

A:    …where it was.

Q:    And as far as your firearm that you had with you; did you take that with you when you left? Your…your sidearm that you had on you?

A:    I did. I took it with me, but when I got back to the office, I was there a little bit of time and then I ended up goin' to the hospital, and before I left, my…my boss relayed to the other agent that was with me, "Hey, leave…leave those guns secured at our office." So…

Q:    Okay.

A:    …even though…so, I have…I have another duty-issued weapon that's a full-sized Glock 17…I, you know, it hadn't even been on my person, but I left that and the one that had been on, this Glock 26 at…at my boss' office at that time.

Q:    So, the same with Agent Gasperoni; he…was he transported from the scene?

A:    He was actually transported from the scene directly to…I mean, when I last saw him, he was on the gurney or whatever for the ambulance, and they were wheelin' him down the road.

Q:    Did they take him…did they take him to the office, or did he go to the hospital?

A:    No, he went to the hospital.

Q:    Okay. And then, so you may or may not be able to answer this, but the weapon that he had and in his…that he shot during this, do you know where that went to?

A:     I…I was still on-scene at that point and I saw my boss, my supervisor, tell another agent that had showed up afterwards just to help, kinda help manage the DEA part of it, to go get an evidence bag, one of ours, and I saw him put that gun into an evidence bag.

Q:     Okay.
A:     And then my boss…per DEA stuff, we…we kinda…we turn those over at a later time and let you guys take 'em later, we don't really just give 'em up right there. It's just kind of the way…

Q:     Well, I know we (unintelligible).
A:     …we're trained.

Q:     I'm just makin' sure I understand the process.
A:     Yeah, so…yeah. That's just kind of training, that's what we're taught to do.

Q:     So, out there it was taken into custody, basically?
A:     Yeah.

Q:     Or to…
A:     My boss secured it…

Q:     Okay.
A:     …from Agent Gasperoni.

Q:     Okay.
A:     And then he, you know, held onto it for; you know, I don't know what happened after that, you know, I'm just assuming he gave it to you guys or let you guys do whatever with it at some point after that, but yeah, it was…it was secured at the scene from what I saw.

Q:     Okay. So, let's kinda go back to this scuffle that, you know, between the three of you. Were you able to…were you able to give any commands to…
A:     I don't know.

Q:     …Mr. Slay? What about Agent Gasperoni, did you hear him givin' any commands?
A:     You know, I just…I just can't say. I don't remember. It was just…it happened so quick and it was at such a heightened level of a…of a contact from the…from the get-go, and I mean, when he tells me the guy's got a gun I kinda go into, you know, I…I remember tellin'…I remember sayin', when I walked up to the guy, that, you know, basically I'm…I'm gonna just…I'm gonna…I don't know if I used the word detain or put cuffs on, but, you know, I'm tellin' him, "Hey, this is…this is gonna happen," because obviously everything's going on and we can't just…we can't just let this guy have a gun and…while we're out here tryin' to do this investigation, so some indication to him I'm gonna either detain him or put him in handcuffs, and then that's really the last thing I remember because the fight was so quick, and based on the level that we're at, at this point I just can't remember that.

Q:     So, you…and what took you, what, roughly forty-five minutes to describe, thirty to forty-five minutes to describe, I mean, now that you've had a little bit of time to reflect…
A:     Yeah.

Q:     …about how long do you think that that actual encounter actually happened?
A:     You mean the encounter, like from the…

Q:     Like the…

A:     …minute I contacted the U-Haul driver, or the…

Q:     No, the…the actual…I would say the struggle. Whenever you learned that there was some issue going on…

A:     Three to five seconds.

Q:     Okay.

A:     I mean, that's…five may be generous…I don't know, it wasn't long.

Q:     Okay.

A:     Because it didn't take long for him to be able to, you know, pull away and do…you know. It's not like I had control of him for a certain amount of time, it's tryin' to get control once, he breaks free, the struggle is on, he breaks free…

Q:     Did he ever say anything to indicate—and I'm talkin' about Mr. Slay—did he ever say anything to indicate that he was giving up, that he wasn't…

A:     No.

Q:     …that he was…he was obeying, you know, commands, or…

A:     The guy didn't say anything and he didn't do anything, so…so, it's…to go to that point, you know, he's…when he's broke…when we were on the ground…I'm on the ground, he's…he's back up, fully, you know…he doesn't turn and…and walk away. He doesn't try to go away, he's not…he doesn't even turn his body away from me, you know. He's…he's free, I mean; I got nothin', you know. Agent Gasperoni is not controllin' him, he's, I mean, like, I don't even see him, like, I mean, he's somewhere just out of my vision. The guy can do what he wants at this point.

Q:     Okay.

A:     You know, he can…he can walk away, he can turn and run away; he can do whatever he wants, and he…he set there and tried to grab this pistol.

Q:     Okay.

A:     So, he…he had the…he had the ability, you know, or…or the physical capability to walk away right then or to just say, "Okay, I'm done," and, you know, his next action was to…to grab a pistol.

Q:     So, do you remember, like, the conditions outside that day? 'Cause you've said this…this started at what time? About…

A:     Well, I mean, the whole…

Q:     …three?

A:     …I left the office at two-twenty, about, and, you know, we were…we were watchin' the U-Haul truck show up at three-oh-five and it leaves at three-sixteen. About…by the time we follow it, I mean, we're…I think I called nine-one-one right around three-twenty-eight, so I guess between…

Q:     Okay.

A:     …between three-fifteen and three-thirty.

Q:     Three-thirty p.m. …

A:     Yes.

Q:      …in the afternoon, so obviously, sunlight outside.
A:      Right.

Q:      Do you remember anything about the day? Was it cloudy, was it clear?
A:      It was clear, you know, warm for…for November second, I mean, it was a nice, warm day…

Q:      Okay.
A:      …because, you know, you notice that kind of thing when it's nice…

Q:      Okay.
A:      …out, and clear.

Q:      Sir, are you still there?
T:      I'm here.

Q:      I'm gonna step out just for a second and…if that's okay with you and John here, and then I'm gonna just double-check a couple of things and then hopefully we'll get wrapped up here just pretty quick, okay? Is that all right with you?
T:      Yeah, that's fine. Just let me know. As that…as you're out of the room, is it still being audio recorded?

Q:      Yes, sir, the…the…where…where John is right now, it is still being audio recorded.
T:      Okay.

Q:      So, I'll…
T:      So, John, we're not…we're not gonna talk about anything.
A:      Yes, sir; yeah, I understand.

T:      Unless…unless you want to talk…
A:      No, no…

T:      …and step outside.
A:      …no, I'm good. I'll just sit right here and wait for the detective to return.

Q:      You…you need anything?
A:      No, sir.

(Sound of door opening and closing)

(Sound of door opening and closing)

Q:      All right, I…I came up with just another couple of other questions if it's all right if we…
A:      Yes.

Q:      …just clarify a few things. So, do you guys carry anything else, like…okay, so the…the day that this happened, did you have any other backup weapon or any other issued weapon on you? I guess more specifically, are…are…are you guys issued Tasers or any…
A:      No.

Q:      …other kind of…

A:   No, DEA doesn't issue Tasers, and an even further point of that, task force officers from local departments that are assigned to DEA can't use their department-issued Taser on DEA operations.

Q:   Okay, so it's…you…you basically just had your handgun with you?
A:   Yeah.

Q:   Okay, and same for…obviously for Agent Gasperoni. Do you remember what Mr. Slay was wearing?
A:   No.

Q:   Okay. You said it was warm outside. Do you remember if he was wearing a coat, wearing just a shirt? And I'm not asking…you know, if you can't remember specifically anything…
A:   Yeah, I mean, I was wearing a tee shirt that day, but, you know, I don't know…I…I don't remember what he was wearing.

Q:   Okay.
A:   I just can't remember.

Q:   Okay, so after this shooting, when you…when you retrieved the…the handgun from Mr. Slay's side, when you pulled it out…you said it was inside the waistband, correct?
A:   Yes.

Q:   Was there any kind of holster or any…anything, you know, sometimes people wear…
A:   Right. I didn't notice one.

Q:   Okay.
A:   When I pulled it out, it…I mean, it came out easily. The…you know, a holster didn't come off with it. Sometimes, you know, just from…from carrying guns as law enforcement, you know how holsters are.

Q:   Right.
A:   Sometimes they'll kinda get stuck or come…come out with the gun, but I didn't notice it. I didn't notice any obvious signs of a holster, but…but…you know…

Q:   Okay.
A:   …I just don't know. It was inside the waistband. He could've had some kind of inside-the-waistband holster, but I didn't notice it, and I never checked further.

Q:   But…and…and whenever you put it in your car, it didn't have one?
A:   No.

Q:   Okay. So, at…just another couple of little things here. You said that Agent Gasperoni had his hands on Mr. Slay's hands as well, when you first kinda noticed and heard him calling your name.
A:   Right.

Q:   You said he was…kinda describe that to me, how you saw him, again.
A:   It was like they were standin' face-to-face and he…it was like Agent Gasperoni had…had his…you know, if I'm him, he's got his hands like this and he's holdin' on to the other guy's hands.

Q:   Okay, and is his…are…were his hands, I guess…I mean, they're just right in front of him?
A:   Yeah, he's…I mean, it's…it's an unusual way to stand, but when I see that, I know this isn't how you sit and talk to somebody; this is…somethin' has happened.

Q:   Right, and then you said you came in kind of on his left side, to try to put handcuffs on him? Mr. Slay's?

A:   Yeah, I mean, just the way the cars were positioned, so I had to walk, you know, I had to walk around the front of the U-Haul truck, which was also in front of this other little car that Mr. …the other guy had been in. I sat Driver down, you know, kinda on the north…north side of that yard…compared, you know, compared to the south. I mean, it's kinda right there, kinda right next to the truck, probably, on the front side, and as…just as I'm walkin' around, just the way I'm walkin', you know, I'm tryin' to…I mean, I'm tryin' to get there, but, you know, Agent Gasperoni's facin' west, the other guy is kinda facin'…they're kinda standin' like this and I'm kinda walkin' up from the north to the south to get to 'em, you know, so it's kinda…I mean, walkin', you know, a few steps behind him, but I'm also comin' up from his left side.

Q:   Okay, so whenever you try to go put hands-on to Mr. Slay's arms, kinda describe to me exactly what…what he does, or…

A:   I mean, it's…it's more or less just as soon as I touch him, as soon, you know, my hand goes to one of his, you know…I'm gonna…I want to move…you know, I was gonna do the standard handcuffing behind your back, and so, as soon as I grab one of his arms, it…it's…he immediately, you know, starts fightin'. I mean, he…he…he pulls away, he breaks that grip, he breaks loose from Agent Gasperoni, and then it's just, you know, then he's on his own and I'm tryin' to regain control.

Q:   Okay, and then after that at some point in time, you end up on your back on the ground?

A:   Right, that's…that's kind of the start of that real short struggle that ends up with me on my back.

Q:   Okay. Do you remember Mr. Slay saying anything at all during this altercation, or this…this exchange or anything like that?

A:   No. I mean, not to me, you know. I mean, basically what I can remember is just when he…when I initially showed up there and he started to get out of the car and I'm tellin' him to get back in the car.

Q:   Okay.

A:   I don't even know his response to that. I, you know, couldn't, you know…don't know if he's…don't know what he said to that, you know, but, you know, it was more or less, I'm dealin' with one guy and then Agent Gasperoni, when he shows up he's the one kinda dealin' with him.

Q:   Okay. So, really, I don't think I have any other questions at this point. I would only just ask you if…if there's anything that you would like to tell me, or you think is relevant to this that I didn't ask…if you have anything to…to fill in any kind of gaps that might come up later on.

A:   No, I mean, that's…that's pretty much the…the whole thing, from…from start to finish that I can remember right now. I mean…

Q:   Okay.

A:   …that's…that's…I mean, that's pretty much it, you know.

Q:   Okay, so my question would be is, if I need to…let's just say if another question comes up later on, how…what's the best way to address that, if I need to ask you a question. Should I just contact your attorney again, or…

T:   If it's just for scheduling purposes, you can reach out…out to John.

Q:   Out to John to reschedule?

T:   You don't…yeah, don't call me for…

Q:   Okay.

T:      …for scheduling.

Q:      Okay. And I guess I didn't actually get your entire name, sir; would you mind just so I can…
T:      Sure. It's Tom Allen.

Q:      Allen, A-L-L-E-N?
T:      Correct. And I'm in New York.

Q:      Okay, and I've got your phone number from the other day.
T:      Right.

Q:      I'll…what…and I'll…I'll ask you some other things later, so, do you have any questions, sir, or anything you need to ask me?
T:      Are you referring to me?

Q:      Yes, sir.
T:      Oh, no…no, thank you. Thank you, I think that just about sums up everything.

Q:      Okay, I think we're gonna go ahead and end the interview at this point in time. We'll…we'll step out; I don't know if you guys…if you…if you want him to just hang up with you and…but I…I don't have anything else at this point in time.
T:      Yeah, John, just when you step out just…if you want to hang up now and call me when you step out, that's fine.
A:      Yeah, I'll call you when I get out to my car.

T:      Okay.
A:      Thank you.

T:      All right, thank you.

(Sound of door opening and closing)

END