IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| TINA RICHARDSON, individually and as successor-in-interest to Decedent Caleb Slay, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) Case No. 6:23-cv-03337-RK<br>) |
| UNITES STATES OF AMERICA, *et al.*, | )<br>) |
| Defendants. | ) |

## ORDER

Before the Court are Defendant United States' motion to exclude the expert testimony of Robert Johnson, (Doc. 138),[1] and Plaintiff Richardson's motion to exclude the expert testimony of Craig Allen, (Doc. 139). The motions are fully briefed. (Docs. 138, 139, 156, 157, 161, 162.) After careful consideration and for the reasons explained below, the Court **ORDERS** that (1) Defendant United States' motion to exclude the expert testimony of Robert Johnson is **GRANTED**, and (2) Plaintiff Richardson's motion to exclude the expert testimony of Craig Allen is **DENIED**.

## Background

This case arises from the fatal shooting of Caleb Slay by federal Drug Enforcement Administration ("DEA") Agent Anthony Gasperoni. On November 2, 2020, Slay encountered DEA Agent Gasperoni and DEA Agent John Stuart. During the ensuing interaction, DEA Agent Gasperoni discharged his firearm, fatally shooting Slay. Slay's mother, Tina Richardson, filed this case asserting numerous claims under federal and state law against the United States and DEA Agent Gasperoni for excessive force, wrongful death, and battery. Following summary judgment, the sole remaining claim in this case is a wrongful death claim brought against the United States pursuant to the Federal Tort Claims Act and Missouri's wrongful death statute, based on a battery

---

[1] The motion by Defendant United States was originally filed jointly with former co-defendant DEA Agent Gasperoni to exclude Plaintiff Richardson's expert testimony of Robert Johnson. Since the filing of the motion to exclude however, the Court granted co-defendant DEA Agent Gasperoni's motion for summary judgment in full and granted in part the United States' motion for summary judgment, leaving the United States as the sole remaining defendant in this case.

theory (Count 5).  (*See* Doc. 163.)  The parties timely designated expert witnesses in this case and now move to exclude the evidence and testimony of the other party's expert.

**Legal Standard**

Rule 702 of the Federal Rules of Civil Procedure, which was amended following *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and most recently amended in 2023, provides the standard for the admission of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Based on Rule 702, the Eighth Circuit applies a three-part test to determine the admissibility of expert testimony:

> First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact.  This is the basic rule of relevancy.  Second, the proposed witness must be qualified to assist the finder of fact.  Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires.

*Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001) (internal quotation marks omitted).[2] "The proponent of the expert testimony bears the burden to prove its admissibility." *Menz v. New Holland N. Am., Inc.*, 507 F.3d 1107, 1114 (8th Cir. 2007) (citing *Lauzon*, 270 F.3d at 686). Following the 2023 amendment, the proponent must show "that it is more likely than not that the proffered testimony meets the admissibility requirements" of Rule 702.  Advisory Committee notes to 2023 amendment; *see also CIS Comm'cns, LLC v. Republic Servs., Inc.*, No. 4:21-cv-00359-

---

[2] The Eighth Circuit has not directly addressed whether its three-part test from *Lauzon* still applies after the 2023 amendment to Rule 702.  In *Academy Bank, N.A. v. AmGuard Insurance Co.*, the Eighth Circuit applied the former Rule 702 standard in a case which was tried prior to the amendment and noted we "do not decide whether our holding here would be the same if the amendments had been in effect at trial."  116 F.4th 768, 790 n.10 (8th Cir. 2024).

However, multiple district courts in the Eighth Circuit have continued to apply the three-part test from *Lauzon* after the 2023 amendment to Rule 703.  *See, e.g.*, *Golden v. United States*, No. 22-cv-3312-WBG, 2024 WL 1743766, at *2 (W.D. Mo. Apr. 23, 2024); *Christensen v. Louisville Ladder, Inc.*, No. 4:23-cv-136 HEA, 2025 WL 2591619, at *2 (E.D. Mo. Sept. 5, 2025).

2

JAR, 2025 WL 2958462, at *3 (E.D. Mo. Sept. 26, 2025). The rules for the admissibility of expert testimony favor admission over exclusion. *See Moore v. Wilson Logistics, Inc.*, No. 21-03212-CV-S-BP, 2025 WL 1783770, at *2 (W.D. Mo. Feb. 6, 2025) (noting that Rule 702 "is not a rule of exclusion" and that "cases are legion that, correctly under *Daubert*, call for the liberal admission of expert testimony" (quotation modified)); *Lauzon*, 270 F.3d at 686.

## Discussion

I. **Defendant United States' Motion to Exclude Expert Testimony of Robert Johnson**

Defendant United States moves to exclude the testimony and report of Plaintiff Richardson's damages expert, Robert Johnson. Specifically, the United States argues that Mr. Johnson's expert testimony opining that the value of decedent Caleb Slay's life is between $5,5000,000 and $16,900,000, based on a "willingness-to-pay" methodology, is not relevant to the factfinder because the willingness-to-pay valuation is not tied to Mr. Slay specifically in any way. The United States argues that Mr. Johnson's opinion is unreliable and that courts have generally excluded expert testimony which relies on the "willingness-to-pay" methodology or so-called hedonic damages.[3] Plaintiff counters that "Mr. Johnson has sufficient experience in forensic economics and is qualified to opine on the loss of the value of human life, or Plaintiff's hedonic damages" and that this Court should follow the Tenth and Ninth Circuit case law on the issue. The Court agrees with the United States.

Mr. Johnson, a forensic economist, opines that the value of decedent Caleb Slay's life is between $5,500,000 and $16,900,000, based on a "willingness-to-pay" methodology. (Doc. 138-1 at 3, 5.) As Mr. Johnson explains in his expert report, the willingness-to-pay methodology values human life based on "how much people are willing to pay (or willing to give up in dollars) to avoid an increase in the risk of death," rather than taking into account any information specific to the decedent (such as physical health, history of mental illness, drug use, familial relationships, education, etc.).

---

[3] "Hedonic damages" refer to damages that encompass the "lost pleasure of life." *See Maracdo v. Ahmed*, 756 F. Supp. 1097, 1102 (N.D. Ill. 1991). The willingness-to-pay methodology is one of the most well-known hedonic damages models. While these concepts are thus distinct, courts addressing the issue of whether willingness-to-pay testimony is admissible often refer to both "hedonic damages" and the "willingness-to-pay" methodology in the decision to describe the type of expert evidence offered by Mr. Johnson here.

3

Mr. Johnson's report begins with a short example of the willingness-to-pay methodology in action. The premise of the example is that there is a toxin in a town of 20,000 people which causes a fatality rate of 3/20,000. The toxin can be reduced so that the fatality rate decreases to 1/20,000, saving two lives:

> The townspeople are asked, "How much are they willing to pay to save these two lives?" It is important to note that the townspeople recognize there is no way of knowing in advance whose lives are going to be saved. *It could be the local vagrant bum, an infant, spouse, or the local version of Dr. Jonas Salk.* All that remains is the intangible human value of life. Although there was some variation, the average amount each citizen was willing to pay was $200. Consequently, since the average citizen was willing to pay $200 for this reduction in the rate of death, then the total Willingness-to-Pay would be $4,000,000 and the intangible human value of life per person saved was $2,000,000.

(Doc. 138-1 at 6 (emphasis added).) Mr. Johnson's own example demonstrates the generality of this methodology. In other words, the willingness-to-pay model provides a value range for some general, average human life, rather than a value specific to a particular decedent.

Other courts have found this generality to be a weak point of the willingness-to-pay methodology, which negates the relevancy of the testimony. *See Sullivan v. City of Buena Park*, No. 20-01732-CJC(ADSx), 2022 WL 2965664, at *7 (C.D. Cal. Apr. 11, 2022) ("Most importantly, however, Mr. Johnson's testimony will not be helpful to the jury because the range is not tied to Sullivan in any way (his health, history, relationships, education, career, and suicidal ideation)."); *Estate of DuBose v. City of San Diego*, No. 99-cv-2279-L(NLS), 2002 WL 34408963, at *2 (S.D. Cal. Oct.1, 2002) ("Second, Johnson's proposed testimony will not assist the jury reach a decision. The value of DuBose's life depends on his particular facts (including health, history, relationships, career, etc.), but this expert gives a range spanning six million dollars that purportedly applies to 'all' individuals."); *Smith v. Jenkins*, 732 F.3d 51, 67 (1st Cir. 2013) ("But even assuming that Dr. Smith's formula is a reliable measure of the value of life, it was of no assistance to the jury in calculating Smith's loss of enjoyment of life. As other courts have recognized, '[t]he willingness-to-pay studies do not relate in any way to the actual component of damages, the enjoyment of life.'" (citation omitted)).[4]

---

[4] Plaintiff's expert, Robert Johnson, appears to be the expert in both the *Sullivan* and *Estate of DuBose* cases where the expert testimony was excluded.

Federal courts have overwhelmingly discredited the willingness-to-pay model as a whole, and thus excluded expert testimony relying on the model, finding that "placing a dollar amount on hedonic damages, including the use of benchmarks and range of values, does not meet the reliability and relevance factors required to admit expert testimony." *Rivera v. Volvo Cars of N. Am., LLC*, No. 13-397 KG/KBM, 2015 WL 11118067, at *1 (D.N.M. June 8, 2015).[5] This includes district courts within the Eighth Circuit. *See Jennings v. Nash*, No. 18-cv-3261-WJE, 2020 WL 770325, at *3 (W.D. Mo. Feb. 17, 2020) (excluding testimony estimating hedonic damages using a willingness-to-pay model because plaintiff "failed to show how" the testimony "would be necessary or reliable under the standard set forth in *Daubert*"); *Moe v. Grinnell Coll.*, 547 F. Supp. 3d 841, 848 (S.D. Iowa 2021) (same).

While the Eighth Circuit has not addressed this issue, multiple courts of appeals have held the willingness-to-pay model inadmissible or affirmed district courts that excluded such evidence. *See Smith v. Jenkins*, 732 F.3d 51, 65-67 (1st Cir. 2013) (rejecting willingness-to-pay methodology as irrelevant and unreliable); *Mercado v. Ahmed*, 974 F.2d 863, 871 (7th Cir. 1992) (affirming district court's exclusion of willingness-to-pay expert testimony). Plaintiff urges this Court to follow the Tenth and Ninth Circuits, citing *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235 (10th Cir. 2000), and *Dorn v. Burlington N. Sante Fe R.R.*, 397 F.3d 1183 (9th Cir. 2005). However, upon closer review of these cases, they do not support Plaintiff's contention that the willingness-to-pay methodology is sufficiently reliable to satisfy a *Daubert* analysis.

In *Smith v. Ingersoll-Rand Co.*, the Tenth Circuit addressed the defendant's appeal of the district court's ruling admitting expert testimony "about the meaning of hedonic damages." 214 F.3d at 1244. The Tenth Circuit affirmed the district court decision permitting testimony *about the meaning* of hedonic damages, but noted that "[t]his case . . . does not require us to determine the admissibility of studies purporting to *quantify* hedonic damages, and we venture no opinion on that count." *Id.* at 1245 (emphasis added). This is because the district court below actually *excluded* the expert testimony on hedonic damages to the extent the testimony calculated a value-range using the willingness-to-pay model because such valuations are "unreliable" and the district court "concluded any attempt to quantify [plaintiff] Ron Smith's hedonic damages would be 'both

---

[5] *See also, e.g., Kurncz v. Honda N. Am.*, 166 F.R.D. 386 (W.D. Mich. 1996); *Ayers v. Robinson*, 887 F. Supp. 1049 (N.D. Ill. 1995); *Hein v. Merck & Co.*, 868 F. Supp. 230 (M.D. Tenn. 1994); *Lopez v. Aitken*, No. 07-cv-2028 JLS (WMC), 2011 WL 672798 (S.D. Cal. Feb. 18, 2011); *Saia v. Sears Roebuck & Co., Inc.*, 47 F. Supp. 2d 141 (D. Mass. 1999).

unhelpful and confusing to the jury.'" *Id.* at 1244 (citation omitted). Thus, the Tenth Circuit did not address the admissibility of expert testimony quantifying the value of human life based on a willingness-to-pay methodology. The court did, however, note that "[a]ttempts to quantify the value of human life have met considerable criticism in the literature of economics as well as in the federal court system" and that "the federal courts which have considered expert testimony on hedonic damages in the wake of *Daubert* have unanimously held quantifications of such damages inadmissible." *Id.* at 1245 (collecting cases).

Similarly, in *Dorn v. Burlington N. Sante Fe R.R.*, the Ninth Circuit addressed the defendant's appeal of the district court's admission of the plaintiff's hedonic damages expert and exclusion of defendant's rebuttal expert. The Ninth Circuit concluded in that case that "we need not reach a conclusion on whether the district court abused its discretion in admitting Smith's [the plaintiff's hedonic damages expert] testimony" because the district court erred by not admitting the defendant's rebuttal expert on the issue. *Dorn*, 397 F.3d at 1195. Therefore, the Ninth Circuit did not reach the issue of the admissibility of expert testimony using the willingness-to-pay methodology in its decision, either.[6] Thus, the only cases Plaintiff cites in support of the relevance and reliability of the willingness-to-pay methodology did not actually decide the issue. The United States, on the other hand, has provided a plethora of case law excluding testimony based on the willingness-to-pay methodology. The Court is persuaded by the reasoning of those courts that have rejected similar expert testimony and concludes that the willingness-to-pay methodology is irrelevant and unreliable generally.

In addition to finding the willingness-to-pay methodology generally unreliable, the Court notes that Mr. Johnson's report in particular has issues which cause his expert testimony to fall short of the *Daubert* standard. In his report, after describing the "toxin in the town" example discussed above, Mr. Johnson sets forth his own analysis:

> Among the many published studies, two prominent analyses on the Human Value of Life are (1) "The Plausible Range for the Value of Life", by Dr. T. Miller and (2) "The Value of Life: Estimates with Risks by Occupation and Industry", by Dr. W. Kip Viscusi. In the Miller study, which represents his critical analysis of over 66 different analyses (by other economists) of the Human Value of Life, he deemed

---

[6] Additionally, the underlying expert opinion in *Dorn* was based on a "risk-reduction model" versus a "willingness-to-pay" model, both of which calculate hedonic damages. The Ninth Circuit stated that "[t]his methodology may have some utility" but that the usefulness of the testimony "was reduced" because the expert averaged different values, some of which were "not at all informative about how much people value their own enjoyment of life." *Dorn*, 397 F.3d at 1195.

6

> 47 as sound. These 47 qualifying studies yielded a statistical floor value of $2,200,000 (in 1988 dollars). In the Viscusi study, the authors' empirical analysis of Bureau of Labor Statistics data yielded a value of life of $8,900,000 (in 1997 dollars).
>
> Thus, after deducting for the Human Capital component and converting to before tax dollars, the appropriate range for the intangible Human Value of Life is from a low of $1,800,000 in 1988 dollars to a mid-point of $8,900,000, in 1997 dollars. When converted (using the Consumer Price Index) into 2023 dollars, the range is from $5,500,000 to $16,900,000.

(Doc. 183-1 at 6.) The Court includes Mr. Johnson's analysis in full to demonstrate the insufficiencies of his report. What is included above is more or less the entirety of Mr. Johnson's explanation as to how he arrived at his range for the valuation of Mr. Slay's life. In *Sullivan v. City of Buena Park*, discussed above, the Central District of California excluded a nearly identical expert report submitted by Mr. Johnson. The *Sullivan* Court noted that:

> Mr. Johnson has provided no explanation as to why he chose the studies that he chose: those of Miller and Viscusi. For all the Court knows, there could be various studies out there that may yield a range below that given by Mr. Johnson. The Miller and Viscusi studies are also quite old. As society, technology, and medicine change through time, would not the value of life change as well? If there are more recent studies, Mr. Johnson has not explained why these older studies were more appropriate to use. And if there are not recent studies, that raises a concern that the WPT methodology has not been further developed and refined over time, but perhaps left in the past as junk science.
>
> More troubling, the variability in the values derived from the Miller and Viscusi studies, and the possible variability between those studies and other studies that Mr. Johnson decided not to use for some unknown reason, suggests the WPT method's unreliability. It does not inspire confidence when a single method meant to value a generic life could arrive at values millions of dollars apart.

2022 WL 2965664, at *6 (internal citation omitted). This Court finds the same issues in the report Mr. Johnson prepared in this case. He relies on two studies that are both now over 20 years old.[7] Mr. Johnson does not explain why these studies were chosen, whether newer studies exist, or whether other studies exist with further variations in estimates of the value of human life. Mr. Johnson's report in this case is nearly identical to the one he submitted in *Sullivan*, except that he converts the final valuation of human life into 2023 dollars rather than 2019 dollars. (*Compare* Doc. 183-1, *with* Doc. 183-4.) Mr. Johnson has not done any further work to update his

---

[7] The Miller study was published in 1990, and the Viscusi study was published in 2004. (Doc. 138-1 at 7.)

7

methodology in the ensuing years between *Sullivan* and this case, despite a court excluding his expert testimony and detailing the insufficiencies in the report; the same insufficiencies thus remain here.

Ultimately, the Court joins the growing consensus among federal courts and concludes that the willingness-to-pay methodology generally is an unreliable way to measure the value of human life and does not satisfy the *Daubert* standard. Moreover, Mr. Johnson's report in particular lacks sufficient explanation and support for his conclusions. The reasonable value of Mr. Slay's life is within the purview and experience of the factfinder. *See Sullivan*, 2022 WL 2965664, at *7 ("The jury has the knowledge and life experience to value human life and can do something the WPT methodology cannot: consider the specific facts of Sullivan's life."); *Estate of Dubose*, 2002 WL 34408963, at *2 ("[T]he jury will have the knowledge and life experience to determine a fair damages award based upon the testimony received at trial. . . . As in any other wrongful death case, this factual determination is most appropriately left to the province of the jury."). Plaintiff may argue whatever valuation she wishes, but the Court finds that Mr. Johnson's expert testimony does not meet the standard under Rule 702 as amended and is inadmissible. Therefore, Defendant United States' motion to exclude the expert testimony of Robert Johnson is **GRANTED**.

II. **Plaintiff Richardson's Motion to Exclude Expert Testimony of Craig Allen**

Plaintiff moves for an order "excluding, or in the alternative limiting, the testimony of [Defendant United States'] Expert, Craig Allen, as it relates to 'Force Science' and eyewitness testimony." (Doc. 139 at 1.)

A. **"Force Science" Opinions**

Plaintiff Richardson seeks to exclude Mr. Allen's opinions that rely on "force science," arguing that opinions based on so-called force science do not satisfy the *Daubert* standard because "force science" is not a generally accepted theory in the relevant scientific community and Mr. Allen is not qualified as an expert in a recognized scientific field such as cognitive psychology or behavioral science. (Doc. 139 at 3.) Plaintiff alternatively argues that Mr. Allen's "force science" opinions should be excluded under Rule 403 of the Federal Rules of Civil Procedure because any probative value is outweighed by the danger of unfair prejudice. (*Id.* at 4.)

To start, the Court notes that Plaintiff does not specify what portion(s) of or opinion(s) within Mr. Allen's expert report should be excluded as relying on "force science" and does not define "force science" anywhere in her briefing. Thus, it is unclear precisely which parts of Mr.

8

Allen's report Plaintiff seeks to exclude. In response to Plaintiff's motion to exclude, the United States identifies and defends as admissible Mr. Allen's opinion that a law enforcement officer's reaction time is longer when the officer has to engage in decision-making rather than simple reaction tests involving only one response. In her reply brief, Plaintiff states that "[r]eaction time of law enforcement is certainly interconnected with 'the human brain's capabilities.'" Thus, it appears that this is at least one of the opinions Plaintiff intended to challenge in the motion to exclude. Plaintiff did not identify or address any other opinions in the reply brief. Thus, the Court considers only Plaintiff's arguments generally and as they relate to the reaction-time opinion identified by the United States.

A basic understanding of "force science" is necessary to proceed. "Force science" has been explained by one expert as "the application of scientific principles, research, and testing to confrontation in which force is used by police officers or others." *Garrit v. City of Chicago*, No. 16-cv-7317, 2022 WL 124554, at *8 (N.D. Ill. Jan. 13, 2022). The District of Kansas has noted "that the concept generally involves examining how scientific principles governing human behavior apply to police work." *Finch v. City of Wichita*, No. 18-1018-JWB, 2020 WL 3403121, at *22 (D. Kan. June 19, 2020). Thus, "force science" appears to address issues at the intersection of police work, training, and practice, and the human behavioral sciences. Based on review of case law included herein, the Court notes that the border between opinions based on experience and training as a police officer and opinions based on human behavioral sciences is rather nebulous. While expert testimony must meet the threshold of admissibility under *Daubert* and Rule 702, "[t]he rules for admissibility of expert testimony favor admission over exclusion." *Roberson v. Kan. City S. Ry. Co.*, No. 4:22-cv-00358-RK, 2024 WL 4502924, at *3 (W.D. Mo. Oct. 16, 2024) (citing *Lauzon*, 270 F.3d at 686).

Plaintiff Richardson argues, and Defendant United States concedes, that "[w]ithout dismissing the field entirely, federal courts confronted with force science-based opinions have routinely determined that witnesses with 'force science' training are not qualified to render scientific opinions." *Garrit*, 2022 WL 124554, at *8. Thus, courts have barred experts—whose qualifications are limited to "force science" training—from "opin[ing] on the human brain's capabilities." *Id.* Mr. Allen is currently employed as the "Director of Training and Senior Instructor with the Force Science Institute." However, this is not Mr. Allen's only qualification

9

and not every opinion by someone associated with the Force Science Institute is inadmissible merely because of such association.

Upon review, Mr. Allen's opinion regarding reaction time does not appear to cross the line into cognitive psychology, physiology, behavioral science, or any other purely scientific field. Moreover, Mr. Allen's opinion does not merely rely on his experiences at the Force Science Institute but also on his 30 years of experience as a police officer, over 25 formal certifications, relevant organization memberships, and review of publications on the issue of police perception and reaction times. (Doc. 156 at 5-6.) Mr. Allen has also "conducted research on police perception/reaction times, police response tactics, and visual attention processes and comparisons with body work cameras." (*Id.* at 6.) He has published five articles on these subjects in the past ten years. (*Id.*) Thus, it appears that Mr. Allen's area of expertise includes police reaction times based on his experience as a police officer, his training, and his research. *See* Fed. R. Evid. 702 (noting a person may be "qualified as an expert by knowledge, skill, experience, training, or education").

In *Finch v. City of Wichita*, the court denied a motion to exclude expert testimony to the extent the expert offered "testimony about reaction times of officers who decide to use force in response to perceived threats." 2020 WL 3403121, at *24. The court noted that the expert cited a "study on officer reaction times" in support of his opinion, as well as his "own familiarity with real world scenarios, reality-based training and the analysis of force encounters." *Id.* (cleaned up). The court concluded that this indicated the expert "has sufficient training, knowledge, and experience to express an opinion about the amount of time it may take an officer to use force after the officer sees a threat" but that "[t]his does not extend to discussions or opinions by [the expert] about cognitive processes – just the amount of time it may take an officer to fire a weapon in response to a threat." *Id.*

Here, Mr. Allen offers an opinion regarding the perception or reaction time of an officer responding to a threat, without opining about cognitive processes.[8] His experience of 30 years as a police officer, his over 25 formal certifications, and his experience at the Force Science Institute combine to demonstrate his qualification to opine on this subject matter. Mr. Allen does not

---

[8] It does not appear that Mr. Allen's opinion on police reaction time goes beyond the limitation recognized in *Finch*. To that extent, this Court finds the decision in *Finch* persuasive. Plaintiff, in failing to point to specific opinions in Mr. Allen's report, has not otherwise shown the Court that Mr. Allen's opinions go beyond what is permissible, consistent with *Finch*.

10

purport to rely on "force science" principles. *See Zuniga v. City of Los Angeles*, No. 2:22-cv-03665-CBM-(ASx), 2024 WL 4744370, at *2 (C.D. Cal. Oct. 7, 2024) (denying motion to exclude expert's opinions to the extent they were based on "force science" principles because "no part of Mr. Flosi's expert report indicates that any of his opinions are based upon this information. The Court finds that Mr. Flosi's extensive background and experience in law enforcement qualifies him to testify as to police practices and tactics, as Defendants' expert disclosures state."). Moreover, like the expert in *Finch*, Mr. Allen conducted research on reaction times and cited at least five of his own publications on the topic and nearly a dozen other published studies in his report. (Doc. 156-1 at 47-48.) Thus, based on the Court's review of Mr. Allen's expert report, the Court concludes that it complies with the *Daubert* standard and Federal Rule of Evidence 702.

Plaintiff alternatively argues that Mr. Allen's opinions relating to "force science" should be excluded under Rule 403 as unduly prejudicial. Plaintiff argues that the jury "may give force science *too much weight* over whether the DEA Agents Gasperoni and Stuart could have exercised other options, such as obtaining an arrest warrant based on probable cause." (Doc. 139 at 4 (emphasis added).) First, the Court notes this argument has little bearing on the specific opinion identified in the briefing—that is, Mr. Allen's opinion that officer reaction time is longer when the officer must engage in decision-making. Second, the quoted language above is the entirety of Plaintiff's argument that the Court should exclude this evidence under Rule 403. The Court is not persuaded that the value of the evidence is outweighed by any undue prejudice. Correspondingly, this evidence that is unfavorable to Plaintiff does not establish undue prejudice.

Accordingly, Plaintiff Richardson's motion to exclude Mr. Allen's "force science" opinions is **DENIED**.

### B. Eyewitness Testimony Opinion

Second, Plaintiff Richardson seeks to exclude Mr. Allen's opinions on eyewitness testimony, particularly his opinion elicited by plaintiff counsel in his deposition that "police officers involved in shootings can have specific, more precise memories of how the event unfurls as opposed to a lay witness watching the incident." (Doc. 139 at 5 (citing Doc. 139-2 at 6).) Plaintiff argues that Mr. Allen has no supporting education, credentials, or background in the field of memory and eyewitness testimony. Defendant United States counters that Mr. Allen's opinion on eyewitness testimony was only given because plaintiff counsel asked the question during Mr. Allen's deposition. The opinion does not appear in Mr. Allen's expert report, and the United States

11

represents that it does not intend to elicit any such opinion from Mr. Allen on direct examination at trial. To the extent plaintiff counsel questions Mr. Allen on the topic during cross-examination at trial, the United States argues that such testimony should be allowed.

The Court finds that Plaintiff's motion to exclude any "eyewitness testimony" opinion by Mr. Allen is premature. *See Charter Oak Fire Ins. v. SSR, Inc.*, No. 11-118-HRW, 2014 U.S. Dist. LEXIS 185878, at *15 (E.D. Ky. Sept. 29, 2014) (finding motion to exclude expert opinion premature where expert did not opine on the issue in his report and where counsel represented that they did not intend for the expert to testify on the issue). Here, Mr. Allen did not include any "eyewitness testimony" opinions in his report, and defense counsel states that they do not anticipate eliciting any such opinions from him at trial. Instead, the only reason Mr. Allen has opined on eyewitness testimony during the course of this litigation is because plaintiff counsel asked Mr. Allen in his deposition, "[d]o you have some reason to believe that police officers who are active participants in a shooting incident would have better memories of the shooting incident than nonactive participants?" (Doc. 139-2 at 6.) The Court is persuaded by Defendant United States' argument that Mr. Allen should be able to respond to such questioning at trial, including providing his opinion, should plaintiff counsel again open that door. *See United States v. Bear*, 920 F.3d 1199, 1202 (8th Cir. 2019) ("Having opened the door to this evidence, Spotted Bear cannot now complain about its admission."); *Brown v. Muzyka*, No. 6:23-cv-00474-ADA-DTG, 2025 WL 1873253, at *3 (W.D. Tex. May 22, 2025) (finding if plaintiff "opens the door to that testimony by asking Mr. Irwin [defendant's expert] about the Move Over or Slow Down law, Plaintiff cannot later complain that Mr. Irwin's testimony is objectionable or inadmissible").

As set forth above, the Court finds Plaintiff Richardson's motion to exclude eyewitness testimony opinion premature, as Mr. Allen has not included any such opinions in his report and defense counsel does not intend to elicit any such opinions on direct examination. Moreover, because the admissibility of Mr. Allen's opinions on eyewitness testimony may very well depend on the nuances of how it is elicited, the Court declines to exclude Mr. Allen's testimony at this juncture. Therefore, Plaintiff's motion to exclude the expert testimony of Craig Allen is **DENIED**.

## Conclusion

Accordingly, after careful consideration and for the reasons explained above, the Court **ORDERS** that (1) Defendant United States' motion to exclude the expert testimony of Robert Johnson, (Doc. 138), is **GRANTED**, and (2) Plaintiff Richardson's motion to exclude the expert testimony of Craig Allen, (Doc. 139), is **DENIED**.

    **IT IS SO ORDERED**.

                                                                s/ Roseann A. Ketchmark
                                                                ROSEANN A. KETCHMARK, JUDGE
                                                                UNITED STATES DISTRICT COURT

DATED: March 2, 2026