**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| TINA RICHARDSON, individually<br>and as successor-in-interest to<br>Decedent Caleb Slay, | )<br>)<br>)<br>) | |
| Plaintiff, | ) | |
| v. | )<br>) | Case No. 6:23-cv-03337-RK |
| UNITED STATES OF AMERICA, | )<br>) | |
| Defendant. | ) | |

## DEFENDANT'S TRIAL BRIEF

The use of deadly force is easily scrutinized with the benefit of hindsight. But liability for

an officer's use of force during a tense and rapidly evolving encounter is based on reasonableness,

not on the narrative that only hindsight can supply. The sole question before this Court is whether

it was reasonable for a federal agent to employ deadly force to save his fellow agent from a man

who was armed, who was brazen enough to fight and wrestle with a federal agent, who resisted

any attempt to be detained, and who chose to position himself over that agent and reach for his

gun. It is the United States' position that the testimonial evidence and expert opinions will

demonstrate that any reasonable officer confronted with all the same facts and circumstances

would believe that such conduct posed an immediate threat to the safety of the officer or others.

The United States of America submits the following trial brief summarizing the relevant law and

facts.

## Factual Background

As described in the parties' stipulated facts, the parties do not dispute that DEA Special

Agent Anthony Gasperoni shot and killed Caleb Slay. The DEA Special Agents were investigating

suspected drug related activity on November 2, 2020, as initiated by the observations of veteran DEA Special Agent John Stuart. SA Stuart initially observed a hand-to-hand transaction at a vehicle oddly parked at an apartment complex. After tailing the vehicle and returning to the complex, the agents observed the arrival of a U-Haul, who's driver made repeated contacts with the same apartment where the individual had entered following the hand-to-hand transaction. Based on his extensive experience, SA Stuart decided to follow the U-haul to deepen the investigation of suspected drug activity he believed to be occurring at the apartment.

When the U-haul parked in front of a nearby residence, Agent Stuart approached the driver's side door on foot. The driver, Casey Ray, made furtive movements, and when asked, stated he had come from an intersection. SA Stuart asked for clarification and Ray stated he came from the Wal-Mart, which Agent Stuart believed to be intentionally evasive. When SA Stuart asked whether Ray had anything that could harm Stuart during a pat down, Ray responded that he did not use needles, which SA Stuart believed to be an unusual answer and further indicative of a person involved in drug activity. When asked what he was doing, Ray nodded toward a nearby passenger vehicle and indicated he was meeting friends.

For the first time SA Stuart observed a second vehicle parked nose-to-nose with the U-Haul, occupied by two individuals. The passenger of the vehicle, Caleb Slay, exited and refused to return or stay in the vehicle as SA Stuart had told him. When SA Gasperoni arrived on scene, he requested Slay return and speak with him. Slay did so, but not without expressing agitation. When Slay began to reach behind his back, SA Gasperoni advised him not to do so because he did not know whether Slay had a gun. Only after this admonition did Slay reveal that he was armed. SA Gasperoni immediately attempted to detain Slay by grasping his wrists, at which point Slay tensed his arms. SA Gasperoni communicated to SA Stuart that Mr. Slay was armed, and Stuart

noticed that the way SA Gasperoni and Slay were standing—face-to-face with Agent Gasperoni grasping Slay's wrists—did not appear normal.  Given the heightened level of risk created by the suspicion of having stepped into the middle of a drug deal and Slay's conduct, SA Stuart moved over to assist SA Gasperoni.  However, when SA Stuart came behind Slay and attempted to place handcuffs on him, Slay broke free of both Agents' grasp.  He then forced SA Stuart onto the ground, and a struggle ensued.  SA Stuart attempted to keep Slay on the ground and to control Slay's arms in order to keep Slay from reaching for his weapon.  However, Slay was able to push off of SA Stuart and rise into a position over the top of him.  Both SA Stuart and SA Gasperoni observed Slay attempt to reach for his hip, a location which both Agents understood to be a common place for an individual to carry a firearm.  SA Gasperoni—who had already drawn his sidearm—made the split-second decision to employ deadly force. A firearm was recovered from Slay's rear right hip.  While other witnesses failed to observe Mr. Slay reaching for a firearm, these witnesses were not involved in the struggle and did not have the same perspective as the Agents.

After exhausting her administrative remedies, Plaintiff Tina Richardson brought suit against the United States, Agents John Stuart and Anthony Gasperoni, the City of Springfield, and Springfield Police Officer C. Nuccio.  The sole remaining claim is a battery claim against the United States premised upon Agent Gasperoni's alleged battery of Caleb Slay.  The United States believes that Plaintiff cannot meet her burden of proof because she cannot show that Agent Gasperoni used more force than reasonably necessary.

<u>**Legal Analysis**</u>

**I.      Federal Tort Claims Act**

Plaintiff's sole remaining claim arises out of the alleged battery by Agent Anthony

Gasperoni.  It is brought under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671 et. seq., [1]

and is properly before the Court as Plaintiff has exhausted her administrative remedies and timely

filed this action within the timeframe required by the FTCA.  *See* 28 U.S.C. § 2401(b).

Pursuant to the FTCA, and subject to the exceptions delineated within that statute, the

United States is responsible "for money damages . . . for injury or loss of property, or personal

injury or death caused by the negligent or wrongful act or omission of any employee of the

Government while acting within the scope of his office or employment."  28 U.S.C. § 1346(b)(1).

To that end, the United States admits that Agent Gasperoni was acting within the scope of his

employment with the DEA when he shot Caleb Slay.

Tort claims under the FTCA are analyzed in accordance with the law of the place where

the act or omission occurred.  28 U.S.C. § 1346(b); *see also Howard v. United States*, 964 F.3d

712, 716 (8th Cir. 2020); *Hungate v. United States*, 626 F.2d 60, 61 (8th Cir. 1980).  As the

allegedly wrongful act by Agents Gasperoni occurred in Missouri, Missouri substantive law

governs.  28 U.S.C. § 1346(b)(1).

---

[1] The FTCA serves as a limited waiver of sovereign immunity with respect to some tort claims against the United States.  *Smith v. United States*, 507 U.S. 197, 199 (1993).  This waiver of sovereign immunity is not broad and unfettered; rather, the FTCA imposes conditions and limitations to its consent to be sued as referenced in 28 U.S.C. § 1346(b), § 2402, and §§ 2671-2680.  These limitations include, but are not limited to, the following:

- No right to a jury trial, 28 U.S.C. § 2402;
- Prohibition on awards punitive damages, 28 U.S.C. § 2674;
- Prejudgment interest may not be awarded against the United States, 28 U.S.C. § 2674;
- Attorneys' fees are limited to no more than twenty percent of any administrative settlement prior to litigation and to no more than twenty-five percent of any judgment or settlement after suit is filed, 28 U.S.C. § 2678.

In addition, as a condition precedent to filing suit on an FTCA claim, a plaintiff is required first to exhaust his administrative remedies.  28 U.S.C. § 2675(a); *see Bellecourt v. United States*, 994 F.2d 427, 430 (8th Cir.1993) (before filing FTCA action, claimant must present administrative claim requesting a sum certain in damages to appropriate federal agency and that claim must be finally denied).

## II.     Liability

The sole issue for the Court to determine in this case is whether Agent Gasperoni used more force than reasonably necessary when he shot Caleb Slay,[2] as a law enforcement officer can only be held liable for battery under Missouri law where "he uses more force than is reasonably necessary." *Neal v. Helbling,.* 726 S.W.2d 483, 487 (Mo. App. E.D. 1987) (quoting *State ex rel. Ostmann v. Hines*, 128 S.W. 248, 250 (Mo. Ct. App. 1910));" *Smith v. Kilgore*, 926 F.3d 479, 486 (8th Cir. 2019); *Wright v. United States*, 892 F.3d 963, 967–68 (8th Cir. 2018).

Plaintiff has the burden to establish that Agent Gasperoni used more force than reasonably necessary.  This is made clear by both Eighth Circuit's Model Jury Instruction 4.40 and by Committee Comment H to Missouri Approved Instruction 23.02.  MAI 23.02, committee comment H ("If defendant is a public official possessing legal right to touch plaintiff, plaintiff must modify MAI 23.02 to accept the burden of proving defendant used more force than was reasonably necessary.") (emphasis added); 8th Cir. Model Jury Inst. Civ. 4.40 ("If any of the above elements has not been proved, then your verdict must be for the defendant.").  Further, the MAI note on use states that "[i]f the battery arises out of a claim that a public official, such as a police officer or jailer, used excessive force in his official duties" the *plaintiff* must show the defendant "used more force than was reasonably necessary[.]" MAI 23.02, note on use no. 2 (emphasis added); *Neal v. Helbing*, 726 S.W.2d 483, 487 (Mo. Ct. App. 1987) ("The instructions in this case clearly put the burden of establishing the use of reasonable force on the defendants and were therefore erroneous.").  *See also Thompson v. Hubbard*, 257 F.3d 896, 899 (8th Cir. 2001) ("[T]he *plaintiffs*

---

[2] The Missouri Approved Jury Instructions applicable to battery claims brought against law-enforcement officers and the Eighth Circuit Model Jury Instructions for excessive force claims include three elements: 1) That the officer intentionally shot, struck, or otherwise touched the plaintiff, 2) the officer used more force than reasonably necessary, and 3) that the officer thereby caused the plaintiff bodily harm.  Mo. Approved Jury Instr. (Civil) 23.02 (8th ed); Mo. Approved Jury Instr. (Civil) 23.02 note on use no. 2 (8th ed); 8th Cir. Model Jury Inst. Civ. 4.40.  The parties have already stipulated that Agent Gasperoni shot Mr. Slay, and that Mr. Slay died at the scene from the gunshot wounds.  Stipulations of Fact ¶¶ 30, 32, ECF No. 190.  Thus elements one and three are not in dispute.

needed to present enough evidence to permit a reasonable jury to conclude that Hubbard's use of deadly force was objectively unreasonable.") (emphasis added).

To determine whether Agent Gasperoni used more force than reasonably necessary, the Court must apply the Fourth Amendment's "objective reasonableness" standard. *See, e.g.*, *Smith*, 926 F. 3d at 486; *Wright*, 892 F.3d at 968; *Schoettle v. Jefferson Cnty.*, 788 F.3d 855, 861 (8th Cir. 2015); *Boude v. City of Raymore, Missouri*, No. 4:14-CV-00624-BCW, 2015 WL 13547447, at *5 (W.D. Mo. Dec. 22, 2015), aff'd, 855 F.3d 930 (8th Cir. 2017); *Hawkins v. City of Springfield*, No. 12-03547-CV-S-GAF, 2014 WL 12575813, at *9 (W.D. Mo. Mar. 25, 2014). "The reasonableness of a use of force turns on whether the officer's actions were objectively reasonable in light of the facts and circumstances confronting him, without regard to his subjective intent or motivation." *Loch v. City of Litchfield*, 689 F.3d 961, 965 (8th Cir. 2012)). "The issue is whether the totality of the circumstances—including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether the suspect is actively fleeing or resisting arrest—justifies a particular sort of seizure." *Liggins v. Cohen*, 971 F.3d 798, 800 (8th Cir. 2020) (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985) and *Loch*, 689 F.3d at 965). Thus Plaintiff bears the burden to show that Agent Gasperoni's decision to shoot Mr. Slay was not objectively reasonable in light of the facts and circumstances known to Agent Gasperoni at the time of the shooting.

"[R]easonableness must be viewed 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Green v. City of St. Louis*, 134 F.4th 516, 523 (8th Cir. 2025) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Indeed, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly

evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396–97 (1989); *Morgan-Tyra v. City of St. Louis*, 89 F.4th 1082, 1085 (8th Cir. 2024) (quoting *Graham*). "[I]n evaluating the reasonableness of an officer's use of deadly force, the court must consider the totality of the circumstances, including the location and danger of the weapon." *Maser v. City of Coralville*,139 F.4th 1004, 1009 (8th Cir. 2025). "Where the weapon was, what type of weapon it was, and what was happening with the weapon are all inquiries crucial to the reasonableness determination." *Id.* (quoting *Partridge v. City of Benton*, 929 F.3d 562, 566–67 (8th Cir. 2019)).

"The use of deadly force is reasonable where an officer has 'probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'" *Liggins v. Cohen*, 971 F.3d 798, 800 (8th Cir. 2020) (quoting *Garner*, 471 U.S. at 118); *see also Morgan-Tyra v. City of St. Louis*, 89 F.4th at 1086 ("As fact-intensive as excessive-force cases usually are, the Supreme Court has provided a straightforward rule in situations like this one: officers may use deadly force when there is "probable cause to believe that [a] suspect poses a threat of serious physical harm, either to the officer or to others.") (quoting *Garner*, 471 U.S. at 11) "If feasible, an officer should give a warning before using deadly force." *Liggins v. Cohen*, 971 F.3d at 800 (citing *Garner*, 471 U.S. at 11). "Both common sense and our cases suggest that a warning is less likely to be 'feasible' in a high-pressure situation that requires a split-second judgment." *Morgan-Tyra*, 89 at 1086.

Though Mr. Slay was shot before he could produce his firearm and use it against the agents, Agent Gasperoni was "not constitutionally required to wait until he set eyes upon the weapon before employing deadly force to protect himself" and Agent Stuart. *Thompson v. Hubbard*, 257 F.3d 896, 899 (8th Cir. 2001). Given the predicate facts known to Agent Gasperoni, Slay's reach

for his hip during the struggle with Agent Stuart was a menacing action—a "move[] as though to draw a gun," *id.*— that would have caused a reasonable officer to believe that he faced an imminent threat of serious harm to himself or others. *Maser v. City of Coralville*, 139 F.4th 1004, 1009 (8th Cir. 2025). *See e.g.*, *Liggins v. Cohen*, 971 F.3d 798, 801 (8th Cir. 2020) ("In dangerous situations where an officer has reasonable grounds to believe that there is an imminent threat of serious harm, the officer may be justified in using a firearm before a subject actually points a weapon at the officer or others."); *Loch v. City of Litchfield*, 689 F.3d 961, 964 (8th Cir. 2012) (holding shooting justified where decedent's hand moved toward his side and officer had reason to believe decedent was armed). Both Agents Stuart and Gasperoni testified in deposition that they saw Mr. Slay reach for his hip in a distinct "shooter's draw." In order for Plaintiff to succeed at trial, she must establish that this "shooter's draw" did not happen.

As no physical evidence contradicts the Agents' accounts and the only testimonial contradictions are from bystanders who—among other concerns—fail to agree on basic details of the ordeal, Plaintiff's burden is particularly heavy. Plaintiff will therefore attempt the obfuscate the simple inquiry before the Court. She will attempt to argue the rather dubious proposition that Mr. Slay had a legal right to carry a firearm. She may also argue that other measures short of deadly force were feasible under the circumstances. However, whether alternative measures were feasible is irrelevant. *Schulz v. Long*, 44 F.3d 643, 649 (8th Cir. 1995) ("[T]he Fourth Amendment does not require officers to use the least intrusive or even less intrusive alternatives in search and seizure cases. The only test is whether what the police officers *actually did* was reasonable") (quoting *Plakas v. Drinski*, 19 F.3d 1143, 1149 (7th Cir. 1994) (emphasis added)). Plaintiff is also likely to argue that by attempting to enforce federal drug laws, Agents Stuart and Gasperoni

somehow created the danger that Mr. Slay would pull a weapon on them.[3]  *See* Pl.'s Resp. to Defendant's Mot. in Limine No. 10; ECF No. 182 at 7.

Most importantly, much of Plaintiff's case will revolve around whether the agents had probable cause or reasonable suspicion of a crime when they contacted Mr. Slay.  The Court already held this to be irrelevant in its order denying Plaintiff's motion for summary judgment:

> [T]he Court concludes that the underlying legality of the encounter between Slay and the DEA agents is immaterial to the legal issues before this Court. In other words, Plaintiff's claim that Agent Gasperoni used excessive force is independent from whether the DEA agents had authority to arrest or detain Slay.

Order on Mots. for Summ. J., ECF No. 163 at 6.  The Court's determination was consistent with Eighth Circuit law and with that of other circuits.  *See Habiger v. City of Fargo*, 80 F.3d 289, 298 (8th Cir. 1996) ("[T]he presence of actual or arguable probable cause is irrelevant to the objective reasonableness of the force used to effect an arrest."); *Andrews v. Scott*, 729 F. App'x 804, 810 (11th Cir. 2018).  Unphased by the Court's prior ruling, Plaintiff maintains the relevance of this inquiry and intends to devote significant attention to whether Agents Stuart and Gasperoni had probable cause to detain Mr. Slay.  *See* Pl.'s Resp. to Def. Mots. in Limine, ECF No. 182 at 8.

Plaintiff's attempts to obfuscate[4] should be understood as what they are: a tacit admission of the weakness of her case.

## III.    Damages

Missouri's wrongful death statute creates a cause of action enabling certain beneficiaries to bring an action for damages against supposed tortfeasors. Mo. Rev. Stat. § 537.090.  The statute

---

[3] To state this argument is to demonstrate its absurdity.

[4] The United States previously addressed each of these arguments in its Motions in Limine No. 7, 10, 11, 12.  *See* Defendant's Mots. in Limine, ECF No. 171.  A favorable ruling on these would have the effect of significantly streamlining the trial and focusing the Court on the sole issue:  Whether, given the totality of the circumstances, Agent Gasperoni had probable cause to believe that he faced an imminent threat of serious harm to himself or others.

provides for three classes of persons who may sue for wrongful death:

(a) A spouse, child, or parent of the deceased; or

(b) If none of the above are living, then a brother or sister of the deceased, or

(c) If none of the above are living, then a plaintiff ad litem.

Mo. Rev. Stat. § 537.080(1)–(3).

Caleb Slay had no children. However, both of his parents are living. As such, each parent is an eligible beneficiary under the wrongful death statute.[5]

Further, pursuant to Missouri law:

The trier of the facts may give to the party or parties entitled thereto such damages as the trier of the facts may deem fair and just for the death and loss thus occasioned, having regard to the pecuniary losses suffered by reason of the death, funeral expenses, and the reasonable value of the services, consortium, companionship, comfort, instruction, guidance, counsel, training, and support of which those on whose behalf suit may be brought have been deprived by reason of such death . . .

Mo. Rev. Stat. § 537.090. Mitigating circumstances attending the death may likewise be considered.[6] *Id.* Further, in considering such damages, the trier of fact is to not include "damages for grief and bereavement by reason of the death." Mo Rev. Stat. § 537.090.

Consequently, Richardson is prohibited from receiving damages for her own grief and bereavement as a result of Slay's death, including any changes in her mental health or health

---

[5] Mr. Slay also had five half-siblings. To the extent the Missouri wrongful death statute allows half-siblings to recover, any recovery is not available here. As class 2 beneficiaries, siblings may only recover where no class 1 beneficiaries— such as parents—are alive. Mo. Rev. Stat. 537.080 (creating cause of action "(1) By the spouse or children . . . or by the father or mother of the deceased, natural or adoptive;" or "(2) *If there be no persons in class (1) entitled to bring the action*, then by the brother or sister of the deceased . . .") (emphasis added).

[6] The United States has not waived its sovereign immunity for an award of punitive damages. 28 U.S.C. § 2674. Thus the Court may not consider any aggravating circumstances attending the death, even though such a consideration is mentioned in the wrongful death statute. *See Call v. Heard*, 925 S.W.2d 840, 849 (Mo. 1996) ("This Court recently explained that aggravating circumstance damages in wrongful death cases are the equivalent of punitive damages . . . ."); United States Mot. in Limine No. 5, ECF No. 171 at 6–7; Pl's Resp., ECF No. 182 at 5 (stating non-opposition to exclusion of punitive damages).

condition and any resulting loss of income from her job due to mental anguish. *See Morrissey v. Welsh Co.*, 821 F.2d 1294, 1304 (8th Cir. 1987) (prejudicial arguments by plaintiff's counsel during opening and closing that sought to invoke jury's sympathy constituted reversible error). Moreover, Richardson cannot testify that Slay would have made a specific amount of money each year or over his lifetime and given her a percentage of his earnings because such opinion is speculative and she lacks foundation to formulate such an opinion that is normally reserved for expert witnesses. Similarly, Plaintiff's counsel cannot argue that Slay would have provided his mother with a specific amount of money over the course of his lifetime had he survived because there is no expert witness testimony that establishes Slay's life expectancy or potential earning capacity.

## IV.     Additional Consideration - Reptile Strategy

The United States anticipates that Plaintiff may use the "Reptile Strategy" at trial in an attempt to improperly draw the Court's attention away from the objective reasonableness standard applicable to this case.  In other words, the United States anticipates that Plaintiff may argue that the Court should determine whether Agent Gasperoni used excessive force not upon the basis of the individual merits of the evidence, but upon ensuring that law-enforcement officers are held accountable across society. Such improper trial tactics are contrary to well-established law, interject undue prejudice at trial, and should be prohibited by the Court under Federal Rule of Evidence 403.

"The 'reptile theory" is a litigation strategy . . . [wherein] lawyers appeal to the [factfinder's] own sense of self-protection in order to persuade [the factfinder] to render a verdict for plaintiffs that will, in the collective, effectively reduce or eliminate allegedly 'dangerous' or 'unsafe' conduct and thereby improve the safety of themselves, their family members, and their

community." *J.B. v. Mo. Baptist Hosp. of Sullivan, et al.*, No.16CV01394-ERW, 2018 WL 746302, 2018 U.S. Dist. LEXIS 19689, at *7-8 (E.D. Mo. Feb. 7, 2018).[7] Similarly, the Eighth Circuit has provided in the criminal context, "A so-called 'golden rule' argument which asks the [factfinder] to place themselves in the position of a party is universally condemned because it encourages the [factfinder] to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence." *United States v. Palma*, 473 F.3d 899, 902 (8th Cir. 2007) (citation and internal quotations omitted).

In an excessive-force case such as this one, the factfinder's duty is to determine whether, under the objective facts presented at trial, the agent used more force than reasonably necessary and, if applicable, recoverable damages. Fourth Amendment jurisprudence establishes a very specific standard in deadly force cases: Whether the agent had probable cause to believe that the suspect posed a threat of serious physical harm, either to the officer or to others. *Liggins v. Cohen*, 971 F.3d 798, 800 (8th Cir. 2020). Any attempt to suggest to the Court that it should consider other factors, such as the impact its verdict may have to send a message that law enforcement officers will be held accountable for their actions, or to ensure community safety, is utterly irrelevant to determining whether Agent Gasperoni used more force than reasonably necessary. Therefore, the Court should prohibit any and all use of this "Reptile Strategy" during trial.

---

[7] Federal courts have increasingly found that the "Reptile Strategy" is simply old, outlawed trial tactics with a new name. *See Brooks v. Caterpillar Glob. Mining Am.*, LLC, No. 4:14CV-00022-JHM, 2017 WL 3401476, at *9 (W.D. Ky. Aug. 8, 2017) (citing *Strickland v. Owens Corning*, 142 F.3d 353, 358 (6th Cir. 1998)); *Randolph v. QuickTrip Corp.*, No. 16-1063-JPO, 2017 WL 2214932, at *4 (D. Kan. May 18, 2017); *Hensley v. Methodist Healthcare Hosp.*, 2015 WL 5076982, at *4 (W.D. Tenn. Aug. 27, 2015).

## V.  Conclusion

As will be more fully demonstrated at trial, the United States contends that Plaintiff cannot establish that Agent Gasperoni used more force than reasonably necessary.  Rather, the Court should enter judgment in favor of the Defendant United States.

Respectfully submitted,

R. Matthew Price
United States Attorney

By:  */s/ Wyatt R. Nelson*
Wyatt R. Nelson
Assistant United States Attorney
Missouri Bar No. 72944
901 St. Louis Street, Suite 500
Springfield, MO 65806
Telephone: (417) 831-4406
Facsimile: (417) 831-0078

By:  */s/ Christa B. Moss*
Christa B. Moss, Mo. Bar No. 65306
Assistant United States Attorney
901 St. Louis St., Ste. 500
Springfield, MO 65806-2511
(417) 831-4406 telephone
christa.moss@usdoj.gov
ATTORNEYS FOR THE UNITED STATES

13

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 20th day of April, 2026, a copy of the foregoing document was filed with the Court using the Court's CM/ECF system and was served upon each attorney of record via ECF notification.

*/s/ Wyatt R. Nelson*

Wyatt R. Nelson
Assistant United States Attorney

Case 6:23-cv-03337-RK    Document 199    Filed 04/20/26    Page 14 of 14