**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**SOUTHERN DIVISION**

| | |
|---|---|
| TINA RICHARDSON, individually and as successor-in-interest to Decedent Caleb Slay,<br>Plaintiff,<br>vs.<br>UNITED STATES OF AMERICA, et al.,<br>Defendants. | CASE NO.: 6:23-cv-03337-RK<br>(*District Judge Hon. Roseann A. Ketchmark*)<br>Trial Date: April 28, 2026<br>Courtroom 8E<br>Springfield – Southern Division |

**PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

PLAINTIFF, Tina Slay, hereby submits her proposed findings of fact and conclusions of law in the bench trial of the instant matter:

**<u>FINDINGS OF FACT:</u>**

The shooting death of Caleb Slay by United States Drug Enforcement ("DEA") Agent Anthony Gasperoni occurred on November 2, 2020, in the mid-afternoon, in the front yard of Mr. Slay's residence at 1827 S. Maryland Avenue. Mr. Slay was lawfully armed pursuant to Missouri state law with a handgun concealed in the right, rear waistband area of his pants at the time Agent Gasperoni shot and killed Mr. Slay. Mr. Slay died at the scene of the shooting in his front yard. Agent Gasperoni and another DEA Agent, John Stuart, were attempting to detain Mr. Slay at the time of the shooting, to investigate their suspicions Mr. Slay could have been involved in possible drug activity. Mr. Slay was not suspected of committing any act of violence, was not wanted by law enforcement, was not on probation or parole at the time of the incident, and his identity was unknown to the two DEA agents.

The DEA agents happened upon Mr. Slay as a consequence of following a vehicle driven by a person whose identity was likewise unknown to them, Casey Ray. The DEA agents had been conducting surveillance at a Wal Mart parking lot in Springfield, Missouri that they contend is a "high drug crime" location, when frequent suspected drug transactions are alleged to take place. The DEA agents duties include conducting surveillance of such areas in plainclothes and unmarked vehicles, to investigate suspected drug crimes and apprehend suspects in those crimes. The DEA agents never observed Mr. Slay at the Wal Mart parking lot or in any area adjacent to it. They observed Casey Ray, whose identity they did not know and with whom they were not familiar, park his U-Haul rental pickup truck and knock on an apartment door in a complex next to the Wal Mart parking lot on the afternoon of the subject-incident. Earlier that afternoon, the DEA agents observed another man knock on the same apartment door, go inside for a few minutes, then leave and drive away. The agents conducted a covert surveillance of that person, believing he had engaged in a drug transaction while inside the apartment. The agents had no information regarding that apartment, and no information as to what transpired while that person was in the apartment. After a short surveillance of that vehicle, the agents ended the surveillance and returned to the Wal Mart parking lot, where they saw Mr. Ray park the U-Haul rental pickup truck and knock on the door to the same apartment. No one answered the door and Mr. Ray returned to the U-Haul rental pickup. After several minutes had passed, Mr. Ray returned to the door of the apartment and was let inside. He came back outside shortly thereafter, went to the U-Haul, retrieved an object from inside the U-Haul and returned to the apartment (Mr. Ray testified that he forgot his cell phone in the U-Haul and simply retrieved it, the DEA agents were not able, from their surveillance, to identify was Mr. Ray retrieved from his vehicle). Mr. Ray was inside the apartment for about 15

minutes, then returned to the white U-Haul and drove away. The DEA agents then conducted covert surveillance of Mr. Ray and the white U-Haul.

As with the previous person who entered and left the apartment, the DEA agents had no information as to what transpired inside the apartment. They did not know whether Mr. Ray had committed a crime, but contend that, based on the similarity in timing to the visit of the previous person to the apartment, and the use of a rental U-Haul pick up truck, that Mr. Ray had likely engaged in an illegal narcotics transaction while inside the apartment.

Mr. Ray eventually parked his vehicle in front of Mr. Slay's residence at 1827 S. Maryland Avenue in Springfield. The DEA agents had no familiarity with that address.

Agent Stuart detained Mr. Ray and began questioning him. Agent Gasperoni arrived at the scene, and Agent Stuart told him to detain Mr. Slay, who was trying to walk to his house. Mr. Slay had been in a vehicle in the front yard of his house, with his other friend Edward Boerste in the passenger seat when Mr. Ray stopped in front of Mr. Slay's house and was then detained by Agent Stuart. Mr. Slay exited that parked vehicle, and Agent Stuart (who was in plainclothes and in an unmarked vehicle but had donned a vest adorned by the word "POLICE"), ordered Mr. Slay to get back in the car several times. Mr. Slay did not get back in the car. Agent Gasperoni, upon arriving at the scene and at the behest of Agent Stuart, "requested" Mr. Slay to come back to him. Mr. Slay stopped walking toward his house and walked to Agent Gasperoni and told him: "I'm going to my fucking house." (See Declaration of Julia N. Quesada (hereinafter "Quesada Decl."), Exhibit A, Gasperoni Trial Testimony, Trial Transcript at 137:18-138:4); (see also Quesada Decl., Exhibit B, Tetlow Trial Testimony, Trial Transcript at 359:1-360:25). Agent Gasperoni contends that his request to Mr. Slay to come back to him was not a detention. (Quesada Decl., Exhibit A, Gasperoni Trial Testimony, Trial Transcript at 186:18-20). Indeed, Mr. Slay complied with Agent Gasperoni's

"request" to come speak with him. (Quesada Decl., Exhibit A, Gasperoni Trial Testimony, Trial Transcript at 137:21-139:7, 189:1-4).

Mr. Slay provided his true name to Agent Gasperoni and told Agent Gasperoni: "I'm armed" when Agent Gasperoni told him "not to be reaching for his waistband" because the agent did not know if Mr. Slay was armed. (Quesada Decl., Exhibit A, Gasperoni Trial Testimony, Trial Transcript at 189:21-190:2). Mr. Slay displayed both hands to Agent Gasperoni. (Quesada Decl., Exhibit C, Wade Trial Testimony, Trial Transcript at 322:1-22); (Quesada Decl., Exhibit B, Tetlow Trial Testimony, Trial Transcript at 359:10-360:2). Mr. Slay was lawfully armed with a Springfield 9 mm semi-automatic handgun, which was in his right rear waistband. (Quesada Decl., Exhibit B, Tetlow Trial Testimony, Trial Transcript at 349:6-14). Multiple witnesses, including Agent Gasperoni, testified that they never saw Mr. Slay's firearm during the lethal force encounter. (Quesada Decl., Exhibit A, Gasperoni Trial Testimony, Trial Transcript at 190:15-21); (Quesada Decl., Exhibit C, Wade Trial Testimony, Trial Transcript 329:17-18).

Agent Gasperoni then decided to detain Mr. Slay and grabbed both of Mr. Slay's arms. (Quesada Decl., Exhibit A, Gasperoni Trial Testimony, Trial Transcript at 149:2-25, 152:2-4, 191:3-16); (Quesada Decl., Exhibit B, Tetlow Trial Testimony, Trial Transcript at 365:8-12). Mr. Slay "tensed up", according to Agent Gasperoni. (Quesada Decl., Exhibit A, Gasperoni Trial Testimony, Trial Transcript at 150:2-24). Agent Gasperoni then called out to Agent Stuart by his first name "John", and Agent Stuart came over and approached Mr. Slay from behind. (Quesada Decl., Exhibit A, Gasperoni Trial Testimony, Trial Transcript at 151:11-13). It appeared to Ms. Wade that Agent Stuart's approach caught Mr. Slay "completely off guard." (Quesada Decl., Exhibit C, Wade Trial Testimony, Trial Transcript at 327:1-6). Agent Gasperoni told Agent Stuart that Mr. Slay had a gun. Mr. Slay "jerked" away from Agent Stuart, according to Agent Stuart, but

did not attempt to flee. (Quesada Decl., Exhibit A, Gasperoni Trial Testimony, Trial Transcript at 154:1-8); (Quesada Decl., Exhibit C, Wade Trial Testimony, Trial Transcript at 326:11-22). Agent Stuart then attempted to tackle Mr. Slay to the ground but only fell to the ground himself. From his back on the ground, Agent Stuart tried to pull Mr. Slay to the ground and otherwise tried to knock him off balance. Then Agent Gasperoni fired the gunshots into Mr. Slay's head without warning. (Quesada Decl., Exhibit C, Wade Trial Testimony, Trial Transcript at 326:11-22, 327:16-329:2, 330:14-331:10); (Quesada Decl., Exhibit B, Tetlow Trial Testimony, Trial Transcript at 366:12-13, 370:7-10, 372:16-22).

The essential factual dispute is whether Mr. Slay reached for the gun in his right rear waistband. All four eyewitnesses, including Mr. Ray and Mr. Boerste, as well two of Mr. Slay's neighbors who observed the entire event and had an obstructed view of the right side of Mr. Slay (whose right side faced the window the neighbors, Shawn "Shon" Tetlow and Bailey Wade observed all events through), testified that Mr. Slay never reached in the direction of right rear waistband. (Quesada Decl., Exhibit B, Tetlow Trial Testimony, Trial Transcript at 373:18-22); (Quesada Decl., Exhibit C, Wade Trial Testimony, Trial Transcript at 326:11-22, 327:16-329:2, 334:20-335:11). Indeed, both of Mr. Slay's hands were pushing off Agent Stuart, who was on the ground beneath Mr. Slay, when Agent Gasperoni shot him, according to the eyewitnesses. (Quesada Decl., Exhibit C, Wade Trial Testimony, Trial Transcript at 326:11-22, 329:22-330:11); (Quesada Decl., Exhibit B, Tetlow Trial Testimony, Trial Transcript at 369: 14-18).

Agents Gasperoni and Stuart contend they both observed Mr. Slay take an action that both described in their delayed interviews taken more than two weeks after the shooting as a sudden drawing motion with his right hand reaching to his right rear waistband. Agents Gasperoni and Stuart worked in the same office and spoke with each other prior to being interviewed about the

shooting of Mr. Slay by Springfield Police Department investigators approximately 2.5 weeks after the incident, though both agents deny that they spoke to each other about the shooting itself before giving their interviews.

All four percipient witnesses who were not involved in the shooting had a direct view of Mr. Slay's right side and right arm. All four percipient witnesses were separated from each other after the shooting and interviewed separately from each other. (Quesada Decl., Exhibit C, Wade Trial Testimony, Trial Transcript at 335:24-336:16); (Quesada Decl., Exhibit B, Tetlow Trial Testimony, Trial Transcript at 381:24-382:8). Mr. Ray and Mr. Boerste had been separated even before the shooting occurred. While Mr. Ray and Mr. Boerste were close friends of Mr. Slay, Mr. Tetlow and Ms. Wade were not close to Mr. Slay. (Quesada Decl., Exhibit B, Tetlow Trial Testimony, Trial Transcript at 381:20-23). They knew him only as a neighbor who they occasionally had casual conversation with, and Mr. Slay once helped out with their dog after it had gotten free from their yard. (Quesada Decl., Exhibit C, Wade Trial Testimony, Trial Transcript at 316:13-317:17, 333:7-13); (Quesada Decl., Exhibit B, Tetlow Trial Testimony, Trial Transcript at 345:9-12, 347:12-25). While Mr. Ray and Mr. Boerste were both near Mr. Slay when the shooting happened, Mr. Tetlow and Ms. Wade observed the event through their kitchen window further away; a different vantage point of Mr. Slay than Mr. Ray and Mr. Boerste. Mr. Tetlow and Ms. Wade had a direct view of the right side of Mr. Slay. (Quesada Decl., Exhibit B, Tetlow Trial Testimony, Trial Transcript at 345:12-346:3); (Quesada Decl., Exhibit C, Wade Trial Testimony, Trial Transcript at 326:11-22, 327:16-329:2, 334:20-335:11).

While the witness testimony is compelling, notably Mr. Tetlow and Ms. Wade's testimony since they have the least interest in the outcome of the case of all testifying witnesses, the Court finds the testimony of Dieter Duff, M.D., the pathologist who performed the autopsy of Mr. Slay,

persuasive, in light by the testimony of Mr. Tetlow, Ms. Wade, and to a lesser extent, Mr. Ray and Mr. Boerste. (Quesada Decl., Exhibit D, Dr. Duff Trial Testimony, Trial Transcript at 36:1-6). Dr. Duff testified that Mr. Slay died from two gunshot wounds to the head and brain. (Quesada Decl., Exhibit D, Dr. Duff Trial Testimony, Trial Transcript at 36:12-21, 46:15-47:12, 65:17-22). One gunshot wound entered in the left temporal scalp behind Mr. Slay's left ear, and was described by Dr. Duff as a "near contact range" shot, meaning the end of the barrel of Agent Gasperoni's gun was at most a few inches from that entrance wound when Agent Gasperoni fired it. (Quesada Decl., Exhibit D, Dr. Duff Trial Testimony, Trial Transcript at 53:4-54:5, 59:8-23, 60:22-23). The other gunshot wound entered the left parietal scalp of Mr. Slay, and was described by Dr. Duff as an "intermediate range" shot, meaning the end of the barrel of the gun was further away from this entrance wound when the gun was fired than the other gunshot entrance wound. (Quesada Decl., Exhibit D, Dr. Duff Trial Testimony, Trial Transcript at 61:19-62:20). Dr. Duff described the trajectories of both gunshot wounds the same way: "Direction rightward, downward, forward". (Quesada Decl., Exhibit D, Dr. Duff Trial Testimony, Trial Transcript at 46:15-48:23). Dr. Duff described the gunshot wound to the left parietal scalp as being near the top of Mr. Slay's head. *Id.*

Mr. Slay was 6'0" tall, which and Agent Gasperoni testified that he is 5'5". (Quesada Decl., Exhibit A, Gasperoni Trial Testimony, Trial Transcript at 151:2). Agent Gasperoni testified that he did not hold his gun raised above his own head and fire in a downward direction at Mr. Slay. Agent Gasperoni was unable at trial to recall many of the details of the incident, including how Mr. Slay was positioned when he shot him (i.e., whether Mr. Slay was bent over at the waist, standing straight up, or in some other position at the time of the shooting). (Quesada Decl., Exhibit A, Gasperoni Trial Testimony, Trial Transcript at 155:22-156:7).

Agent Gasperoni denies holding his gun next to Mr. Slay's head either time he fired it and claims that he was several feet from Mr. Slay when he fired his gun. This is inconsistent with the physical evidence testified to by Dr. Duff. Particularly the "near contact range" shot that entered the left temporal scalp behind Mr. Slay's left ear. That shot could only have been fired if the barrel of the gun was at most inches from Mr. Slay's head, which is the sequence of events described by Mr. Tetlow, Ms. Wade, Mr. Ray and Mr. Boerste.

Further, while Agent Stuart does not claim any impairment to his memory regarding the shooting, Agent Stuart was on his back on the ground below Mr. Slay when Agent Gasperoni shot Mr. Slay. Agent Stuart testified that Mr. Slay was standing up over him, leaning forward slightly when Agent Stuart shot him. This account also does not explain the location and trajectory of the gunshot wounds to Mr. Slay: Downward trajectory shots to Mr. Slay's head, given the significant height disparity between Agent Gasperoni and Mr. Slay, require that Mr. Slay be significantly bent over at the waist at the time of the shooting. Again, the trajectory and location of the gunshot wounds are consistent with the four civilian eyewitnesses' testimony and inconsistent with the testimony of both agents. Agent Gasperoni's testimony, that he observed Mr. Slay reach for his right waistband three separate times before shots were fired, is discounted by the overwhelming weight of the civilian witnesses who testified consistently that Mr. Slay never reached for his waistband at any point during the lethal force encounter. (Quesada Decl., Exhibit A, Gasperoni Trial Testimony, Trial Transcript at 143:3-144:23, 156:19-21, 163:18-21); (Quesada Decl., Exhibit B, Tetlow Trial Testimony, Trial Transcript at 373:18-22); (Quesada Decl., Exhibit C, Wade Trial Testimony, Trial Transcript at 326:11-22, 327:16-329:2, 334:20-335:11).

While such evidence does not definitively prove that Mr. Slay's right arm was not reaching behind his back, it is consistent with the witness testimony of Mr. Slay pushing off of Agent Stuart

with both hands, and consistent with the witness testimony that Mr. Slay never reached behind his back.

As the burden of proof Plaintiff is required to meet in this civil case is a preponderance of the evidence, or more likely than not, the witness testimony bolstered by the testimony of Dr. Duff and its reasonable inferences, the Court finds that Plaintiff has proven by a preponderance of the evidence that Mr. Slay did not reach behind his back, and that the shooting of Mr. Slay by Agent Gasperoni was unreasonable.

**CONCLUSIONS OF LAW:**

Following the Court's Order on dispositive motions, Plaintiff's sole remaining claim is their Battery claim under Missouri State Law (Mo. Rev. Stat. section 537.080) against the United States of America under the Federal Tort Claims Act. The Court's Order permits recovery of Wrongful Death damages pursuant to Mo. Rev. Stat. section 537.090. (ECF No. 163). Thus, while Plaintiff's Federal claims were dismissed under *Bivens*, the essential cause of action, wrongful death, survives, styled as a Battery claim. The legal standard for Plaintiff's Battery claim is the same as Federal excessive force standard: "[O]nly when in the performance of his duty in making the arrest he uses more force than is reasonably necessary for its accomplishment." *Wright v. United States,* 892 F.3d 963, 967-68 (8th Cir. 2018) (citing *Neal v. Helbling*, 726 S.W.2d 483, 487 (Mo. Ct. App. 1987).

As stated supra, Agent Gasperoni's use of force in shooting Mr. Slay was unreasonable: Mr. Slay volunteered that he was armed, and the Court has found that he did not reach for the weapon, or toward his right lower back area.

Notably, Agent Gasperoni testified that Mr. Slay reached for his waistband three times. The first being when Agent Gasperoni first contacted Mr. Slay, to which Mr. Slay extended his arms in

front of his body and informed Agent Gasperoni that he was armed. Agent Gasperoni contends Mr. Slay reached a second time for his waistband, however, Agent Gasperoni chose not to shoot. Agent Gasperoni testified that prior to Mr. Slay's third reach to his waistband, Mr. Slay somehow created space between he and Agent Stuart. Agent Gasperoni testified that he chose to use lethal force prior to the alleged third reach to Mr. Slay's waistband.

Mr. Slay being bent over at the waist at the time Agent Gasperoni used lethal force, as contended by Plaintiff, is supported by both forensic evidence and witness testimony, contradicting the agents' accounts. According to Dr. Duff, powder deposits around the gunshot wound indicated the gun was held within 2 millimeters to 2 inches of Mr. Slay's head. Dr. Duff further found that both gunshot wounds to Mr. Slay's head had downward trajectories. Dr. Duff's autopsy findings thereby corroborate Ms. Wade's and Mr. Tetlow's testimony that Mr. Slay was bent over at the time Agent Gasperoni shot Mr. Slay in the head from a close distance, both independent and unbiased witnesses. Thus, the forensic evidence coupled with the four civilian witnesses' testimony, weighs in favor of Plaintiff's claim that Mr. Slay was bent over at the waist when Agent Gasperoni shot him in the head; a complete contradiction to the agents' accounts.

Moreover, the Court declines to discount the weight of Ms. Wade's testimony because she may have been confused which agent shot Mr. Slay. Ms. Wade testified at trial, consistent with her interview, that both agents were similarly dressed. Even more importantly, Ms. Wade testified that her attention was focused on Mr. Slay during the shooting. Ms. Wade's account of the events is specific to Mr. Slay's actions leading up to and during the shooting, which is highly relevant to whether Mr. Slay was reaching for his waistband when Agent Gasperoni discharged his weapon. Ms. Wade testified that she observed the entire encounter between the agents and Mr. Slay from her kitchen window and there was no obstruction to her view. Ms. Wade described the black object

pressed against Mr. Slay's neck and the streak of red that she saw when Agent Gasperoni fired the gun. The Court finds Ms. Wade's testimony to be credible and weighs her testimony in favor of Plaintiff's claim that Agent Gasperoni used more force than was reasonably necessary against Mr. Slay.

Under Mo. Rev. Stat. 537.090, Plaintiff may recover damages for pecuniary losses suffered by reason of the death, funeral expenses, and the reasonable value of the services, consortium, companionship, comfort, instruction, guidance, counsel, training, and support of which those on whose behalf suit may be brought have been deprived by reason of such death; and pre-death pain and suffering. Mo. Rev. Stat. § 537.090. See *Evans v. FirstFleet, Inc.*, 345 S.W.3d 297 (Mo. App. S.D. 2011) (reaffirming the physical, emotional, and psychological relationship between a parent and child must be considered in wrongful death action when computing the loss of consortium for the loss of a child for a parent); see also *Call v. Heard*, 925 S.W.2d 840, 851 (Mo. banc. 1996) (holding an element of the total damages is based upon the relationship between the deceased and each individual party to the action); see also *Economy Fire and Cas. Co. v. Haste*, 824 S.W.2d 41 (Mo. App. W.D. 1991) (holding that plaintiff is entitled to recover damages in wrongful death action for losses occasioned by death itself and such damages as decedent sustained as direct result of injury received, such as pain and suffering and other items that decedent would have been able to recover had he survived).

Ms. Slay testified to the closeness of her relationship with Caleb. Indeed, Ms. Slay was an involved mother, who had contacted Mr. Slay's neighbors weeks prior to the incident out of concern for Mr. Slay's emotional well-being. While Mr. Slay did not financially support his mother, such support is not required for the Court to award Ms. Slay wrongful death damages. Settlements for wrongful death shootings within the Eighth Circuit range from $212,000 to

$37,000,000. (The National Police Funding Database, 2026 NAACP Legal Defense and Educational Fund, Inc., accessed April 2026); (see also Jury awards $37M in damages for St. Louis police shooting | FOX 2, published March 28, 2026).

In 2012, the St. Louis Police Department paid $212,500 to the family of Normane Bennet, who was shot by police following their pursuit of him in an attempt to make a drug arrest. *Id.*

In 2013, the St. Louis Police Department agreed to pay $400,000 to the family of Cary Ball, who was shot 212 times by police following a pursuit. *Id.*

In 2015 a St. Louis jury awarded the family of Mansur Ball-Bey $6,250,000 in compensatory damages (and an additional $12,500,000 in punitive damages which are not at issue here). *Id.*

The St. Louis Police Department also paid $900,000 to the survivors of Anthony Lamar Smith, who was fatally shot by police. *Id.*

In 2017, the City of Ferguson paid $1,500,000 to settle a wrongful death lawsuit filed by the family of Michael Brown, who was killed in 2014 by officer Darren Wilson. *Id.*

The City of Cedar Rapids, Iowa, settled a lawsuit for $8,000,000 in 2020 for the wrongful shooting of Jerime Mitchell, where Mr. Mitchell was shot and paralyzed by Sergeant Lucas Jones who was subsequently fired in June 2020. *Id.*

In October 2022, a judge in Jackson County, Missouri, approved a $500,000 settlement for the decedent's parents, Don and Carolyn Prince, after their son was tackled by a Kansas City Police Department (KCPD) officer in 2017 and later died. *Id.*

In November 2022, the Kansas City Board of Police Commissioners reached a $5,000,000 settlement agreement with the family of Terrence Bridges Jr., a thirty-year-old, unarmed Black man who was fatally shot in the chest in 2019 by a Kansas City, Missouri, police officer. *Id.*

Most recently, in March 2026, a federal jury awarded $37 million to Tyron Edwards, a 14-year-old at the time of the incident, for a 2016 police shooting. (Jury awards $37M in damages for St. Louis police shooting | FOX 2, published March 28, 2026).

In the case at bar, Ms. Slay, as Mr. Slay's successor, is entitled to recover damages for Mr. Slay's pain and suffering caused by the shooting from the time of the shooting to Mr. Slay's death. While the evidence does not show how long Mr. Slay survived after the shooting, he did have a slight heartbeat when the paramedics arrived and began treating him. The Court finds that Mr. Slay more likely than not survived for more than an instant after the first shot was fired by Agent Gasperoni, and that, more likely than not, Mr. Slay suffered pain and fear as a consequence of at least the first gunshot fired by Agent Gasperoni.

Since Battery is an intentional tort, and that is the only cause of action being tried, there is no offset for comparative fault.

**CONCLUSION**

The Defendant, UNITED STATES OF AMERICA, is liable under the Federal Tort Claims Act to Plaintiff TINA SLAY for the wrongful death under Missouri law caused by the battery of her son CALEB SLAY by United States Drug Enforcement Agent Anthony Gasperoni by the unreasonable use of force in shooting and killing CALEB SLAY.

Accordingly, the Court awards Plaintiff TINA SLAY a total of $10,000,000.00 in compensatory damages for Mr. Slay's pain and suffering and wrongful death.

IT IS SO ORDERED.

DATED:_____________

_________________________________
Hon. Roseann A. Ketchmark
UNITED STATES DISTRICT JUDGE

Respectfully submitted,

Dated: June 4, 2026

**BURRIS NISENBAUM CURRY & LACY**

By: */s/ Julia N. Quesada*

JOHN L. BURRIS (Cal. SBN 69888)
BEN NISENBAUM (Cal. SBN 222173)
**BURRIS, NISENBAUM, CURRY, & LACY LLP**
Airport Corporate Centre
7677 Oakport Street, Suite 1120
Oakland, California 94621
Telephone: (510) 839-5200
Facsimile: (844) 273-6873
E: john.burris@johnburrislaw.com
E: bnisenbaum@gmail.com

DeWITT M. LACY (Cal. SBN 258789)
JULIA N. QUESADA (Cal. SBN 337872)
**BURRIS, NISENBAUM, CURRY, & LACY LLP**
9701 Wilshire Blvd., Suite 1000
Beverly Hills, California 90212
Telephone: (310) 601-7070
Facsimile: (844) 273-6873
E: dewitt@bncllaw.com
E: julia.quesada@bncllaw.com

HENRY W. TANNER, JR, Esq. (MO #66277)
**THE LAW FIRM OF HENRY TANNER LLC**
1432 E. 49th Terrace
Kansas City, Missouri 64110
Telephone: (816) 547-2162
Facsimile: (816) 393-0338
E: henry@htannerlaw.com

*Attorneys for Plaintiff, Tina Richardson*

## CERTIFICATE OF SERVICE

I, Julia N. Quesada, hereby certify that the foregoing was filed through the CM/ECF system on June 4, 2026, which provided notice to all attorneys of record.

*/s/ Julia N. Quesada*
Julia N. Quesada