# EXHIBIT A

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI

TINA RICHARDSON, individually and as successor-in-interest to Decedent Caleb Slay,

Plaintiff,

v.

UNITED STATES OF AMERICA, et al.,

Defendants.

Docket No. 6:23-cv-03337-RK

Springfield, Missouri
April 28, 2026

. . . . . . . . . . . . . . . . . . . . . . . . . .

# TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE ROSEANN A. KETCHMARK
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff: Mr. Benjamin Nisenbaum
Ms. Julia N. Quesada
BURRIS NISENBAUM CURRY & LACY LLP
7677 Oakport Street, Suite 1120
Oakland, California 94621

For the Defendants: Mr. Wyatt R. Nelson
UNITED STATES ATTORNEY'S OFFICE
Hammons Tower, Suite 500
901 East St. Louis Street
Springfield, Missouri 65806

Ms. Christa Barber Moss
UNITED STATES ATTORNEY'S OFFICE
400 East Ninth Street, Suite 5510
Kansas City, Missouri 64106

Proceedings recorded by machine shorthand. Transcript produced by computer-aided transcription.

---

Darcie A. Cruz, CSR, RDR
United States Court Reporter
400 East Ninth Street, #8420
Kansas City, Missouri 64106
816.512.5608

their car to their house, right? 12:46PM
A. Yes, they are. 12:46PM
Q. And Agent Stuart had not given you any further information, correct? 12:46PM 12:47PM
A. Any further information in regards to? 12:47PM
Q. Anything that was happening, other than what we've discussed. 12:47PM 12:47PM
A. Not at that time. Not that I recall. 12:47PM
Q. Okay. So you had no information that Caleb Slay, walking to his house, was in the commission of any crime at that time, right? 12:47PM 12:47PM 12:47PM
MR. NELSON: Objection, Your Honor. I believe that misstates prior testimony. 12:47PM 12:47PM
THE COURT: I'm going to let him respond. 12:47PM
THE WITNESS: Sorry. Can you repeat the question, sir. 12:47PM 12:47PM
BY MR. NISENBAUM: 12:47PM
Q. You had no information at this time that Mr. Slay was engaged in the commission of any crime while he was walking towards his house, correct? 12:47PM 12:47PM 12:47PM
A. No. We're still conducting the investigation that started with a -- what was believed to be a narcotics investigation which led us to that scene. So we're still conducting the investigation at that time, sir. 12:47PM 12:47PM 12:47PM 12:47PM
Q. So you're conducting an investigation to develop evidence 12:47PM

to ultimately try to determine if there -- if there is a crime being committed? 12:47PM 12:48PM
A. Yes. We're always trying to conduct investigations to gather intelligence information and evidence. 12:48PM 12:48PM
Q. Okay. In this situation, when Mr. Slay was walking to his house, you ordered him to stop, correct? 12:48PM 12:48PM
A. I asked him if he would come back -- or, I actually asked him where he was going originally. 12:48PM 12:48PM
Q. Okay. And what were your words? Where are you going? 12:48PM
A. Something along those lines. 12:48PM
Q. And his response was, quote, unquote, I'm going to my fucking house? 12:48PM 12:48PM
A. Yes. 12:48PM
Q. Okay. And it's not a crime to use a curse word, right? 12:48PM
A. No, sir. 12:48PM
Q. And it's not a crime to be upset or somewhat rattled when the police want to detain you, right? 12:48PM 12:48PM
A. No, sir. 12:49PM
Q. Okay. So at this time, based on your training and experience, Mr. Slay would have had a right to keep walking and go into his house. He did not have to come back to you, right? 12:49PM 12:49PM 12:49PM
A. Correct. 12:49PM
Q. Okay. So you were not actually attempting to detain him, correct? 12:49PM 12:49PM
A. Correct. 12:49PM

Q. You requested that he come here, and he did.
A. He did.
Q. Voluntarily.
A. Yes, he came back.
Q. Now, when you got out of your car, you initially did not have your vest on, correct?
A. That's correct.
Q. And that was when you first saw -- well, when you first saw Mr. Slay walking towards his house, you were outside of your car. You only went back to put the vest on after you asked Mr. Slay where he was going and he responded the way he did, correct?
A. From my recollection, yes, sir.
Q. So, during that time, Mr. Slay allowed you to go back to -- by allowed, he didn't attack you. He didn't do anything aggressive towards you while you walked back to your car and put your vest on and then came back to him, correct?
A. I'm sorry. Can you repeat that. That was a lot there.
Q. Sure. Mr. Slay did not do anything aggressive towards you physically while you walked back to your car, put your vest on and then came back to him.
A. Physically, no, he did not.
Q. Okay. The only thing that he did was make a comment about your lack of professionality -- professionalism.
A. He would make that comment, yes, sir, that it was

Q. Can I ask you this?
A. Yes, sir.
Q. I'm going to show you something. Can you tell me if this is what he did. Did he reach back and hold his hands like that, clasp his hands together?
A. No, sir, he did not.
Q. Okay. Was it just the -- was it just the right arm?
A. It was just the right arm.
Q. Okay. And can you show us the movement that he made the first time with the right arm. You can stand up and show us, demonstrate.
A. It's the jacket.
Q. Are you saying your jacket interferes?
A. Well, I mean, it's kind of hard to see.
Q. Well --
A. Is it not?
Q. -- you can take it out. I would like you to turn toward the judge so the judge can see it though.
A. Okay. I'm kind of shorter than the wall.
Q. Yeah. I can see it from here.
A. Okay. So, I mean, again, I'm standing on my tiptoes.
Q. Okay. So, you're saying he moved his right hand openly to his right hip -- waist/hip area with his elbow kind of bent, correct?
A. Sir, it's hard to say exactly how he moved his arm at

that time. I can't say exactly how his elbow is or how his entire body is positioned at that time.
Q. All right.
A. It's hips movement. So, it's not mine. It's...
Q. So what you're saying -- so I understand, that was not intended to be an exact replication.
A. No, it is not.
Q. Okay. There was movement of the right hand to the right hip. Was it a quick movement, a slow movement?
A. It was movement. As far as the determination of how quick or how slow, I mean, it's a movement. It was --
Q. I'm asking you. Was it sudden or was it not?
A. I don't think it was too quick at that time.
Q. Okay. And you told Mr. Slay, hey, man, don't be reaching for your waistband or anything, I don't know if you have a firearm on you, or words to that effect, correct?
A. Yes, sir.
Q. All right. And did Mr. Slay's hand go all the way behind him, or did it stop at the hip?
A. It went towards like his right rear waistband area.
Q. Okay. And that's where you were intending to show us just now?
A. That's what I'm attempting to show you, yes, sir.
Q. Okay. Mr. -- you wore a jacket, right?
A. I'm sorry?

relation to when I grab you. 01:03PM
Q. Okay. But you do grab Mr. Slay's hands. 01:03PM
A. Yes, I do. 01:03PM
Q. Okay. And do you recall where they were when you actually grabbed them? 01:03PM
A. No. I just stated that, sir. I don't recall exactly. Like I said, people can talk with their hands. 01:03PM
Q. I got it. Well, how did you grab his hands? 01:03PM
A. So, I grabbed -- I grabbed what would have been his hands and wrist area. 01:03PM
Q. Okay. So, at this point, you're grabbing his hands and wrist area on the outside. And you're applying pressure, right? 01:03PM
A. Yes, I believe so. And, again, this is a -- what would be, I guess, a reenactment and not an actual... 01:03PM
Q. I understand. 01:03PM
A. I forgot what term you used. 01:03PM
Q. It's a demonstration. 01:04PM
A. It's a demonstration. 01:04PM
Q. Thank you. 01:04PM
A. You're welcome. 01:04PM
Q. Do you recall telling investigators that both of Mr. Slay's arms were in front of him at the time that you grabbed both of his wrists? 01:04PM
A. That's sounds familiar, yes, sir. 01:04PM

Q. Okay. And upon being grabbed and you applying some pressure on his wrists, Mr. Slay tensed up, correct? 01:04PM
A. Upon me grabbing him, yes, he tensed up. 01:04PM
Q. Okay. And you could feel the resistance of that, correct? 01:04PM
A. I could. 01:04PM
Q. And is there anything wrong with that? Is there anything suspicious about that? 01:04PM
A. Yes, sir, there is. 01:05PM
Q. When you grab someone by the wrists and they tense up, that's suspicious? How? 01:05PM
A. Because he's already showing that, you know, he doesn't like the fact that his wrists have been secured and grabbed and that he's being detained at that time. 01:05PM
Q. Okay. I'm trying to understand what -- how is that connected to a crime? Isn't that just a human response to someone grabbing their wrists and applying pressure? 01:05PM
A. It's not always a human response, sir. I've detained and arrested several people that have not resisted and/or flexed any muscles, pulled away. So, I mean, I would say that based off of my contacts, no, I would say that's not common. 01:05PM
Q. Just to be clear, you call this resistance by Mr. Slay, him tensing up after you grab him, correct? 01:05PM
A. Yes. 01:05PM
Q. All right. And that caused you -- oh, by the way, how 01:05PM

tall are you?
A. I'm five foot five, sir.
Q. Okay. How tall was Mr. Slay?
A. Approximately six foot, maybe a little taller.
Q. Okay. And what size was he, roughly, in terms of weight?
A. Oh, I'd say 220, 225, I believe.
Q. What was your weight?
A. 160 pounds, sir.
Q. All right. Same as it is now?
A. Just about.
Q. Okay. And then you yelled out, John, to your partner, correct?
A. Yes, I did.
Q. Now, Mr. Ray was already in handcuffs at that time, correct?
A. Yes, he was.
Q. And Agent Stuart brought Mr. Ray over and sat him down in the front yard of the residence, correct?
A. That's correct.
Q. How far was Mr. Ray from where Mr. -- where Mr. Slay was when Mr. Slay was shot?
A. I don't know, sir. It's -- he's in the front yard. I can't estimate the distance for you at this time.
Q. Would you estimate it was less than ten feet?
A. I don't -- I don't feel comfortable estimating the

distance on this, sir. It's in the front yard. 01:07PM
Q. Okay. You did not ask Mr. Slay to give you his hands. You just grabbed them, correct? 01:07PM
A. That's correct. 01:07PM
Q. Was there any evidence, up to this point in time, of any further suspected drug activity? 01:07PM
A. I'm sorry? 01:08PM
Q. Was there any evidence that you had developed up to this point in time of any further suspected drug activity? 01:08PM
MR. NELSON: Objection. Vague. 01:08PM
THE COURT: I'm going to let him answer. 01:08PM
THE WITNESS: Sorry. Again, can you repeat it. 01:08PM
BY MR. NISENBAUM: 01:08PM
Q. Was there any further evidence of any suspected drug activity up to this time? 01:08PM
A. Not that I am aware of. We're still right in the middle of -- or, the very beginning of this contact. I mean, it's all happening extremely quickly. 01:08PM
Q. Well, for example, you did not see a meth pipe sticking out of any of Mr. Slay's pockets, correct? 01:08PM
A. No, sir, I did not. 01:08PM
Q. And you didn't see any drug paraphernalia in the passenger car that Mr. Slay had been in, correct? 01:08PM
A. I did not. 01:08PM
Q. And you didn't see any drugs on Mr. Slay or in the car, 01:08PM

Q. And then Mr. Slay, once -- as soon as Agent Stuart grabbed his wrist, Mr. Slay turned into -- meaning towards -- into Agent Stuart, correct?
A. Yes. He broke free of my grip and turned into Agent Stuart.
Q. Okay. So Mr. Slay would have turned towards his left towards Agent Stuart and into him, correct?
A. Yes, he turned into him, sir.
Q. And then there was some sort of a grappling that occurred, correct?
A. Yes.
Q. Okay. Now, you didn't see exactly how they went to the ground, did you?
A. I believe I previously stated they wrestled to the ground. They basically wrestled to the ground and began to roll.
Q. Okay. But, I mean, you couldn't identify any particular move or action that took them to the ground?
A. No, I could not.
Q. All right. It was a struggle between them, and they went to the ground.
A. Yes.
Q. Okay. And when they went to the ground, what was their positioning relative to each other?
A. Agent Stuart ended up on his back, and his head would

have been closer towards the street. However, if sitting up, he would be facing westbound towards the house. Mr. Slay's feet were underneath him. He's standing at that time bent over, and then he would be facing towards the street. 01:12PM 01:12PM 01:12PM 01:12PM
Q. Okay. And did you see Mr. Slay like punch, throw any punches? 01:12PM 01:12PM
A. No, I don't remember him throwing any punches, sir. 01:12PM
Q. Any kickes -- any kicks? 01:12PM
A. I'm sorry? 01:12PM
Q. Any kicks? 01:12PM
A. Like, did he kick him? 01:12PM
Q. Yes. 01:12PM
A. I don't know if he intentionally kicked him, no. 01:12PM
Q. There were no strikes from Mr. Slay that you saw to Agent Stuart, correct? 01:12PM 01:12PM
A. That's correct. 01:13PM
Q. Okay. It was a wrestling. They went to the ground. Then Mr. Slay was above Agent Stuart. Agent Stuart, was he on his back? 01:13PM 01:13PM 01:13PM
A. Yes, sir, he was on his back. 01:13PM
Q. Okay. And Mr. Slay was bent over at the waist, correct? 01:13PM
A. He would have been bent over. His exact body positioning, again, I don't know. But he would be bent over with his feet underneath him. And from the time it went to the ground, like I said, this is extremely fast-moving at this -- 01:13PM 01:13PM 01:13PM 01:13PM

at this point. 01:13PM
Q. Any verbal threat from Mr. Slay? 01:13PM
A. Any verbal threat? I'm sorry. 01:13PM
Q. Verbal threat. 01:13PM
A. Not that I recall, sir. 01:13PM
Q. Okay. You pulled out your gun, correct? 01:13PM
A. I did. 01:13PM
Q. Then Mr. Slay -- well, actually, Agent Stuart tried to grab Mr. Slay's left arm to control his arms, correct? 01:13PM 01:14PM
A. Yes, sir. 01:14PM
Q. And you don't know more specifically if Agent Stuart was trying to bring Mr. Slay to the ground or not, correct? 01:14PM 01:14PM
A. That's correct. I do not. 01:14PM
Q. And then you saw Mr. Slay break free and back away from Agent Stuart, correct? 01:14PM 01:14PM
A. Yes, later. Yes, he did. 01:14PM
Q. Okay. Well, they're wrestling over their arms. 01:14PM
A. That's correct. Over the left arm. 01:14PM
Q. Over the left arm. And then you say there us a second gun reach with the right arm; is that right? 01:14PM 01:14PM
A. That's correct. 01:14PM
Q. Okay. So the second gun reach, what did that look like? 01:14PM
A. So, it would be very close to the same thing. He's reaching towards his right rear waistband area, sir. 01:15PM 01:15PM
Q. So -- and I'm just going to show you. Is this 01:15PM

A. I do not. We were yelling multiple verbal commands. What those commands were, I do not know at this time. 01:22PM
Q. Okay. You don't recall saying, stop or I'll shoot, correct? 01:23PM
A. I don't recall what any of the commands were, sir. 01:23PM
Q. You don't recall saying, I'm going to kill you, quote, mother fucker, close quote. 01:23PM
A. I don't remember any of those statements, sir. I don't recall what those statements were, what the commands were. 01:23PM
Q. Okay. So you don't recall any of the commands. How far were you from Mr. Slay when you shot him? 01:23PM
MR. NELSON: Objection. Asked and answered. 01:23PM
THE COURT: I'm going to let him answer one more time. 01:23PM
A. Close. But, again, I can't estimate the approximate distance. Everybody is moving, and this is extremely fast-happening situation. 01:23PM
Q. And then you say that there was a third shooter's draw, correct? 01:23PM
A. I stated that the third reach towards it would be consistent with that of a shooter's draw. 01:23PM
(Interruption by the reporter.) 01:23PM
A. (Continuing) Yes, the third reach would have been the shooter's draw. 01:24PM
Q. Okay. And how is that different from the other two? 01:24PM

communication -- as you're getting out of your car, did you make any communication with Agent Stuart? 01:58
A. As I'm getting out of the car? 01:58
Q. Yes, sir. 01:58
A. Agent Stuart's making communications with me by telling me that the individuals were not following his verbal commands. 01:58
Q. And did he point out Caleb Slay? 01:59
A. I don't recall at the time. 01:59
Q. Who are you investigating at this point when you show up at 1827 South Maryland? 01:59
A. Mr. Ray. 01:59
Q. And, in your investigation of Mr. Ray, are you investigating the scene? 01:59
A. Yes, I am. 01:59
Q. Does investigating the scene include investigating the other individuals that are there on the scene? 01:59
A. That's correct. 01:59
Q. And -- so is Mr. Slay under arrest when you first saw him? 01:59
A. No, he is not. 01:59
Q. And why'd you talk to him? 01:59
A. Because Agent Stuart informed me that they were not following his commands, and I asked him where he was going. 01:59
Q. And we know what happens. He asks -- he says, I'm going to my fucking house. 02:00

Q. After he says he's going to his house, what happens next? 02:02PM
A. I asked him if he would come back over and speak to me. 02:02PM
Q. And then what? 02:03PM
A. He did. 02:03PM
Q. And was that at the point that he made the statement about your police vest? 02:03PM
A. Yes. While I was putting on my police vest, he made the comment that it was -- or, the statement that it was unprofessional at that time. 02:03PM
Q. And you later find out that he has a firearm. What's the comment about you putting on your vest communicating to you? 02:03PM
A. I mean, it's definitely odd that a person with a firearm is communicating that it's odd that I'm putting on a firearm when they're in possession of a firearm. 02:03PM
Q. Where you guys standing? As you're -- as you're making small talk, where are you standing in relation to the house? 02:03PM
A. I'm facing towards the residence. So I would have my back towards the street. I'd be facing the residence at that time. 02:03PM
Q. And you're making small talk. What happens? 02:03PM
A. Again, as I previously stated, I observe Mr. Ray's (sic) right hand go towards his right rear waistband area for the first time. At which point in time I immediately addressed that. 02:04PM
Q. When you say addressed that, your words were? 02:04PM

A.     Something along the lines of don't be reaching for your waistband, I don't know if you have a firearm on your person.
Q.     Was that a statement that you made to elicit a response?
A.     It is.
Q.     And what was his response?
A.     That he was armed with a firearm.  So he was armed.
Q.     And based on your training, did you have an idea of where the firearm was?
A.     Yes.  Based off of his movement, where his hand went, my statement and Mr. Slay's own statement, I believed that his firearm was in his right rear waistband area given the totality of what I knew at that time.
Q.     Why'd you believe that it was specifically in his right rear waistband?
A.     Because that is exactly where his hand went.  And then I made the statement about don't be reaching for your waistband, I don't know if you have a firearm on you.  And then he immediately tells me he's armed.  So I believe that that firearm would be in that position at that time.
Q.     And could you see the weapon?
A.     I could not.
Q.     And what do you do in response to him telling you that he's armed.
A.     Yes, he told me that he was armed.
Q.     And then what's your response?

A. Again, I reached out and grabbed his wrist.
Q. And then what?
A. I felt his arms -- his arm muscles contract, and I called for Agent Stuart to respond to my location.
Q. And his arm muscles contract. Can you explain to us what that is making you believe at that point?
A. That, you know, he's -- he's basically resisting at that time. I'm requesting that Agent Stuart, he has a firearm on him and that things may escalate from there.
Q. And you call to John. What happens next?
A. Agent Stuart, again, puts Mr. Ray, who's already in handcuffs, down in the front yard. Agent Stuart responds to my location, and we attempt to detain Mr. Slay, who then, upon being grabbed by Agent Stuart, turns into him. And the wrestling -- and he's wrestled to the ground. The wrestling match begins.
Q. And how quickly does all of that happen?
A. Extremely fast.
Q. And, during all of this, we've already established you are to the north; is that...
A. So, at what point, sir?
Q. At the point that they're on the ground wrestling.
A. At the point that they're on the ground, I would have been to Mr. Slay's left, Agent Stuart's right, which puts me on the north side of both of them, give or take.

MR. NISENBAUM: Right. And then it would be Jack Ryan, and then it will be Ms. Slay. 05:26PM 05:26PM

THE COURT: All right. And then the government had mentioned Craig Allen and CSI Thorn; is that right? 05:27PM 05:27PM

MR. NELSON: Yes, Your Honor. Then one other -- Detective Patton as well. 05:27PM 05:27PM

THE COURT: Okay. All right. Well, we'll play it by ear. I won't put time limits on you at this point, but we need to be more prepared and efficient with our questioning. 05:27PM 05:27PM 05:27PM

We will -- 05:27PM

MR. NISENBAUM: Okay. 05:27PM

THE COURT: -- be in recess, and I'll see you at 8:30. 05:27PM 05:27PM

MR. NISENBAUM: Thank you. 05:27PM

(Adjourned.)

* * * * *

REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

May 15, 2026

/s/ Darcie A. Cruz

DARCIE A. CRUZ, RDR
United States Court Reporter