# EXHIBIT B

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI

TINA RICHARDSON, individually and as successor-in-interest to Decedent Caleb Slay,

Plaintiff,

v.

UNITED STATES OF AMERICA, et al.,

Defendants.

Docket No. 6:23-cv-03337-RK

Springfield, Missouri
April 29, 2026

. . . . . . . . . . . . . . . . . . . . . . . . .

TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE ROSEANN A. KETCHMARK
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff:

Mr. Benjamin Nisenbaum
Ms. Julia N. Quesada
BURRIS NISENBAUM CURRY & LACY LLP
7677 Oakport Street, Suite 1120
Oakland, California 94621

For the Defendants:

Mr. Wyatt R. Nelson
UNITED STATES ATTORNEY'S OFFICE
Hammons Tower, Suite 500
901 East St. Louis Street
Springfield, Missouri 65806

Ms. Christa Barber Moss
UNITED STATES ATTORNEY'S OFFICE
400 East Ninth Street, Suite 5510
Kansas City, Missouri 64106

Proceedings recorded by machine shorthand. Transcript produced by computer-aided transcription.

---

Darcie A. Cruz, CSR, RDR
United States Court Reporter
400 East Ninth Street, #8420
Kansas City, Missouri 64106
816.512.5608

November of 2020, how old was your son? 09:25
A. He would have been just shy of two months. 09:25
Q. So he was essentially a newborn. 09:25
A. Uh-huh. 09:25
Q. Is that a yes? 09:25
A. Yes. 09:25
Q. Thank you. I need yeses and nos. 09:25
A. Sorry about that. 09:25
Q. It's all good. Do you know a person named Caleb Slay? 09:25
A. I do. 09:25
Q. And how did you know Mr. Slay? 09:25
A. He was my direct adjacent neighbor across the street. 09:25
Q. Okay. And you say across the street. What kind of street is that? 09:25
A. It's just your standard residential street. My house and his house -- the front doors pretty much lined up. 09:25
Q. Okay. And I was there -- been there a couple times at that location. Is there room for cars to park on the street? 09:25
A. There is. 09:25
Q. Okay. About how wide is the street? 09:25
A. Street isn't very wide, but the street -- the residences themselves, they kind of have like a gravel pull-off onto the street. You know what I'm -- if that make sense to you. 09:26
Q. Can you give an estimate of about how far from the front of your house to the front yard -- the front area of the front 09:26

yard of Mr. Slay's residence.
A. From my front door to the edge of his front yard, probably 50 feet at most.
Q. Okay. And can I ask you how your vision is?
A. I'd say it's pretty good.
Q. Okay. Do you wear -- are you required to wear glasses when you drive?
A. No.
Q. Okay. And has there been any deterioration in your vision over time?
A. No.
Q. You haven't reached my age. Okay. So, how about your hearing?
A. It was pretty good.
Q. Okay. And, again, any deterioration in your hearing? Okay.
A. No.
Q. Now, prior to the incident -- well, first off, do you -- do you recall the date of the incident with Mr. Slay?
A. It was early November.
Q. Okay. So prior to that, how long had you lived at that residence?
A. I think we had moved in that February. So, I guess we had been there for nine months.
Q. And had you lived in Springfield with Bailey before that?

A. That was our first house together. 09:27

Q. Okay. And on the day of the incident involving Mr. Slay, do you recall about what time of day it was? 09:27

A. It was middle of the afternoon. Wasn't morning, wasn't night. 09:27

Q. Okay. And had you been drinking or doing anything else that would impair your perception? 09:27

A. No, sir. 09:28

Q. Did you know Mr. Slay's name? 09:28

A. Yes, I did. 09:28

Q. Okay. And how did you come to know his name? 09:28

A. Kind of knew his name -- he had had a previous neighbor who lived on the street before we did who is a good friend of mine. And she had said "my neighbor Caleb" when I went to visit her. And then I eventually moved in across the street. And after a couple days or maybe about a week, he introduced himself. 09:28

Q. Okay. And prior to the incident happening, about how many times had you interacted with Mr. Slay? 09:28

A. Prior to the incident in November? 09:28

Q. Yes. 09:28

A. Minimal. 09:28

Q. Minimal. Can you give an estimate or even a range. Zero to five, five to ten? 09:28

A. Five or less. 09:28

A. We'll go with less than five. It couldn't been a couple times, you know. 09:30/09:30/
Q. Right. And I take it that was just seeing her pull in and pull out. 09:30/09:30/
A. Sure. 09:30/
Q. Okay. At any point in time, had you seen Mr. Slay carry a weapon? 09:30/09:30/
A. I did. 09:30/
Q. Okay. When? 09:30/
A. Often. He typically carried a holster on his hip. It's one of those things you just grow to notice around here. I personally myself -- I'm not a big gun advocate. So, when I see somebody with one, you know, it's acknowledged and I go about my business. 09:30/09:30/09:30/09:31/09:31/
Q. Okay. Is it common for you to see people with guns -- carrying guns around here? 09:31/09:31/
A. Yeah. 09:31/
Q. Okay. Had you ever seen Mr. Slay in an intoxicated state? 09:31/09:31/
A. I can't really say intoxicated. But I'm -- I mean, I was never so close to him to be -- you know, most of the time I would see him, I would say -- from where I'm sitting to maybe where that door is was about the distance, maybe a little more, when I would see him. I didn't have much general interaction to determine intoxication. 09:31/09:31/09:31/09:31/09:31/09:31/

A. So, as he approaches -- they approach each other. I actually announced to Bailey -- I was like, hey, I think -- I think something may be going on across the street. And I can hear that they're speaking to each other. They're not yelling. I can't make out word for word for what they were saying, but they were definitely speaking. And it lasted for a few seconds. And at some point in the conversation, Caleb proceeds -- may I stand?
Q. Yes.
A. He proceeds to put his arms out like this. And he's speaking to the officer. The officer is just speaking. They're spaced about the space between her and I right now.
Q. Okay. Let me --
A. Like this.
Q. Let me pause right there. So, that looks like it's about a space of four to five feet between you and the court reporter?
A. Sure.
Q. Okay. And you -- in terms of how you saw Caleb's arms being out, it looks like they're basically a little bit above your waist.
A. Uh-huh.
Q. Your elbow's almost --
A. It was --
Q. -- extended --

A. -- like he was asking for him to -- for them to cuff him or to arrest him or something like that.

Q. Okay. Let me ask you another question. Prior to that, did you hear the loud sound of yelling from anyone?

A. No.

Q. Okay.

A. No. It was a pretty quieted event.

Q. Okay. If someone had yelled the F word super loud before that, just kind of out of the blue, is that something you would have been in a position to hear?

A. If somebody was --

MR. NELSON: Objection. Calls for speculation.

THE COURT: I'm going to allow it.

A. (Continuing) If somebody was yelling, I would have probably heard exactly what was saying. You don't really miss a loud F-bomb.

Q. Right. Especially with the windows open.

A. Yeah.

Q. About how far was Caleb from you -- from your position when you saw him?

A. I would say -- I was standing at my window, and he was at the inner edge of that gravel drive. So I'd say that was probably about 40, 50 feet, like I said from the beginning.

Q. And you can see just fine at that distance?

A. At that distance, oh, yeah.

as the west side of the SUV where I couldn't see. He was out of my vision, didn't know he was there. He was then in my vision and now wrestling with Caleb.

Q. Okay. So, in other words, he came from your right towards your left.

A. That's correct.

Q. And you said he came up, boom. What do you mean by that?

A. I mean, they went to apprehend him in some sort of fashion or another. I'm sure you know how big Caleb was at this point, and I'm -- you -- sure you've met with the officer at this point. You know, once they became entangled, I mean, it was kind of hard to tell.

Q. Right. Let me ask you, did you hear that officer say anything or -- either -- did you hear that officer say anything --

A. There was --

Q. -- to Caleb?

A. -- a lot being said and not a lot being heard because it was -- you know, it was quick and muffled. Because, I mean, they were -- it's like, yeah, rrh, rrh, rrh, rrh. And...

Q. That was after he tackled him?

A. That was kind of during. That was -- yeah.

Q. At the point when -- up to the point when the officer tackled him, do you recall that officer --

A. No.

Q. -- saying anything? 09:52
A. No one said anything. I mean, it was -- it was just, woo. 09:52
Q. And were you -- 09:52
A. It happened -- 09:52
Q. Were you in a position to hear it if they had said something? 09:52
A. Yeah. I would say so. If they would have said it in a commanding, loud enough voice, I mean, I could tell -- I could hear that they were talking beforehand. 09:52
Q. Right. 09:52
A. I mean, if they had given some sort of loud, outward command, I would have heard that. 09:52
Q. Could you even hear the sound of that officer who tackled Caleb saying anything before he tackled him? 09:52
A. That officer, Officer No. 2, I wouldn't say that I would -- I'd been able to hear him because he was on the other side of a vehicle, and I -- you know. 09:52
Q. Okay. 09:52
A. I -- so, no, I wouldn't say I would have been able to hear a small command. 09:52
Q. Okay. Was -- did it appear that Caleb was looking at that officer as he approached? And you called him Officer No. 2? 09:53
A. Officer No. 2. 09:53

Q. Okay. Did you see the officer take the -- what you thought was a taser from his holster? 09:55
A. Yes. 09:55
Q. Okay. And what side of the officer's body was the taser -- what you thought was a taser? 09:55
A. It ended up in his right hand. 09:55
Q. Okay. 09:55
A. I'll tell you that. 09:55
Q. Okay. And at the time that that officer had the taser in his hand, where was Caleb positioned relative to the other officer? 09:55 09:56
A. They were right up next to each other. 09:56
Q. Were they on the ground? 09:56
A. They never fully went down to the ground. Caleb was a very large guy. They -- the officer never fully got him slammed down to the ground. Caleb was trying to, you know, push up, push off, or whatever, but there was no full horizontal. 09:56
Q. Okay. 09:56
A. Like, whether or not the officer was touching him right when that happened, I can't say. 09:56
Q. Okay. And the officer who had the taser -- what you thought was a taser, how was he positioned relative to Caleb? 09:56
A. I mean -- (to the reporter) you're in the perfect spot -- about this far away from where I'm standing to where she is at 09:56

this moment. 09:56
Q. Okay. And that's about five feet or so? 09:56
A. Yeah. 09:56
Q. Okay. All right. And what did that officer -- the one with the taser -- do after you saw him with what you thought was a taser? 09:56 09:56 09:57
A. So, this part happens real quick. I said, what... And by the time I said what, that is when I visually watched the officer then grab his gun and proceed to shoot Caleb three times. 09:57 09:57 09:57 09:57
Q. So, you said you saw the officer grab his gun? 09:57
A. Yeah, I did see that for sure. 09:57
Q. Okay. 09:57
A. So whether -- what he had in his hand in the first place, if he changed hands, his back is towards me now. 09:57 09:57
Q. Did he reholster what he had in his hand -- 09:57
A. I couldn't tell you. 09:57
Q. -- and holster -- 09:57
A. Couldn't tell you. 09:57
Q. Okay. Let me finish the question. 09:57
A. Sure. 09:57
Q. Thank you. So just so it's clear, you don't -- you don't recall seeing if he reholstered and then unholstered again. 09:57 09:57
A. I do not. 09:57
Q. Okay. Describe the object that was in his hand. 09:57

this way.

Q. Right. Was there an officer underneath Caleb?

A. Maybe for a second, but not really. They were kind of in and out of doing this. And they're -- I mean, these are two grown men trying to take each other to the ground that cannot.

Q. Okay. And so the shaking of Caleb's body that you observed, what caused you to think that that was consistent with a taser?

A. I mean, given the relevance of the situation, the officer's motions, the direct hard twitching like this seemed very taser to me from, you know, my knowledge. I have not been tased. I've only seen it. So I -- you know, you can only assume from general knowledge.

Q. Okay. All right. And -- well, at some point, you heard the sound of gunshots.

A. Yeah. I visually watched the gunshots happen.

Q. Okay. Describe for me what you saw then.

A. It was just about as quick then. I mean, it went from they're like this, the tasing incident, him doing that, the officer took maybe a quarter step back, you know, just assumed a shooting stance, took the shooting stance and fired three rounds at Caleb.

Q. Okay. Where was the gun relative to Mr. Slay's head at that time?

A. Hard to tell, but it was pointed that way.

Q. Okay. Could you estimate distance wise?
A. Again, he took another step back. So I would say, between me and this nice lady, probably about this far.
Q. Okay. Thank you. So before the shots happen, what view -- what view of Caleb do you have?
A. The entire view.
Q. Okay. Meaning you could see both the right and left side?
A. Yeah.
Q. Okay. Was -- did you have a better view of one side?
A. At the beginning, the right-hand side because that's how he was positioned. As things -- as the -- as it unfolded -- I mean, mind you, they're doing this.

(Witness bumped microphone.)

THE WITNESS: I'm sorry.

A. (Continuing) They are doing this. So, I'm getting visual of all sides, you know.
Q. Okay. So, even going further back, at any point in time, did you see Mr. Slay reach with either hand towards his waistband?
A. No. Both of his hands were actively trying to get the officer off of him.
Q. Okay. You mean both of his hands were occupied kind of in front of him?
A. To clarify, I think most people have seen two guys

A. I was interviewed on my back porch.
Q. Okay. Was Bailey present during -- when you were --
A. No, nobody was present. The officer took me out the side.
Q. And do you know if Bailey was interviewed?
A. I do believe she was interviewed, but I don't know the --
Q. You weren't --
A. -- details.
Q. You weren't present --
A. No.
Q. -- when she was interviewed. Okay. Well, there are two -- did you see anyone else in the yard?
A. You're going to have to be more clear.
Q. Prior to the shooting, did you see if there were any, you know, like, people that might have been associated with Caleb in the yard?
A. No, not at that moment.
Q. Okay.
A. No.
Q. Do you know the name Eddie Boerste?
A. No.
Q. How about Casey Ray?
A. No.
Q. Have you ever -- so I take it you've never talked to either of those two people about this incident?

A.    No.
Q.    And you certainly didn't talk to them before you were interviewed.
A.    No.
Q.    You didn't talk to anybody else.
A.    No.  Now, sorry.  I did say no.  The only person I had spoke to was the family friend who knew the grandparents, who was our -- Amanda Motsinger.  That person I spoke to.
Q.    Okay.  Did you tell her what you saw?
A.    I told her what I saw.  She -- not only did she know exactly where I'm at, she used to live across the street.  So she rushed through.  And, somehow or another, they let her through to get to my house.
      I don't -- I'm not sure if she managed to get ahold of the grandparents on her way in, but she was -- she was there very, very quickly.  But, like I said, she was able to contact the grandparents.
Q.    Okay.  And are you here voluntarily?
A.    I was court-subpoenaed.
Q.    Okay.  You want to be here?
           MR. NELSON:  Objection.  Relevance.
           THE COURT:  Sustained.
           MR. NISENBAUM:  All right.  I don't think I have any further questions.
           THE COURT:  It is 10:15.  Are you ready for your

that all sides are preserving their various motions at the close of the cases and the end of all evidence. 02:23PM 02:23PM

MR. NISENBAUM: From plaintiff's end, yes. 02:23PM

THE COURT: All right. 02:23PM

MR. NELSON: Nothing on behalf of the United States, Your Honor. 02:23PM 02:23PM

THE COURT: All right. We will see you then at 9 in the morning. 02:23PM 02:23PM

MR. NISENBAUM: Okay. 02:23PM

(Adjourned.)

* * * * *

REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

May 15, 2026

/s/ Darcie A. Cruz

DARCIE A. CRUZ, RDR
United States Court Reporter