# EXHIBIT C

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI

TINA RICHARDSON, individually and as successor-in-interest to Decedent Caleb Slay,

Plaintiff,

v.

UNITED STATES OF AMERICA, et al.,

Defendants.

Docket No. 6:23-cv-03337-RK

Springfield, Missouri
April 29, 2026

. . . . . . . . . . . . . . . . . . . . . . . . . .

# TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE ROSEANN A. KETCHMARK
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff: Mr. Benjamin Nisenbaum
Ms. Julia N. Quesada
BURRIS NISENBAUM CURRY & LACY LLP
7677 Oakport Street, Suite 1120
Oakland, California 94621

For the Defendants: Mr. Wyatt R. Nelson
UNITED STATES ATTORNEY'S OFFICE
Hammons Tower, Suite 500
901 East St. Louis Street
Springfield, Missouri 65806

Ms. Christa Barber Moss
UNITED STATES ATTORNEY'S OFFICE
400 East Ninth Street, Suite 5510
Kansas City, Missouri 64106

Proceedings recorded by machine shorthand. Transcript produced by computer-aided transcription.

---

Darcie A. Cruz, CSR, RDR
United States Court Reporter
400 East Ninth Street, #8420
Kansas City, Missouri 64106
816.512.5608

A. I currently live at 518 West Silsby Street, Springfield, Missouri 65807.
Q. And how long have you lived and worked in Springfield?
A. Several years. We started renting the house in 2019, March of 2019. Before that, I resided in Willard, Missouri, not far from here.
Q. Do you live by yourself, or do you live with other people?
A. I live with family. I live with Shawn Tetlow and my son Rye, Rye Tetlow.
Q. And is Shawn Tetlow your husband?
A. He is my fiance.
Q. And where were you living in November of 2020?
A. I was living at 1828 South Maryland.
Q. And did you live with Mr. Tetlow at that time as well?
A. Yes.
Q. And what about your son?
A. Yes.
Q. How long had you been living at the 1828 South Maryland address?
A. Since March of 2019.
Q. While you were living on South Maryland, did you know anyone by the name of Caleb?
A. Yes.
Q. How well did you know Caleb?

A. Not well. We had a few interactions. 08:46
Q. And was Caleb a neighbor? 08:46
A. Yes. He lived directly across the street. 08:46
Q. How many times had you interacted with Caleb? 08:46
A. Approximately three times. 08:46
Q. And what were some of those instances? 08:46
A. Our dog had gotten out of the back yard. He had opened the gate. And he brought -- he knocked on the door and brought my dog home. 08:47
Another time, I had been carrying in the baby and all the groceries, and I had left the hatch of my SUV open. And he came over, knocked on my door, and let me know that I had left my hatch open. 08:47
And then after I had had my son, I was out taking pictures of him outside in a basket. And he just kind of hollered over, congratulations on your new baby. 08:47
So, those were the three interactions I had had with him. 08:47
Q. Okay. Can you describe Caleb's physical appearance that you recall. 08:47
A. He's a white male. He was taller and a stockier build. 08:47
Q. How would you estimate how tall he is? 08:47
A. I would just say over six foot, probably. 08:47
Q. While you were living on South Maryland, did you know whether Caleb carried a gun? 08:47
A. I had seen a gun in a holster a few times while he was 08:48

A. So, Shawn had initially brought my attention that there were people outside and that something was going on. But then when I was standing there, I saw Caleb put his arms out like this. And so at that moment I said, Shawn, he's about to be arrested, which drew both of our attention. That's when we started watching.

Q. Okay. Who was -- was somebody standing with Caleb when he had his arms extended that way?

A. Yes.

Q. Okay. And can you demonstrate again how Caleb's arms were.

A. (Witness complies.)

Q. Are they -- are your warmed locked at all?

A. No. No.

Q. Thank you.

A. He was like this.

Q. Okay. Did it seem like he was trying to --

MS. QUESADA: And for the record, Ms. Wade's arms were extended out in front of her. They were -- both hands were facing down, palm down, and they were not fully extended all the way straight. They were soft. There was some way in there.

BY MS. QUESADA:

Q. How far away would you say Caleb was at this time, from you?

Q. Did you understand what was going on at that point?
A. No.
Q. Did you see Caleb's gun at that point?
A. No.
Q. How long was Caleb interacting with the first officer?
A. Less than a minute.
Q. Before the second officer?
A. Before the second officer, yeah.
Q. Okay. And can you describe what happened after Caleb was tackled?
A. Yeah. So, Caleb had fallen down. He was caught off guard by the second officer. And he had kind of turned like this towards him. But then he fell forward and landed on the first officer's legs. It was a scuffle. Like, he had, like, kind of tripped over him. And he had fallen down, face down.
And then he had tried to kind of get up. And his body was kind of trembling. The second officer had a black object pointed at his neck and his upper body.
And at this point I had thought that they were tasing him and that's why he was still down and kind of trembling. And then after that, the officer kind of like raised up and then shot three times.
Q. I'm going to just break that down just a little bit. Okay?
A. Okay.

Q. When the officer tackled Caleb, was Caleb -- did it look like he was trying to hit any of the officers at that time? 08:59/ 08:59/
A. No. He looked completely off guard. 08:59/
Q. Okay. Would you say that he was -- what was his demeanor at that time? 08:59/ 08:59/
A. Shocked. 08:59/
Q. Okay. Could you see his face? 08:59/
A. I wasn't really looking at his face at that point. I was also shocked by the second officer coming in. 08:59/ 09:00/
Q. Okay. Did it appear that Caleb was threatening any of the officers before he was tackled? 09:00/ 09:00/
A. No. 09:00/
MS. MOSS: Object to form. Calls for speculation. 09:00/
THE COURT: She can testify what she observed. 09:00/
BY MS. QUESADA: 09:00/
Q. Before Caleb was tackled, did you observe his -- him reach for anything in his waistband? 09:00/ 09:00/
A. No. 09:00/
Q. Or move his arms? 09:00/
A. No. 09:00/
Q. Were his arms still raised in front of him at the time he was tackled? 09:00/ 09:00/
A. Yes. 09:00/
Q. And were his fists ever clenched when his hands were up? 09:00/
A. No. 09:00/

Q. Did you hear Caleb yell anything at the officers?
A. No.
Q. Did you hear the officers give -- say anything to Caleb?
A. No.
Q. Where was Caleb facing? Was he still facing towards your house when he was tackled?
A. When he fell, he had kind of -- he was parallel with our house as he went down.
Q. Okay. Could you see the entire interaction?
A. Yes.
Q. From the moment that the officer approached Caleb to the tackle?
A. Yes.
Q. And then through the shooting as well, you could see Caleb?
A. Yes.
Q. Okay. If Caleb had reached for something in his waistband and made a gesture like this --
A. Yes.
Q. -- would you have been able to see that?
A. Yes.
Q. Would you have been able to see it clearly?
A. I believe so.
Q. And did you ever see Caleb make this motion?
A. No.

Q. At any point?
A. No.
Q. You said you thought it was a taser. Was that what you believed it was initially?
A. Yes.
Q. What was your understanding that it was a gun?
A. After the shots were fired.
Q. Okay. Did you see, like, the shots?
A. I did. I actually saw red. And so -- and then, in my mind, I thought maybe it was rubber bullets or something because nothing made sense. So...
Q. When you say nothing made sense, what do you mean by that?
A. I mean, I did not want to believe that it was a gun in that scenario. I wanted to -- wanted it to be a taser or rubber bullets.
Q. Okay. And you never saw Caleb's firearm at all.
A. No.
Q. When Caleb fell or tripped and was taken down, how -- what happened in that interaction before the shots? Was he completely on the ground? Did he try to get up? Was...
A. He had fallen, and he had tried to get up. So, he had tried to push himself up. And his body was kind of trembling at that point.
Q. Okay. And when you say -- I see you put your -- both of

your hands up like this as -- and you say you're -- he's trying to push himself up. Did Caleb use both of his hands to try to push -- put himself up? 09:03/
A. I believe so. 09:03/
Q. Okay. Was Caleb able to get up? 09:03/
A. No. 09:03/
Q. No. And was Caleb still down when the shots were fired? 09:03/
A. Yes. 09:03/
Q. Okay. Was he all the way on the ground, or was he kind of bent over? 09:03/
A. He was partially up. 09:03/
Q. Okay. And did you see which officer fired the shots? 09:03/
A. The second one. 09:04/
Q. The second one? And where did this officer fire the shots on Caleb, which part of his body? 09:04/
A. His upper body. 09:04/
Q. Okay. And was it -- where on his body? 09:04/
A. It looked as if he shot him in the head. 09:04/
Q. Okay. Did it appear that the firearm was pushed against Caleb, or was there space? 09:04/
A. Initially. So, he had it held to his neck. And then he kind of went back. He went back and then fired three shots. 09:04/
Q. And were the shots -- were they on Caleb's right side or left side, that you recall? Where was the gun that the -- where did the officer point the gun at Caleb? 09:04/

A. Looked directly at his head. 09:04
Q. Okay. And you could see that from your window? 09:04
A. Yes. 09:05
Q. Okay. And you never heard Caleb shout any expletives or anything? 09:05
A. No. 09:05
Q. No? And you never heard anything from officers? 09:05
A. No. 09:05
Q. Did you see Caleb get up after? 09:05
A. No. 09:05
Q. After that happened, what did you do? 09:05
A. Shawn shoved me because we were afraid that the bullets would -- we ran to the back of the house. 09:05
Q. Was it your understanding that police were arresting Caleb at that time? 09:05
A. Initially, I had thought they were the police due to the bulletproof vests stating police. But then I thought maybe that wasn't the police. There was no police cars. There were no police uniforms or anything like that. So I told Shawn to call 911. 09:06
Q. Why did you have him call 911 if... 09:06
A. Because I thought that there could be the possibility that those were not the police and it was something different. 09:06
Q. Okay. Did Caleb appear agitated at all, initially, when he -- 09:06

A. I did.
Q. And what was that interaction?
A. I stood in the yard with her and I told her what happened.
Q. Okay. And that was the same day?
A. Yes.
Q. Did you have Ms. -- did you call Ms. Slay after?
A. I could not remember her name in the moment because we had only had the one brief interaction. And so, we had a friend who had lived on that street previously and kind of knew. And so we called her to get ahold of the family, because she had known the family, just to try to let them know that something did happen.
Q. Okay.
A. So, no, I did not call her on that night.
Q. And how soon after this happened did Ms. Slay come to your yard?
A. Pretty quickly. Within 30 minutes.
Q. Had you seen Ms. Slay in the -- around Caleb's --
A. Yes.
Q. -- house before?
A. Yes.
Q. How often would you say?
A. Oh, at least once a week.
Q. Okay.

09:07 09:07 09:07 09:07 09:07 09:07 09:07 09:07 09:08 09:08 09:08 09:08 09:08 09:08 09:08 09:08 09:08 09:08 09:08 09:08 09:08 09:08 09:08 09:08 09:08

MS. QUESADA: If I may just have a moment just to confer with... 09:08 09:08

BY MS. QUESADA: 09:09

Q. When the shots were fired, what side of Caleb was facing you? 09:09 09:09

A. His left side. 09:09

Q. His left side? 09:09

A. Uh-huh. 09:09

Q. Okay. Just one moment. And have you ever seen Caleb's grandparents before? 09:09 09:09

A. Yes. 09:09

Q. Okay. And are they in court today? 09:09

A. Yes. 09:09

Q. Okay. And you recognize them? 09:09

A. Yeah. 09:09

Q. How often had you seen them before? 09:09

A. Quite often, just around his house. 09:09

Q. Okay. Did they frequent there as well? 09:09

A. Yes. 09:09

Q. If Caleb made any movements with his arms on the right side, you would see that -- you would have seen that? 09:09 09:10

MS. MOSS: Object to -- 09:10

A. Yeah. 09:10

MS. MOSS: -- form. Asked and answered. 09:10

BY MS. QUESADA: 09:10

Q. And that was -- you would have -- you didn't see any of that ever.
A. No.
Q. No movement. Before Caleb was taken to the ground, his arms were extended in front of him the way you had demonstrated earlier.
A. Yes.
Q. And then he was taken down to the ground?
A. Yes.
Q. And then shots were fired.
A. Yes.
Q. Okay. Thank you.
MS. QUESADA: I have no further questions.

CROSS-EXAMINATION

BY MS. MOSS:
Q. Good morning, Ms. Wade. How are you?
A. Good.
Q. You doing okay?
A. (No audible response.)
Q. There's some water there. If you need a break, you just let me know. Okay?
Fair to say this was a traumatic event?
A. Yes.
Q. Ms. Wade, you spoke with the Springfield Police Department, Detective Sweet, shortly after this incident,

09:10 09:10 09:10 09:10 09:10 09:10 09:10 09:10 09:10 09:10 09:10 09:10 09:10 09:10 09:10 09:10 09:11 09:11 09:11 09:11 09:11 09:11 09:11 09:11 09:11

correct? 09:11

A. Yes. 09:11

Q. Do I correctly understand that he interviewed you within 10 to 20 minutes after the incident? 09:11

A. Yes. 09:11

Q. Okay. Would you agree that this event was fresh in your mind at that time? 09:11

A. Yes. 09:11

Q. And everything you told the detective on that day was the truth, right? 09:11

A. Yes. 09:11

Q. You gave an accurate account when you were interviewed, correct? 09:11

A. Yes. 09:11

Q. And that interview was recorded? 09:11

A. Yes. 09:11

Q. Ms. Wade, on November 2nd, 2020, when this incident began outside, you were cleaning in the kitchen, correct? 09:12

A. Yes. 09:12

Q. And when you came into the living room, the encounter was already underway, correct? 09:12

A. Shawn had just mentioned that there were people outside. And at this point, that's when I looked out the window. I was sitting in a chair. I looked out the window. I saw them talking. 09:12

that all sides are preserving their various motions at the close of the cases and the end of all evidence. 02:23P 02:23P

MR. NISENBAUM: From plaintiff's end, yes. 02:23P

THE COURT: All right. 02:23P

MR. NELSON: Nothing on behalf of the United States, Your Honor. 02:23P 02:23P

THE COURT: All right. We will see you then at 9 in the morning. 02:23P 02:23P

MR. NISENBAUM: Okay. 02:23P

(Adjourned.)

* * * * *

REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

May 15, 2026

/s/ Darcie A. Cruz

DARCIE A. CRUZ, RDR
United States Court Reporter