# EXHIBIT D

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI

TINA RICHARDSON, individually and as successor-in-interest to Decedent Caleb Slay,

Plaintiff,

v.

UNITED STATES OF AMERICA, et al.,

Defendants.

Docket No. 6:23-cv-03337-RK

Springfield, Missouri
April 28, 2026

. . . . . . . . . . . . . . . . . . . . . . . . . .

TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE ROSEANN A. KETCHMARK
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff: Mr. Benjamin Nisenbaum
Ms. Julia N. Quesada
BURRIS NISENBAUM CURRY & LACY LLP
7677 Oakport Street, Suite 1120
Oakland, California 94621

For the Defendants: Mr. Wyatt R. Nelson
UNITED STATES ATTORNEY'S OFFICE
Hammons Tower, Suite 500
901 East St. Louis Street
Springfield, Missouri 65806

Ms. Christa Barber Moss
UNITED STATES ATTORNEY'S OFFICE
400 East Ninth Street, Suite 5510
Kansas City, Missouri 64106

Proceedings recorded by machine shorthand. Transcript produced by computer-aided transcription.

---

Darcie A. Cruz, CSR, RDR
United States Court Reporter
400 East Ninth Street, #8420
Kansas City, Missouri 64106
816.512.5608

Q. Okay. Thank you. All right. I'm going to direct your attention to Caleb Slay. Did you have occasion to examine the remains of Caleb Slay?
A. Yes, I did.
Q. When did that examination occur, if you can recall?
A. November 3rd, 2020.
Q. Okay. Did you have an understanding of when it was that Mr. Slay died?
A. Yes.
Q. When was that?
A. That was the day before November 2nd, 2020.
Q. And did you have an understanding of how Mr. Slay died?
A. Yes, I did.
Q. Okay. Can you tell the Court what -- how he died.
A. I was -- I was told that there was an officer-involved shooting with the Drug Enforcement Agency and that there were gunshot wounds.
Q. Do you know if he was pronounced dead at the scene?
A. He was.
Q. Okay. And you know that through your investigation?
A. Yes.
Q. Okay. So, are you able to say if you performed the autopsy within approximately 24 hours of when he was pronounced dead?
A. Yes.

09:29
09:29
09:29
09:29
09:29
09:29
09:29
09:30
09:30
09:30
09:30
09:30
09:30
09:30
09:30
09:30
09:30
09:30
09:30
09:30
09:30
09:30
09:30
09:30
09:30

Q. Okay. I take it that means that Mr. Slay was alive and breathing. 09:45

A. That just means that blood was aspirated into the airway. With the injuries that we're going to discuss, there are cases where there's an agonal respiration or agonal inspiration at the moment of dying when blood is taken down into the airways. 09:45 09:45 09:45 09:46

Q. Okay. Meaning a person is breathing and there's air in the blood way -- in the -- there's blood in the airways while they're still breathing. Whether it's agonal or not, they're breathing. 09:46

A. Yes. 09:46

Q. And they're breathing the blood into their lungs. 09:46

A. Yes. I just wanted to emphasize that may be very momentarily. 09:46

Q. I understand. Okay. How many gunshot wounds did you note -- 09:46

A. Two. 09:46

Q. -- to Mr. Slay? 09:46

A. Two gunshot wounds. 09:46

Q. Okay. Can you -- well, you can use me to point out where the gunshot wounds were. Are you able to do that on me? 09:46

A. I can approximate where the gunshot wounds were on you. 09:46

Q. I'm going to come stand by you. And if you could show the Court -- demonstrate where the gunshot wounds were. 09:46

A. There are two gunshot wounds on the left side of the 09:46

head. One is just behind the left ear and of the upper part of the ear, and the other one is above that almost in line with the ear canal but closer to the top of the head. So, entry wound just above and behind the left ear and then one a little bit higher up on the head closer to the top of the head. 09:47/ 09:47/ 09:47/ 09:47/ 09:47/

Q. Okay. And while I'm here, were you able to determine the trajectory of the bullets that went into those entry wounds? 09:47/ 09:47/

A. Yes. The direction of both shots was from left to right and forward, meaning from back to front, and downward from up to down. Now they were sharply from left to right, more from back to front than they were from up to down. So they were slightly, I would say, from up to down or slightly downward. 09:47/ 09:47/ 09:47/ 09:47/ 09:48/

Q. Okay. 09:48/

MR. NISENBAUM: Now, I have two dowels, Your Honor, that I would like to use as trajectory rods for purposes of this demonstration. 09:48/ 09:48/ 09:48/

THE COURT: Yes. 09:48/

BY MR. NISENBAUM: 09:48/

Q. Are you able to use the dowels to show the Court what the actual approximate the trajectories? 09:48/ 09:48/

A. I can attempt to do that, yes. 09:48/

Q. Okay. 09:48/

THE WITNESS: Can I stand? 09:48/

THE COURT: Of course. 09:48/

A. The shot that entered just above and behind the left ear 09:48/

went from left to right, slightly downward and slightly forward, and a bullet was found in the right cheek. We actually had to go inside the mouth to recover the bullet just under that -- the cheekbone. The gunshot wound that entered the -- higher up on the left side of the head takes what appears to be almost a parallel path from left to right, slightly downward, and from back to front or forward. Entrance on the left side of the head four centimeters from the top of the head, and then the bullet lodged in what's called the right temporal scalp or under the scalp. The bullet passed through the skull on both sides but then lodged just under the skin on the right side of the scalp like this.

Q. Now, if I were to drop my head, what would that do to the trajectory path, if I drop my head downward?

A. Yes. If you drop your head downward, then the trajectory path would seem less sharply downward.

Q. Okay. Meaning it would artificially elevate it relative to standing straight up?

A. Yes. And whether the head's tilted to the left or the right or front or back can affect what I see at the time of the autopsy. What I'm describing is not the bullet in space, but the bullet path through the head. So I don't know if the head is tilted one way or the other, nodding or leaning backward.

Q. Thank you. Okay. I'm going to move to some of the photographs now. All right.

A.    Yes.
Q.    Okay.  What -- how do you know that?  What is your education in that area?
A.    That is a big part of forensic pathology education is determining what's called range of fire.  And in very general categories, it is contact range, close range, intermediate range or distant or I actually prefer the term indeterminate when it's -- when there's no evidence that it's intermediate or close range.
      And then within those categories, as we'll see here, there's near contact where the end of the gun is not quite touching the skin, but it's close.  And then intermediate range is -- and I'm not able to give precise numbers, but intermediate range is typically categorized as inches to feet. Maybe two to three feet at the farthest end and probably not three feet and inches at the closer end for intermediate range. And then once it gets beyond that, which is not in this case, it's called either indeterminate or distant range.
Q.    Okay.  To be clear, so there are two categories within the contact range?
A.    There's contact and then there's near contact.
Q.    Okay.
A.    And then beyond that would be what some people call close range.  And the way that we determine this is by looking not just at the bullet hole itself but the stuff around the bullet

hole. When a gun is fired, it's not just the bullet that exits the barrel. There's smoke. There's particles, which may be burnt or unburnt gunpowder. Small metal shavings sometimes. And that -- some of those things can get deposited on skin and leave characteristic marks. 09:59/ 09:59/ 09:59/ 09:59/ 09:59/

Q. Okay. And I'm showing you now -- I guess the photograph has popped up. 09:59/ 09:59/

MS. QUESADA: This is 8 through 12. 09:59/

MR. NISENBAUM: Okay. This is 8. Are all of them available now? 09:59/ 09:59/

MS. QUESADA: The x-rays are right now. 09:59/

MR. NISENBAUM: Okay. So let's go back to the x-rays because I have them up. 09:59/ 09:59/

BY MR. NISENBAUM: 09:59/

Q. So this is from Exhibit 4. This is page 8 of Exhibit 4. What is this document? 09:59/ 09:59/

A. This is an x-ray of the head, more or less from front to back, a little bit tilted to the side. But -- and this is actually a photograph of an x-ray on a computer screen. There's a big bright spot which is just glare on the computer screen. And the way x-rays work, the -- what we see on the left side is actually on his right side. The two bright spots on the right are the bullets. 09:59/ 09:59/ 10:00/ 10:00/ 10:00/ 10:00/ 10:00/

Q. Okay. And can you point -- are you able to point them out by tapping on the screen? 10:00/ 10:00/

A. Yes. And this is typical in medical examiner's offices to shave away the hair to better characterize the skin around the wound. 10:06/ 10:07/ 10:07/
Q. Okay. And did you do any analysis to determine how close the shot was -- the muzzle of the gun was to Mr. Slay's head? 10:07/ 10:07/
A. Yes, I did. I examined the skin around the wound looking for soot and searing and gunpowder particles. 10:07/ 10:07/
Q. Okay. And I'm going to show you -- let's do -- let's go to what's marked 78. I believe that is the 78th page of the autopsy photos. So while we're waiting, let me ask you another question. Were you able to form a determination of how close the gun -- the muzzle of the gun was to Mr. Slay -- to the gunshot entry wound for the -- for the gunshot you labeled number one above the ear? 10:07/ 10:07/ 10:07/ 10:08/ 10:08/ 10:08/ 10:08/
A. Yes. That is near contact. 10:08/
Q. Near contact. And remind me again, remind the Court. Near contact? 10:08/ 10:08/
A. Near contact means the muzzle is not in contact with the skin, but it's close. And the books say that would be maybe one to two centimeters at the most. Could have been closer than that. 10:08/ 10:08/ 10:08/ 10:08/
Q. One to two centimeters. So, a half an inch? 10:08/
A. Yes. 10:08/
Q. All right. So we're looking at 78. Looking at the gunshot entry wound, which you've identified as number 1, above 10:08/ 10:09/

Mr. Slay's left ear, can you circle -- well, first circle the area kind of in a broad way. 10:09
A. What area are you wanting me to circle? 10:09
Q. Of the gunshot wound, but leave room. Don't cover any of the soot or, you know. 10:09
A. (Witness complies.) 10:09
Q. Okay. Now, can you identify for the Court what the darkened area around the entry wound is? 10:09
A. In the darkened area, there is soot and searing from the heat of the -- of the flash of a gunshot, soot, searing and gunpowder grains. Although it's difficult to see individual gunpowder grains from this far away, there are gunpowder grains in that as well. 10:09
Q. And you know that because you saw them with your own eyes? 10:10
A. Yes. 10:10
Q. Okay. You obviously -- I'm not going to show those other photos, but you did more incisions to find that? 10:10
A. No. There were incisions to look at the skull and the brain, but -- 10:10
Q. Okay. 10:10
A. -- no additional evaluation is needed to determine that that's near contact range. It's very clear. 10:10
Q. Okay. That's obvious to anyone in your profession? 10:10
A. Yes. 10:10

Q. Okay. Anyone who said that it was from a couple feet away even, that would -- they would be wrong? 10:10
A. They're wrong, yes. It's near contact. 10:10
Q. So this is -- essentially, the gun was being held to his head, close to his head? 10:10
A. Close to the head, yes. 10:10
Q. Okay. All right. Now, looking at the -- at the other gunshot wound, the one that you've labeled number 2, the other area shave -- of shaved hair, we don't see any of that black mark, correct? 10:11
A. No. 10:11
Q. Okay. Now let me ask you this. Was -- does the presence of hair -- obviously, you would have hair above the -- between the muzzle of the gun and the entry ground. Does that affect whether or not you would have soot deposits or stippling or powder burns? 10:11
A. Yes. 10:11
Q. Okay. Can you explain how. 10:11
A. Well, particularly with -- stippling is gunpowder particles. The hair can catch those powder particles so that they don't make it to the skin. And, actually, in this case, I did see gunpowder particles in the hair and on the scalp. They're embedded in the skin of the scalp. And this one is an intermediate range gunshot wound. 10:11
Now, if the gun had been in contact or very close, there 10:12

would still be soot and searing. However, it does particularly impact the determination of what we call intermediate range where there's gunpowder stippling.

Q. Okay. How so?

A. The gunpowder can get caught up in the hair and not make it to the skin.

Q. Okay. So, are you able to estimate how far the end of the muzzle of the gun was from the entry wound of gunshot 2?

A. Yes. This is an intermediate range wound. Which I can't give a precise number, but intermediate range is typically described as inches to feet.

Q. Okay.

A. So it may be inches or it may be two feet to three feet. It depends on a lot of things that I don't know in this case: The type of load that was used, the length of the barrel, the type of powder, whether it's ball powder or flake powder. Ball powder travels farther, and so could leave marks on the skin from farther away than flake powder. And I just don't know those things. But I do know for sure that the categorization of range of fire would be intermediate range.

Q. Okay. All right. Now, I'm going to ask you -- and we can take that -- take that off, please. All right. Now I'm going to ask you -- does any of that, on its own, tell you what Mr. Slay's body positioning was at the time of the shooting?

A. No, it does not.

not the methamphetamine in Mr. Slay's system affected his conduct, correct? 10:17
A. I am not able to say exactly what his behavior would have been. 10:17
Q. Okay. And how old was Mr. Slay when he died? 10:17
A. Twenty-five years old. 10:17
Q. All right. And you prepared a death certificate? 10:17
A. I did. 10:17
Q. Okay. 10:17
MR. NISENBAUM: And we have that death certificate as an exhibit. It's already been admitted. It is. 10:17
MS. QUESADA: Plaintiff's Exhibit 2. 10:17
MR. NISENBAUM: Okay. And if you could pull that up, please. 10:17
MS. QUESADA: Yes. 10:17
BY MR. NISENBAUM: 10:17
Q. So looking at Exhibit 2, here you identify the cause of death, gunshot wounds of the head; the date of the death, November 2nd, 2020. Obviously, we have his birth date, December 12th, 1994. And if you could scroll down. It looks like you certified this on New Year's Eve, 2020. 10:18
A. Yes, that's correct. 10:18
Q. Okay. And why -- do you know why there was a delay? Were you waiting for the toxicology report? 10:18
A. At that time in my practice, I often did wait for the 10:18

MR. NISENBAUM: Right. And then it would be Jack Ryan, and then it will be Ms. Slay. 05:26PM 05:26PM

THE COURT: All right. And then the government had mentioned Craig Allen and CSI Thorn; is that right? 05:27PM 05:27PM

MR. NELSON: Yes, Your Honor. Then one other -- Detective Patton as well. 05:27PM 05:27PM

THE COURT: Okay. All right. Well, we'll play it by ear. I won't put time limits on you at this point, but we need to be more prepared and efficient with our questioning. 05:27PM 05:27PM 05:27PM

We will -- 05:27PM

MR. NISENBAUM: Okay. 05:27PM

THE COURT: -- be in recess, and I'll see you at 8:30. 05:27PM 05:27PM

MR. NISENBAUM: Thank you. 05:27PM

(Adjourned.)

* * * * *

REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

May 15, 2026

/s/ Darcie A. Cruz

DARCIE A. CRUZ, RDR
United States Court Reporter