**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | | |
|---|---|---|
| TINA RICHARDSON, individually and as successor-in-interest to Decedent Caleb Slay, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 6:23-cv-03337-RK |
| UNITED STATES OF AMERICA, *et al.*, | ) | |
| Defendants. | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The Court held a three-day bench trial in this case beginning on April 28, 2026.[1] Having considered the record,[2] the evidence presented at trial, and the parties' arguments and proposed findings of fact and conclusions of law, (Docs. 217, 218), the Court concludes that Plaintiff failed to meet her burden of establishing her wrongful death claim premised on battery under the Missouri wrongful death statute, § 537.080, RSMo, and the Federal Torts Claims Act ("FTCA"), and **ORDERS** that a judgment of **NOT LIABLE** is therefore entered in favor of Defendant United States of America.

**Background and Procedural Posture**

On October 31, 2023, Plaintiff Tina Richardson[3] filed a Complaint for damages against Defendants[4] for their involvement in the fatal shooting of Caleb Slay by Drug Enforcement Administration ("DEA") Agent Anthony Gasperoni. Plaintiff asserted nine counts, seeking damages for various constitutional violations under 42 U.S.C. § 1983 and *Bivens* (Counts 1-4), a

[1] "FTCA actions must be tried to a judge, not a jury." *Mader v. United States*, 654 F.3d 794, 797 n.1 (8th Cir. 2011) (citing 28 U.S.C. § 2402).

[2] This includes the parties' joint stipulated uncontroverted facts for use at trial. (Doc. 190.)

[3] Plaintiff filed this case as Tina Richardson. At trial, Plaintiff requested that the name of the case be amended to "Tina Slay." At this time, the Court declines to amend the case name, but recognizes that Plaintiff now goes by Tina Slay.

[4] Initially, Defendants included the United States of America; DEA Agent Anthony Gasperoni; DEA Agent John Stuart; the City of Springfield, Missouri; Springfield Police Department Sergeant C. Nuccio; and 40 "John Doe" Defendants from the DEA and Springfield Police Department. (Doc. 1.)

claim for wrongful death premised on battery pursuant to the Missouri wrongful death statute and the FTCA (Count 5), and four state-law claims for wrongful death, assault/battery, intentional infliction of emotional distress, and negligence (Counts 6-9). (*See generally id.*) Following the Court's motion to dismiss ruling entered on September 30, 2024, (*see* Doc. 65), and the Court's summary judgment ruling entered on December 1, 2025, (*see* Doc. 163), the sole-remaining claim for trial was Count 5—Plaintiff's claim for wrongful death premised on battery pursuant to the Missouri wrongful death statute and the FTCA.

**Findings of Fact**[5]

The following facts have been established by a preponderance of the evidence, and any conflicts in the evidence have been resolved consistently with these findings. To the extent these findings constitute legal conclusions they should be regarded as such.

The events giving rise to this case occurred in Springfield, Missouri, on November 20, 2020, when Caleb Slay encountered two federal agents with the DEA who were conducting surveillance and an investigation for potential drug activity in the area. Slay was 25 years old at the time and living in a house at 1827 S. Maryland Avenue, Springfield, Missouri 65807. He was approximately six feet tall and weighed 227 pounds. Slay's mother is Plaintiff Tina Richardson.

Agents Anthony Gasperoni and John Stuart are federal officers for the DEA who were assigned to the Springfield, Missouri, Resident Office to investigate federal drug crimes. Agents Stuart and Gasperoni were employed by the United States at all relevant times and were acting in the course and scope of their employment as Agents for the DEA.

Agent Stuart joined the DEA in February of 2012. Prior to being sworn as a Special Agent for the DEA, Agent Stuart was a police officer for approximately nine years at the Springfield Police Department. Agent Stuart has twenty-three total years in law enforcement, with twenty of those years dedicated to investigating drug-related crime. He has been a firearms instructor and a field training agent and has been involved in hundreds, if not thousands, of narcotics investigations throughout his career, including daily surveillance operations. Agent Stuart is 5'11" and weighs 160 pounds.

[5] Defendant's proposed findings of fact and conclusions of law were persuasive. Portions are adopted herein without further attribution.

Agent Anthony Gasperoni joined the DEA in June of 2019. When he became a DEA Agent, Agent Gasperoni went through field training and Agent Stuart served as his field training officer. Prior to being sworn as a Special Agent for the DEA, Agent Gasperoni was a police officer for the Maryland Heights Police Department for approximately six years. He was assigned to the Community Response Team, was a certified SWAT officer, went to the National Tactical Officers Association conference, and took the advanced tactical pistol course. In his career he has contacted thousands of suspects. Agent Gasperoni is 5'5" and weighs 160 pounds.

The agents did not carry body-worn cameras or audio cameras and their vehicles were not equipped with in-car camera or audio recording systems either.

**I. Initial Surveillance by DEA Agents**

On November 2, 2020, Agent Stuart and Agent Gasperoni conducted surveillance in Springfield, Missouri, in what they considered to be a well-known high crime and drug area near a local Walmart. While in the Walmart parking lot, Agent Stuart noticed a red Pontiac parked in a grassy, non-parking area across the street at the apartment complex at 410 W. Normal Street. Agent Stuart initiated an investigation. Agent Stuart observed an individual come out of Apartment No. 3, kneel next to the Pontiac driver's window, have a quick conversation, and exchange an item hand-to-hand with the Pontiac driver. Based on this observation, Agent Stuart decided to investigate what he had observed as a potential drug crime. The agents initially followed the Pontiac when it left the apartment complex but did not make contact with the Pontiac's driver and instead returned to the apartment to continue conducting surveillance.

During this subsequent surveillance, the agents observed a U-Haul pickup truck ("rented pickup") arrive at the apartment complex. Agent Stuart testified that this was suspicious because rental cars are often used by people involved in drug crimes to hide their identity. The agents did recognize the driver of the rented pickup, later found to be Casey Ray. The agents observed Ray get out of the rented pickup, knock on the door to Apartment No. 3, and, after nobody answered his knock, return to the rented pickup. Ray went back to Apartment No. 3 and went inside for ten to fifteen minutes. The agents observed Ray came back out of Apartment No. 3, get into the rented pickup, go back to the apartment door (but not inside) for a short time, and then drive away in the rented pickup. Based on these observations and Agent Stuart's earlier observation concerning the red Pontiac (in which an individual from Apartment No. 3 had met the driver of the red Pontiac

and engaged in a quick hand-to-hand transaction), Agent Stuart believed that Ray was involved in a drug deal and decided to follow him.

## II. 1827 S. Maryland Avenue

Agent Stuart and Agent Gasperoni, in separate vehicles, followed Ray in the rented pickup to a house located at 1827 S. Maryland Avenue, Springfield, Missouri 65807. Ray pulled over on the west side of the street in front of the house and was facing south. Agent Stuart arrived at the house before Agent Gasperoni, and he parked his vehicle behind the rented pickup, also facing south. Agent Gasperoni had not yet arrived at the house.

Agent Stuart, wearing a vest that said "POLICE," decided to make contact with Ray and approached the rented pickup. As he was doing so, Agent Stuart observed Ray reaching down towards the floorboard of the rented pickup. Believing that Ray could have been retrieving a weapon or hiding contraband, Agent Stuart opened the driver's door of the rented pickup to see inside the vehicle, asked Ray to put his hands on the steering wheel, and asked Ray where he was coming from. Ray responded that he was coming from the Walmart. Based on the conversation, Agent Stuart found Ray to be evasive. Coupled with the prior behavior observed at Apartment No. 3, Ray's use of the rented pickup and his repeated contacts with the apartment, as well as Ray reaching toward the floorboard as Agent Stuart had approached him, Agent Stuart believed Ray was involved in a drug crime.

During the conversation, Agent Stuart also asked Ray what he was doing at the house. Ray told Agent Stuart that he was there to see some people. Ray nodded in the direction of another vehicle, a green Ford Focus parked nose to nose with the rented pickup, facing north, with enough room to walk in between the two vehicles. There were two people in the green Ford Focus. Until Ray nodded at the vehicle, Agent Stuart had not noticed either the other car or the people inside it. Edward Boerste was sitting in the driver's seat of the green Ford Focus, while Caleb Slay was sitting in the front passenger seat. Based on his observations, training, and experience, Agent Stuart believed that Ray, Boerste, and Slay were involved in a drug transaction and that he had stepped into a drug deal.

While Agent Stuart and Ray were still talking, Slay got out of the green Ford Focus. Agent Stuart saw Slay stand up and exit the passenger's seat of that car, and observed that Slay seemed to stare "intently" and appeared focused on what Agent Stuart was doing. It seemed like Slay might interject himself into Agent Stuart's interaction with Ray. Agent Stuart instructed Slay to

sit back in the car more than once, having some concern with Slay's behavior. Slay did not get back in the car as instructed.

After Agent Stuart had initially contacted Ray, Agent Gasperoni had arrived on the scene, approaching from the south. After parking, Agent Gasperoni exited his vehicle. Agent Stuart advised Agent Gasperoni that Slay was "not acting right." At that point, Slay was in the yard walking toward the house. As Agent Gasperoni approached, Slay continued to walk towards the house; Agent Gasperoni asked Slay to come back. Slay told Agent Gasperoni that he (Slay) was "going to my fucking house." Agent Gasperoni perceived that Slay was at a "heightened level" because people normally do not start an interaction with an aggressive amped-up or hostile tone with cursing. Agent Gasperoni believed that Slay was involved in drug activity based on the circumstances, and he knew that individuals involved in drug activity can be dangerous to law enforcement officers.

After Agent Gasperoni asked Slay to come back, Slay walked back to Agent Gasperoni and stated "that's unprofessional" as to some unspecified conduct, though around that same time, Agent Gasperoni was putting on his police vest. Agent Gasperoni and Slay began talking. While Agent Gasperoni was talking with Slay, Agent Gasperoni observed Slay's right hand go toward his right rear waistband area. Agent Gasperoni asked Slay not to reach toward his waistband in case he (Slay) had a firearm on him. Slay complied by putting his hands back in front of his body. Slay told Agent Gasperoni that he was armed.

## III. Physical Altercation with Caleb Slay

At this point, Agent Gasperoni and Slay were standing face to face. Agent Stuart was patting down Ray. As Agent Gasperoni grabbed both of Slay's arms, Slay tensed up. Agent Stuart heard Agent Gasperoni call his name twice and saw Agent Gasperoni standing and holding both of Slay's arms, in a manner which Agent Stuart found "unusual." Agent Gasperoni told Agent Stuart that Slay had a gun. Agent Stuart moved Ray away from the driver's door of the rented pickup and had Ray sit down in the front yard near the northern most tree (of two trees in the house's yard), and went over to Agent Gasperoni.

Slay pulled his arm away as Agent Stuart attempted to help detain him, grabbing for one of Slay's arms. Slay and Agent Stuart started fighting for control. Slay continued to resist. Ray observed Slay "backing up" and saying, "Why are you grabbing me?" Both agents grabbed Slay's arms; Slay told them to "Get off of me. Get off of me." In an attempt to retain control, Agent

Stuart tried to use Slay's momentum to pull him to the ground, but Slay resisted that momentum and pushed against Agent Stuart, causing the agent to fall to the ground on his back.

During the ensuing physical altercation, the parties' body positions did not remain stagnant, but were generally oriented as follows: Slay was in his yard facing east out toward the street. Agent Stuart was on his back on the ground under Slay, his head was closer to the street, and his feet were closer to the house. Agent Gasperoni was standing just in front of Slay, slightly to Slay's left (in other words, slightly to the north of Slay and Agent Stuart). Boerste was standing at the driver's side door of the green Ford Focus, six to seven feet away from Slay and the agents. Ray was sitting a couple steps from the northern most tree in the yard.

All the witnesses agree that the physical altercation happened quickly. Slay fought with Agent Stuart in a wrestling-like manner with the agent on the ground. Slay continued to resist and pushed up with his hands either off the ground or off Agent Stuart's chest. Agent Gasperoni observed Slay reach toward his right rear waistband area a second time, the first being while they were previously conversing. Boerste testified that "at that point he [i.e., Agent Gasperoni] removed his firearm from his holster" and "both hands were on his gun." Ray testified that he heard Agent "Stuart"[6] warn Slay to "stop resisting or I'm going to fucking shoot you." Slay broke free and began to stand, creating space between himself and Agent Stuart, who was still on his back on the ground. Slay was leaning over Agent Stuart, bent over at the waist, so that his torso was leaning over Agent Stuart's torso. Agent Gasperoni still had his sidearm drawn and was aiming at Slay.

Agent Gasperoni testified that he is trained to look at a person's hands and is always watching where people's hands are during interactions. At this point of the altercation, Slay again reached his right hand toward his right rear waistband. Agent Gasperoni described this reach as a "shooter's draw" and testified that Slay was reaching toward the right rear waistband area in an actual drawing motion. Agent Stuart described the reach as a quick gesture to Slay's waistband at which point his hand paused, indicating to Agent Stuart that Slay was trying to establish a grip on the gun. Agent Gasperoni fired three rounds, striking Slay in the head with two rounds. Agent Stuart did not fire his sidearm but testified that he would have if he had had the opportunity to draw his own weapon. After Slay fell to the ground, the agents observed a gun in Slay's waistband.

[6] As noted below, Ray affirmatively identifies Agent Stuart (not Agent Gasperoni) as the agent that both warned Slay that he was going to shoot and as the agent that actually shot Slay.

Agent Stuart recovered an olive-green colored Springfield XD 9 mm semi-automatic handgun from inside Slay's waistband on his right hip toward the rear. Slay died at the scene.

## IV. Post-Shooting Investigation

Immediately after the shooting, the Springfield Police Department responded to the scene and began to interview the witnesses. Medical Examiner, Dr. Deiter Duff, examined the remains of Caleb Slay the next day, on November 3, 2020, and issued an autopsy report. Dr. Duff noted two gunshot wounds on the left side of Slay's head with one entry wound just above and behind the left ear and a second entry wound closer to the top of the head. His autopsy report findings state that the direction of both gunshots was "rightward, downward and forward." One bullet entered Slay's left temporal scalp, behind the upper portion of the left ear, and left "a small amount of soot" indicating this was a "near-contact range" gunshot wound. "Near-contact range" means that the muzzle of the gun was not touching Slay's head but that it was likely within a half-inch of it. A second bullet entered Slay's left parietal scalp, near the top of his head. Dr. Duff determined it was shot from an "intermediate range," which Dr. Duff described as "inches to feet" away from the target. The order in which the gunshots were fired is undetermined.

Dr. Duff could only offer testimony about the direction of the bullet through the body anatomically. He could not offer any opinion about the external geographical positioning of the bodies of the shooter and the decedent at the time of the shooting. He explained that this is because a person's body can move and contort, and the head can turn and lean. Dr. Duff concluded that Slay's death was caused by the gunshot wounds to the head, and that Slay died from the gunshot wounds to his head quickly. Slay likely would have been unconscious immediately and was very unlikely to have felt any pain.

## V. Witness Testimony and Credibility Determinations

The foregoing facts are those which the Court finds are established by a preponderance of the evidence, and which it relies on in the conclusions of law below. The Court here addresses additional conflicting witness testimony and necessary credibility determinations underlying the foregoing facts.

A central factual dispute raised by the evidence presented at trial in this case is whether Slay reached for the gun in his right rear waistband just prior to Agent Gasperoni shooting him. The Court finds that Slay did reach toward his right rear waistband just prior to the shooting. As discussed above, the agents both testified that they observed Slay reach for his right rear waistband.

The agents were trained to look at people's hands and to have an awareness of where people's hands are during interactions. The agents' testimony as to the nature of the reach, including that he was reaching toward his right rear waistband, is corroborated by the fact that this is where the gun was located tucked in Slay's waistband. Moreover, the agents had the best vantage point to observe Slay's hand reaching toward his waistband. Agent Stuart was directly below Slay, while Agent Gasperoni was just in front of Slay, slightly to his left.

While Agent Gasperoni was unable to recall certain details of the incident, such as the precise positioning of Slay at the time of the shooting, his testimony detailing his observation of the reach for the gun was confident, his demeanor was open and forthcoming, and his account is further supported by his law enforcement training which included being trained to observe people's hands during interactions. Moreover, the Court is not persuaded by Plaintiff's argument that Dr. Duff's testimony regarding the proximity of the gun to Slay's head when shot and the trajectory of the bullets requires discrediting Agent Gasperoni's testimony. Agent Gasperoni testified that he was several feet away when he shot Slay; Dr. Duff testified that one shot was within an inch, but that the other at intermediate range could have been inches to feet away. As to the trajectory of the bullets, particularly with relation to Slay's body position, Dr. Duff clearly testified that he could not opine as to the positioning of the shooter or Slay's body. Therefore, his testimony is consistent with the agents' version of events.[7] The Court finds credible the agents' corroborating testimony that Slay reached for his right rear waistband before Agent Gasperoni shot him.

Four non-Agent eyewitnesses testified that they did not ever see Slay reach in the direction of his right rear waistband. However, the Court finds their testimony less credible and/or less reliable than the agents' testimony for a variety of reasons.

Casey Ray, the driver of the rented pickup, testified that he was able to see Slay's actions during the entire encounter with the agents, (Ray depo. at 95:12-22), and that he never saw Slay reach for his gun, (*id.* at 111:17-21). However, the Court finds Ray's testimony unreliable because

[7] Plaintiff particularly argues that Agent Stuart testified that Slay was "leaning forward slightly" at the time he was shot, but that Slay would have to have been significantly leaning forward to be in a position consistent with the bullet trajectories Dr. Duff found. However, at trial Agent Stuart stated that Slay was bent over at the waist over him, not merely leaning forward slightly. Regardless, because Dr. Duff could not opine on Slay's body position at the time of the shooting, the Court is not persuaded by Plaintiff's argument.

he observed the interaction from a further vantage point and his testimony is inconsistent with other testimony and evidence in this case which the Court finds more credible. During the physical altercation, Ray was sitting a few feet away from the north tree in the yard, further from Slay than both agents. Thus, his view of the event was from a further distance. Agent Gasperoni was also between Ray and Slay. Ray's account of certain aspects of the incident is inconsistent with other evidence in the record that the parties agree on. Most significantly, Ray testified that neither agent was ever on the ground, and he was adamant that Agent Stuart (who he had been directly dealing with) shot Slay and that Agent Stuart was the only one with his gun out during the interaction. (*Id.* at 47:14-16; 67:21-24; 68:19-22.) Agent Stuart, however, was on the ground during the physical altercation with Slay and did not draw his weapon, but instead Agent Gasperoni was the agent who shot Slay.[8]

Edward Boerste, the person sitting in the green Ford Focus with Slay when the agents arrived, testified that Slay's hands never left the Agent who was on the ground, (Boerste depo. at 29:8-10), and that he did not see Slay touch his gun during the interaction, (*id.* at 44:4-7). As with Ray, the Court finds Boerste's testimony unreliable because he observed the interaction from a further vantage point and his testimony is inconsistent with other testimony and evidence in this case which the Court finds more credible. During the physical altercation, Boerste was standing by the green Ford Focus, further from Slay than the agents. Boerste's account of certain aspects of the incident is inconsistent with other evidence in the record, including facts agreed upon by the parties. Most significantly, Boerste testified that Slay carried his gun on his belt in a holster and that the gun was clearly visible that day, (*id.* at 14:1-8; 23:12-15), though the evidence shows Slay's gun was tucked in his waistband and not visible prior to the shooting. Additionally, Boerste testified that he only heard one shot, (*id.* at 32:5-6), though the parties have stipulated that Agent Gasperoni shot his gun three times.[9]

[8] Moreover, Ray and Slay were friends, and Ray testified that on November 2, 2020, they were planning to meet at Slay's house to chill and get high for a little bit, and that it was understood they were going to get high on meth. (*Id.* at 21:1-17.) Ray also has a criminal history including felony drug convictions. (Def. Ex. 565.)

[9] Moreover, Boerste and Slay were friends. Boerste testified that he was doing meth at the time, had "probably" used meth within a few days of the incident, and was probably going to get high that day. (*Id.* at 35:24-36:21.) Boerste also has a criminal history including a felony for unlawful use of a weapon. (Def. Ex. 565.)

There were two additional non-Agent eyewitnesses to the shooting who testified that Slay did not reach for his gun. However, the Court finds that their testimony is unreliable due to their further vantage point of the altercation and testimony inconsistent with other evidence in the record. Shawn Tetlow and his fiancé Bailey Wade lived across the street from Slay, where they had resided with their infant for approximately six months prior to November 2, 2020. Tetlow and Wade had brief neighborly interactions with Slay but did not know him well. On the day of the incident, both Wade and Tetlow were home. Their front house window was open but there was a screen on the window. From their front window to the edge of Slay's yard was approximately 50 feet.

At some point in the afternoon, Tetlow told Wade to look outside because there were people across the street. As Wade began to watch, she observed Slay put his arms out in front of him, not fully extended. She could not hear anything being said but could tell Slay and the Agent were talking. (Doc. 213 at 323.) Likewise, Tetlow could hear they were talking but could not make out the words of what they were saying. (*Id.* at 365, 368.)

Wade described "Officer One" as the officer Slay was originally speaking with (Agent Gasperoni) and that "Officer Two" came from the other side of the vehicle, from her right (Agent Stuart). (*Id.* at 340-41.) Wade saw Officer One (Agent Gasperoni) holding something black against Slay's neck but could not tell if it was a taser or a gun. She heard three pops and saw red. (*Id.* at 329, 338.) Wade testified that Officer Two (Agent Stuart) fired the shots, (*id.* at 330), and that Slay fell onto Officer One (Agent Gasperoni), (*id.* at 341). Thus, while Wade did not see Slay reach for his gun, Wade misidentified the shooting Agent as Agent Stuart and admitted to being unable to see certain details from her vantage point such as whether the Agent held a taser or gun.

Tetlow described the struggle on the ground as a "wrestling, wrangling kind of tango." (*Id.* at 361.) He observed pushing and pulling like "one's trying to take the other to the ground. And the other, being Caleb [Slay], does not want to go to the ground." (*Id.* at 368, 373.) Tetlow saw the standing agent take a taser from his holster and saw Slay shaking as if he was being tased. (*Id.* at 369, 372.) Thus, Tetlow observed the use of a taser. However, neither Agent was authorized to carry a taser and did not deploy a taser during their attempt to detain Slay. Tetlow denied that he ever saw Slay reach for his waistband during the encounter, but he qualified his statement by noting that "[i]f [Slay] had made a swipe past or something," then he "[couldn't] really say" whether he would have seen Slay reach for his waistband. (*Id.* at 375.)

Though the Court generally found Wade and Tetlow to be sincere and forthcoming witnesses, indicating a degree of credibility, the Court concludes that their testimony is *unreliable* because of their less-than-ideal vantage point of the altercation. Both were about 50 feet away from the shooting and observed it through a screen in a window. The effect of this further vantage point on the accuracy of their observations is emphasized by clear factual inaccuracies in their testimony.[10]

Accordingly, and consistent with the Court's findings of fact above, the Court concludes that the testimony of the agents regarding whether Slay reached for his right rear waistband is credible and reliable, while the testimony of the four non-Agent eyewitnesses to the contrary is unreliable.

## Conclusions of Law[11]

This Court has jurisdiction pursuant to the FTCA, 28 U.S.C. §§ 1346, 2671, *et seq.*, over Plaintiff's sole remaining claim for wrongful death premised on battery under the Missouri wrongful death statute, § 537.080 RSMo, and the FTCA. Venue is proper in this district pursuant to 28 U.S.C. § 1402. The FTCA provides a limited waiver of sovereign immunity for certain "negligent or wrongful acts by federal employees committed while acting within the scope of their employment." *Washington v. Drug Enforcement Admin.*, 183 F.3d 868, 873 (8th Cir. 1999) (citing 28 U.S.C. § 1346(b)). Within this waiver of sovereign immunity, the United States may only be held liable "to the same extent that a private person under like circumstances would be liable to the claimant in accordance with the law of the place where the wrongful conduct took place." *Id.* "The 'law of the place' refers to the substantive law of the state where the wrongful conduct took place." *Id.* In this case, the misconduct complained of occurred in Springfield, Missouri. Therefore, Missouri law applies.

To prevail on a battery claim against a law enforcement officer in Missouri, a plaintiff bears the burden to prove by a preponderance of the evidence that the officer "use[d] more force than is

[10] The Court has highlighted the most significant factual inaccuracies herein. Additional inaccuracies can also be attributed to these witnesses. For example, Wade and Tetlow testified that before the shooting they did not see anyone else in the yard except for Slay and the two agents, though Ray and Boerste were also in the yard. (Doc. 213 at 337:6-8; 381:11-17.)

[11] To the extent the Court's discussion of the conclusions of law includes any additional factual findings, these factual findings have also been found by a preponderance of evidence.

reasonably necessary." *Wright v. United States*, 892 F.3d 963, 968 (8th Cir. 2018) (quoting *Neal v. Helbling*, 726 S.W.2d 483, 487 (Mo. Ct. App. 1987) (emphasis omitted)); *see also* MAI 23.02, committee comment H ("If defendant is a public official possessing legal right to touch plaintiff, plaintiff must modify MAI 23.02 to accept burden of proving defendant used more force than was reasonably necessary."). This is the same "objective reasonableness" standard applicable to an excessive force claim brought pursuant to the Fourth Amendment. *See Wright*, 892 F.3d at 968 (recognizing that Missouri courts "essentially engage in a [Fourth Amendment] reasonableness analysis" when analyzing a battery claim against a law enforcement officer); *see also Smith v. Kilgore*, 926 F.3d 479, 486 (8th Cir. 2019) (using objective reasonableness standard in Fourth Amendment excessive force context to analyze state-law assault, battery, and wrongful death claims). Accordingly, the Court finds persuasive to its analysis caselaw applying the Fourth Amendment reasonableness standard.

"The reasonableness of a use of force turns on whether the officer's actions were objectively reasonable in light of the facts and circumstances confronting him, without regard to his subjective intent or motivation." *Loch v. City of Litchfield*, 689 F.3d 961, 965 (8th Cir. 2012). "The issue is whether the totality of the circumstances—including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether the suspect is actively fleeing or resisting arrest—justifies a particular sort of seizure." *Liggins v. Cohen*, 971 F.3d 798, 800 (8th Cir. 2020) (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985) and *Loch*, 689 F.3d at 965). "[R]easonableness must be viewed 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Green v. City of St. Louis*, 134 F.4th 516, 523 (8th Cir. 2025) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Moreover, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97; *see also Morgan-Tyra v. City of St. Louis*, 89 F.4th 1082, 1085 (8th Cir. 2024) (quoting *Graham*).

Specifically, and relevant in this case, "[t]he use of *deadly force* is reasonable where an officer has 'probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'" *Liggins*, 971 F.3d at 800 (quoting *Garner*, 471 U.S. at 11) (emphasis added); *see also Morgan-Tyra*, 89 F.4th at 1085 ("As fact-intensive as excessive-force

cases usually are, the Supreme Court has provided a straightforward rule in situations like this one: officers may use deadly force when there is 'probable cause to believe that [a] suspect poses a threat of serious physical harm, either to the officers or to others.'" (quoting *Garner*) (emphasis omitted)). "If feasible, an officer should give a warning before using deadly force." *Id.*

"[I]n evaluating the reasonableness of an officer's use of deadly force, the court must consider the totality of the circumstances, including the location and danger of the weapon." *Maser v. City of Coralville*, 139 F.4th 1004, 1009 (8th Cir. 2025). "Where the weapon was, what type of weapon it was, and what was happening with the weapon are all inquiries crucial to the reasonableness determination." *Id.* (quoting *Partridge v. City of Benton*, 929 F.3d 562, 566-67 (8th Cir. 2019)). Further, "[a]n officer is not constitutionally required to wait until he set eyes upon the weapon before employing deadly force to protect himself" or others. *Thompson v. Hubbard*, 257 F.3d 896, 899 (8th Cir. 2001).

Thus, the Court considers the totality of the circumstances based on Agent Gasperoni's knowledge and observations at the time he shot Slay. At the time of the altercation, Agent Gasperoni and Agent Stuart were engaged in an active drug investigation, which began at the apartment complex across the street from Walmart and which (through Ray) led them to Slay's house. The agents believed, based on their training and experience, that Slay, Ray, and Boerste were engaged in a drug deal. Agent Gasperoni knew that individuals involved in drug activity can be dangerous to law enforcement officers. Slay had been non-compliant with earlier verbal directives to return to his car, and Agent Stuart told Agent Gasperoni that Slay was "not acting right." When Agent Gasperoni asked Slay to come back when he was walking across the yard, Slay responded "I'm going to my fucking house," which to Agent Gasperoni indicated that Slay was at a "heightened level" and hostile toward the agents. After reaching toward his waistband, prompting Agent Gasperoni to ask him not to do so, Slay told Agent Gasperoni that he was armed.

Finally, Agent Gasperoni observed Slay physically resisting and actively wrestling with Agent Stuart on the ground. Agent Gasperoni then observed that space had been created between Slay and Agent Stuart,[12] and Agent Gasperoni saw Slay reach back toward his hip for a third time, this time in a "shooter's draw" action, that is, a "move[] as though to draw a gun." *Thompson*, 257 F.3d at 899. This final reach by Slay for his right rear waistband, in combination with Agent

[12] Agent Gasperoni did not recall how that space was created. (Doc. 212 at 182:16-21.)

Gasperoni's other contemporary knowledge and awareness, would have caused a reasonable officer to believe that Slay posed an imminent threat of serious harm to the agents or others. *Id.* (finding deadly force reasonable when officer encountered "a fleeing suspect who turn[ed] and move[d] as though to draw a gun"); *Loch*, 689 F.3d at 964, 967 (holding shooting reasonable where decedent's hand moved toward his side and officer had reason to believe decedent was armed); *see also Maser*, 139 F.4th at 1010 (where Maser took a "menacing action" by raising his rifle, but not pointing it at anyone, deadly force was reasonable). Accordingly, the Court concludes that Agent Gasperoni's use of deadly force was objectively reasonable under the totality of the circumstances.

Moreover, there was a warning to Slay prior to the use of deadly force. The testimony of Casey Ray is that Agent "Stuart" warned Slay that if he did not stop resisting, Slay would be shot. Based on Ray's confusion of the two officers discussed above, it appears more likely than not that this warning was issued by Agent Gasperoni rather than Agent Stuart. Regardless, even if there had not been a warning—which the Court finds there was—the Court would excuse the lack of warning because of the surrounding circumstances, speed at which the physical altercation took place, and because "a failure to warn does not automatically render the use of deadly force unreasonable." *Maser*, 139 F.4th at 1010 (citing *Cole v. Hutchins*, 959 F.3d 1127, 1133 (8th Cir. 2020)) (finding failure to warn not feasible because Maser raised his rifle in a matter of seconds); *see also Cole*, 959 at 1133 (noting the failure to warn, *even where feasible*, does not automatically render use of deadly force unreasonable). Here, as the physical interaction quickly escalated and developed, Agent Gasperoni saw Slay make a quick "shooter's draw" motion as if to grab his gun (which he had told Agent Gasperoni he had), rendering a warning less feasible.

For all the reasons explained above, the Court finds that Slay reached for the gun on his hip while fighting with the agents and that Agent Gasperoni had probable cause to believe that Slay posed a threat of serious physical harm to the agents and others. Agent Gasperoni's use of deadly force was, therefore, reasonable and there is no liability for wrongful death under Missouri state law on a battery theory.

## Conclusion

Accordingly, after careful consideration and review, and based on these findings of fact and conclusions of law, the Court **ORDERS** that a judgment of **NOT LIABLE** is entered in favor of Defendant United States of America on Count 5 of the Complaint for wrongful death premised on battery under the Missouri wrongful death statute and the FTCA. Having found Defendant not liable, the Court does not address the issue of damages.

**IT IS SO ORDERED**.

s/ Roseann A. Ketchmark
ROSEANN A. KETCHMARK, JUDGE
UNITED STATES DISTRICT COURT

DATED: September 10, 2026